```
 1                 BEFORE THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2


 3     UNITED STATES OF AMERICA,        .
                                        .  Case Number 21-cr-57
 4              Plaintiff,              .
                                        .
 5          vs.                         .
                                        .  Washington, D.C.
 6     NICHOLAS RODEAN,                 .  July 11, 2022
                                        .  9:30 a.m.
 7              Defendant.              .
       - - - - - - - - - - - - - - - - -

 8


 9               TRANSCRIPT OF BENCH TRIAL, VOLUME I
                  BEFORE THE HONORABLE TREVOR N. McFADDEN
10                     UNITED STATES DISTRICT JUDGE

11     APPEARANCES:

12     For the United States:      CINDY CHO, ESQ.
                                   United States Attorney's Office
13                                 10 West Market Street
                                   Suite 2100
14                                 Indianapolis, Indiana 46204

15                                 MELANIE ALSWORTH, ESQ.
                                   United States Department of Justice
16                                 145 N Street Northeast
                                   Washington, D.C. 20530

17

18     For the Defendant:         CHARLES BURNHAM, ESQ.
                                   Burnham & Gorokhov PLLC
19                                 1424 K Street Northwest
                                   Suite 500
20                                 Washington, D.C. 20005

21     Official Court Reporter:   SARA A. WICK, RPR, CRR
                                   United States District Court
22                                   for the District of Columbia
                                   333 Constitution Avenue Northwest
23                                 Room 4704-B
                                   Washington, D.C. 20001
24                                 202-354-3284

25     Proceedings recorded by stenotype shorthand.
       Transcript produced by computer-aided transcription.
```

C O N T E N T S

TESTIMONY

THOMAS LOYD                Direct Examination..............   4
                          Cross-Examination...............  38
                          Redirect Examination...........  50

BRIAN MORGAN              Direct Examination..............  52
                          Cross-Examination...............  69

JASON McINTYRE            Direct Examination..............  78
                          Cross-Examination............... 112

LAWRENCE PETTIT           Direct Examination.............. 115
                          Cross-Examination............... 121
                          Redirect Examination........... 124

EXHIBITS RECEIVED

Government 3, 4, 6, 11A through 11I, 26, 29...........   7
Government 5, 9, 11, 14, 15, 16, 18, 23, 24, 27, 28, 30   7
Government 1........................................   9
Government 19 and 20................................  12
Government 22.......................................  12
Government 7, 10, and 13............................  19
Government 7A, 10A, and 13A.........................  19
Government 7, 25, and 33............................  20
Government 37.......................................  87


Government Closing Argument......................... 144
Defense Closing Argument............................ 151
Government Rebuttal Closing Argument................ 163

```
1                          P R O C E E D I N G S
2              (Call to order of the court.)
3                  COURTROOM DEPUTY:  This is Criminal Case 21-57, United
4      States of America versus Nicholas Rodean.
5              Counsel, please come forward to identify yourselves for the
6      record, starting with the government.
7                  MS. CHO:  Your Honor, Cindy Cho and Melanie Alsworth
8      for the United States, together with our case agent, FBI Special
9      Agent Doug Eadie, and our paralegal, Marcus Bennett.
10                 THE COURT:  Good morning, folks.
11                 MR. BURNHAM:  Good morning, Your Honor.  Charles
12     Burnham for Nicholas Rodean.
13                 THE COURT:  Good morning, Mr. Burnham.  Good morning,
14     Mr. Rodean.
15             Ms. Cho, is the government prepared for trial?
16                 MS. CHO:  We are, Your Honor.  We do not have an
17     opening statement prepared.  We did file a trial brief in this
18     matter, and we would submit that as our opening statement.
19                 THE COURT:  Thank you.  I have read your trial brief.
20             Mr. Burnham, is the defense ready for trial?
21                 MR. BURNHAM:  Yes, Your Honor, we are ready for trial.
22     We will reserve opening statement.
23                 THE COURT:  Ms. Cho, you may call your first witness.
24                 MS. CHO:  Thank you, Your Honor.  The government calls
25     U.S. Capitol Police Inspector Thomas Loyd.
```

|    |    |
|----|----|
| 1  | THOMAS LOYD, WITNESS FOR THE GOVERNMENT, SWORN |
| 2  | DIRECT EXAMINATION |
| 3  | BY MS. CHO: |
| 4  | Q.   Good morning, Inspector Loyd. |
| 5  | A.   Good morning. |
| 6  | Q.   I know that you've testified in this courtroom before, but |
| 7  | for purposes of the record, we're going to go through some of |
| 8  | the same questions that you've answered previously in another |
| 9  | trial.  So if you will bear with us in the beginning as an |
| 10 | introduction. |
| 11 | What do you do for a living? |
| 12 | A.   I'm a U.S. Capitol police officer. |
| 13 | Q.   How long have you been with the Capitol Police? |
| 14 | A.   32 years. |
| 15 | Q.   What generally are your responsibilities? |
| 16 | A.   Currently, I'm responsible for the safety and security of |
| 17 | the U.S. Capitol building, of the Capitol Visitor Center, and |
| 18 | the Capitol Square. |
| 19 | Q.   Are you one of the more senior officers with the Capitol |
| 20 | Police? |
| 21 | A.   Yes. |
| 22 | Q.   Were you on duty on January 6, 2021? |
| 23 | A.   Yes. |
| 24 | Q.   What time did you arrive at the building that day? |
| 25 | A.   Approximately 7:30. |

1  Q.   Okay.  Before we get into the events of January 6, let's

2  introduce some exhibits into trial.  Are you generally familiar

3  with the Capitol's CCTV system?

4  A.   Yes.

5  Q.   How is that?

6  A.   Just through security protocols and administrative

7  investigations.

8  Q.   So as a part of that, do you have a general knowledge of

9  where cameras are located in and outside of the building?

10 A.   Yes.

11 Q.   And the footage itself, does it include time and date

12 stamps?

13 A.   Yes.

14 Q.   Does it include audio and video?

15 A.   No, just video.

16 Q.   Okay.  In preparation for your testimony here today, did

17 you review certain footage captured by the Capitol surveillance

18 cameras?

19 A.   Yes.

20 Q.   And based on your presence at the Capitol on January 6 and

21 your knowledge of that system, does that footage -- did that

22 footage fairly and accurately depict events that took place at

23 the Capitol on January 6?

24 A.   Yes.

25            MS. CHO:  Your Honor, the parties have reached a

1    stipulation, and it's Government's Exhibit Number 39.  And I

2    believe I will need to hand-file this because we did not include

3    it in our exhibit binder.  We just got it signed this morning.

4    I can put it on the ELMO, if the Court would prefer, or --

5              THE COURT:  Either way.  If you want to read from it,

6    that's fine.  Otherwise, you can just pass it up.

7              MS. CHO:  The stipulation of the parties, in summary,

8    is that the Capitol Police operate and maintain closed circuit

9    video monitoring and recording equipment that captures locations

10   inside and outside of the U.S. Capitol building and on the

11   grounds.  In short, the video footage contained in Government's

12   Exhibit 5, 9, 11, 14 through 16, 18, 23 through 24, 27, 28, and

13   30 are authentic in that they are what they purport to be.

14     In addition, screenshots and close-up screenshots from this

15   same video footage are fair and accurate depictions of the

16   events at the Capitol on January 6, 2021, and were not altered

17   or edited, aside from being zoomed in, in any way.

18     Therefore, Government's Exhibits 3, 4, 6, 11A through 11I,

19   26, and 29 are authentic in that they are what they purport to

20   be.

21              THE COURT:  Great.

22              MS. CHO:  And I will now --

23              THE COURT:  Are you seeking to move all of those in at

24   this time, ma'am?

25              MS. CHO:  I am about to, yes, Your Honor.

1        THE COURT:  Okay.

2        MS. CHO:  So now the government moves to admit all of

3   those exhibits into evidence.

4        MR. BURNHAM:  No objection.

5        THE COURT:  All right.  Without objection, Exhibits 3,

6   4, 6, 11A through 11I, 26, and 29 will be admitted.

7        (Government Exhibits 3, 4, 6, 11A through 11I, 26, and 29

8   received into evidence.)

9        MS. CHO:  In addition, Your Honor, the exhibits before

10  that, the video footage, were 5, 9, 11, 14 through 16, 18, 23

11  through 24, 27, 28, and 30.  And we would move for those

12  exhibits to be admitted as well.

13       MR. BURNHAM:  No objection.

14       THE COURT:  Without objection, 5, 9, 11, 14, 15, 16,

15  18, 23, 24, 27, 28, and 30 will be admitted.

16       MS. CHO:  Thank you, Your Honor.

17       (Government Exhibits 5, 9, 11, 14, 15, 16, 18, 23, 24, 27,

18  28, and 30 received into evidence.)

19       BY MS. CHO:

20  Q.   Inspector Loyd, back to January 6, was the building open to

21  the public that day?

22  A.   No, it was not.

23  Q.   Why not?

24  A.   It had been closed previously because of the COVID virus.

25  Only the staff and invited guests were allowed in the building.

1    Q.   And was it closed for any additional reasons on that day?

2    A.   Yes.  We also, on that particular day, had the presidential

3    ballot process that was taking place.

4    Q.   Okay.  What about areas outside of the building?  Were

5    areas outside also closed off to the public?

6    A.   Yes.  On the east side, the east paved plaza was cordoned

7    off with bike rack, and on the west side, the closures with the

8    bike rack went all the way down to First Street Northeast and

9    Northwest at Garfield and P Circle.

10   Q.   Okay.  Let's pull up what's been marked for identification

11   as Government's Exhibit Number 1, Mr. Bennett.

12        While Mr. Bennett is pulling that up, Your Honor, I think

13   actually I can just quickly do this the old-fashioned way.

14        Inspector Loyd, do you recognize what's been marked for

15   identification as Government's Exhibit 1?

16   A.   Yes.

17   Q.   And what is it generally?

18   A.   That's the outline of the bike rack that was in place on

19   January 6.

20   Q.   Does that denote the outside perimeter of the restricted

21   area you were just talking about?

22   A.   That's correct.

23   Q.   And you've already mentioned bike racks.  Were there any

24   other restrictive -- physical restrictions in place to keep that

25   area denoted as restricted?

```
 1    A.    Yes.  On the west side, the inaugural stage, which consists
 2    of most of the west front, was segregated with snow fence, green
 3    snow fence.
 4              MS. CHO:  Okay.  The government now moves into
 5    evidence Exhibit Number 1.
 6              MR. BURNHAM:  No objection.
 7              THE COURT:  Without objection, 1 is in.
 8         (Government Exhibit 1 received into evidence.)
 9              BY MS. CHO:
10    Q.    Okay.  Inspector Loyd, as a part of your duties that
11    morning, did you meet with a member of the U.S. Secret Service?
12    A.    Yes.  I met with Paul Wade.
13    Q.    Why did you meet with him?
14    A.    Just to go over the arrival of the vice president on that
15    particular day.
16    Q.    Okay.  And what does Paul Wade do?
17    A.    Paul Wade is the lead agent in charge of a total of five
18    Secret Service agents or liaisons who are actually assigned to
19    the U.S. Capitol building.
20    Q.    Is Agent Wade -- does he have an office in the Capitol
21    building?
22    A.    Yes.
23    Q.    Okay.  Around what time did you meet with him that day?
24    A.    It was in the morning.  I'm figuring between 9:00 and 10:00
25    in the morning.
```

1  Q.   And did you communicate with him about the building being

2  restricted that day?

3  A.   Yes.  He was already aware of that, but we did go over

4  that.

5  Q.   Did Vice President Mike Pence visit the building that day?

6  A.   Yes.

7           MR. BURNHAM:  Objection; foundation.

8           THE COURT:  Can you rephrase?

9           MS. CHO:  Sure.

10          BY MS. CHO:

11 Q.   What was -- let's go back to the purpose of your meeting

12 with Special Agent Paul Wade.  What specifically prompted your

13 meeting with him?

14 A.   The vice president was scheduled to arrive that day to walk

15 up to the Senate chamber to start the ballot process.  So I met

16 with Paul Wade briefly just to make sure we were on the same

17 page with the arrival, the visit, and the departure.

18 Q.   And was Paul Wade and/or other Secret Service agents, were

19 they providing protection to the vice president that day?

20 A.   Yes.

21 Q.   Okay.  So did the vice president visit the building that

22 day?

23 A.   Yes.

24 Q.   How do you know that?

25 A.   I was there when he arrived.

1    Q.    Approximately what time did he arrive?

2    A.    Between 12:30 and 12:40.

3    Q.    And this may be obvious, but why were you there when he

4    arrived that day?

5    A.    Just to make sure he arrived safely without any issues.

6    Q.    When he arrived, was he again protected by Secret Service

7    agents?

8    A.    Yes.

9    Q.    So when he arrived, what did you do next?

10   A.    I helped escort him up to the Senate chamber, and once he

11   was there safely, I made my way around to the Ohio clock area,

12   and I was going to help escort him and the entourage from the

13   Senate chamber down to the House chamber.

14   Q.    Why would he be moving from the Senate chamber to the House

15   chamber?

16   A.    That's a part of the ballot process.  It involves the House

17   and the Senate, and they had to walk down to the House chamber

18   to get the process started.

19   Q.    Okay.  So then I'm assuming, but let's just clarify, that

20   you are aware that both the Senate and the House were called to

21   order on January 6?

22   A.    Yes.

23   Q.    And generally, why were they called to order?  What was the

24   purpose of --

25   A.    The purpose was the presidential ballot process.  The

1    ballot process involves the House and the Senate to certify the

2    election.  So both chambers have responsibilities in that

3    aspect.

4            MS. CHO:  Your Honor, I now move to admit Government's

5    Exhibits 19 and 20, which are portions of the Congressional

6    Record.

7            MR. BURNHAM:  No objection.

8            THE COURT:  Without objection, 19 and 20 are in.

9        (Government Exhibits 19 and 20 received into evidence.)

10           BY MS. CHO:

11   Q.   Now, Inspector Loyd, just to go off track briefly, do each

12   of the Senate and House Chambers have their own video cameras?

13   A.   Yes.

14   Q.   Are those cameras separate from the Capitol Police's closed

15   circuit TV system?

16   A.   Yes.  On the inside of the chambers, I believe it's

17   controlled by C-SPAN.

18           MS. CHO:  Your Honor, as a summary exhibit, the

19   government would move into evidence Exhibit 22, which is what

20   we've called "The Official Proceedings Montage."

21           MR. BURNHAM:  No objection.

22           THE COURT:  Without objection, 22 is in.

23       (Government Exhibit 22 received into evidence.)

24           BY MS. CHO:

25   Q.   Mr. Bennett, if we could pull up video Exhibit Number 22

1    and go to the 00:48 marker.

2         Inspector Loyd, up on the screen, what time does it say

3    that the Senate proceeded to the hall of the House of

4    Representatives for the purpose of counting electoral votes?

5    A.   12:51.

6    Q.   Okay.  Is that about the first time you learned that

7    rioters were approaching the Capitol building?

8              MR. BURNHAM:  Objection to leading.

9              THE COURT:  Sustained.

10             BY MS. CHO:

11   Q.   Inspector Loyd, what were you doing shortly before 12:51

12   when the Senate was supposed to proceed to the House of

13   Representatives?

14   A.   I was in the area of the Ohio clock getting ready to escort

15   the vice president and the entourage from the Senate chamber to

16   the House chamber, and I received a call from headquarters

17   alerting me that there was a lot of people heading my way from

18   the west side of the mall to the Capitol building.

19   Q.   So what did you do after you received that phone call?

20   A.   I did not do anything immediately, because we were

21   expecting a large crowd that day.  So that was nothing out of

22   the ordinary at that point, that a lot of people were coming up.

23   Q.   Did you eventually go look out a window?

24   A.   Yes.  About 12:53, a radio call went out that there was a

25   breach of the police barricades down at P Circle on the west

1    side of the Capitol.  I was in the area of the Ohio clock.  I

2    went into Senator McConnell's office, the majority leader's

3    office, because his office had a bird's eye view of the breach.

4    I walked in there, saw that the breach was bad, and then I made

5    my way down to the inaugural stage out the Lower West Terrace

6    door.

7    Q.   Mr. Bennett, let's pull up previously admitted Government's

8    Exhibit Number 4.  Mr. Bennett, it is not a video.

9         Inspector Loyd, do you see Government's Exhibit 4 up there?

10   A.   Yes.

11   Q.   Okay.  Is this what you were just saying you went out to

12   the western stage and looked out?

13   A.   Yes.

14   Q.   Okay.  About what time was this?

15   A.   It appears to be 1:00 in the afternoon.

16   Q.   So once you got out there and you saw this crowd, what did

17   you do first?

18   A.   I locked down the Capitol building so no person could enter

19   or exit the building, and I also called for help.

20   Q.   When you say "locked down the Capitol," what does that

21   mean?

22   A.   All the doors -- when they receive that order, the officers

23   have to lock the doors on the exterior of the building so people

24   cannot leave or enter.

25   Q.   By 1:00, the time of this photo, had this group of rioters

1   already breached any police lines that you were able to see?

2   A.   Yes, at least one down at P Circle.  They also came

3   through -- there was a snow fence in the middle of the west

4   front lawn, and there was a ceremonial fence that was there to

5   segregate people for the inauguration and several temporary

6   police lines where police tried to set up a police line after

7   the initial one had been breached.

8   Q.   Okay.  I'm going to mark on the exhibit right here.  Right

9   there, is that a line of primarily police officers as well?

10  A.   Yes.

11  Q.   Did the rioters -- and how long were you out here?

12  A.   I was out there for approximately an hour and ten minutes.

13  Q.   So did the rioters eventually breach that line of police as

14  well?

15  A.   Yes.

16  Q.   How long did it take from the time they got there for them

17  to breach that line of police?

18  A.   Are you talking from the breach at P Circle to this time?

19  Q.   No, I'm talking about from the line of police here, how

20  long did it take for rioters, once they got to that area, to get

21  through that line?

22  A.   Oh, just minutes.

23  Q.   Okay.  So that would be at least a second or a third police

24  line that's breached?

25  A.   Yes.

1    Q.   Did you yourself engage with any rioters out here?

2    A.   Yes.

3    Q.   Now, let's look again at Exhibit 4.  Was there scaffolding

4    on both sides of the stage?  Is there some visible in the

5    exhibit?

6    A.   Yes.  The stage is like a small amphitheater with

7    scaffolding on the north and the south of the actual seating

8    area.

9    Q.   At some point did rioters enter into the scaffolding?

10   A.   Yes.

11   Q.   Which side's scaffolding did you see them enter first, if

12   you remember?

13   A.   The north side.

14   Q.   Did officers head toward the north scaffolding?

15   A.   Yes.

16   Q.   Why?

17   A.   To try to prevent them from -- the initial concern was they

18   were going to tear it down, so to try to prevent them from

19   tearing down the scaffolding.

20   Q.   Okay.  Were you in the scaffolding at all that day?

21   A.   No.

22   Q.   Are you, nonetheless, through your job, your presence on

23   the grounds that day and at that time familiar with the area of

24   the grounds where the scaffolding was located?

25   A.   Yes.

1    Q.   Mr. Bennett, if you could pull up already admitted

2    Government's Exhibit 5, which is a video.

3         Before we play this entire video clip, Inspector Loyd, do

4    you recognize the area depicted in this video?

5    A.   Yes.

6    Q.   Where is it?

7    A.   That's the north scaffolding on the very northern edge on

8    the Senate steps leading from the Lower West Terrace to the

9    Upper West Terrace.

10   Q.   Okay.  So is it fair to say this is toward the northwest

11   side of the building?

12   A.   Yes.

13   Q.   And what is the time on the beginning of the video?

14   A.   2:09.

15   Q.   Mr. Bennett, let's play the clip until 01:10.

16        (Video played.)

17   Q.   And if you will hit pause, Mr. Bennett.  Before you go

18   ahead, let's zoom in on the middle of the frame.  Oh, I think

19   we're missing some of that.  Could you hit pause and go

20   backwards, Mr. Bennett, by about 20 seconds?  Okay.

21        (Video played.)

22   Q.   And we'll stop at 01:10.

23        Inspector Loyd, do you see toward the back of the frame a

24   red flag that looks like it has the word "Trump" in the middle?

25   A.   Yes.

1  Q.   What time does it appear to be, according to the time

2  stamp?

3       And Mr. Bennett, if you could move the Zoom window up to

4  the upper left-hand corner to get that time stamp.

5  A.   2:10.

6  Q.   Okay.  And then, Mr. Bennett, if we could go back to the

7  middle.

8       All right.  Let's keep an eye, Inspector Loyd, on the

9  person holding that red Trump flag, and let's play the clip

10 until 01:25.

11      (Video played.)

12 Q.   Inspector Loyd, did you see the person holding that red

13 Trump flag?

14 A.   Yes.

15 Q.   Was he wearing a red hat?

16 A.   Yes.

17 Q.   Where does he appear to be going in this video?

18 A.   He's on the north stairwell of the Senate side from the

19 Lower West Terrace to the Upper West Terrace, heading up to the

20 Upper West Terrace.

21 Q.   Okay.  Let's look at another video, this one from another

22 person.

23      And before I do that, Your Honor, I would like to move into

24 evidence another stipulation that the parties have reached,

25 Government's Exhibit 38.  And this exhibit concerns videos and

1    photographs recorded and taken by third parties.

2         In short, the Government Exhibits 7, 10, and 13 are all

3    fair and accurate depictions of the events at the Capitol on

4    January 6.  The video footage is authentic in that it is what it

5    purports to be.

6         So the government would move in at this time Exhibits 7,

7    10, and 13.

8              MR. BURNHAM:  No objection.

9              THE COURT:  Without objection, 7, 10, and 13 are in.

10        (Government Exhibits 7, 10, and 13 received into evidence.)

11             MS. CHO:  The additional exhibits covered by the

12   stipulation are Exhibits 7A, 10A, and 13A, which are all

13   screenshots from Exhibits 7, 10, and 13.  The parties stipulate

14   that they are all fair and accurate depictions of the events at

15   the Capitol on January 6.

16        So I would move for admission of those exhibits.

17             MR. BURNHAM:  No objection.

18             THE COURT:  Without objection, 7A, 10A, and 13A are

19   in.

20        (Government Exhibits 7A, 10A, and 13A received into

21   evidence.)

22             MS. CHO:  And finally, the stipulation covers photos

23   obtained from Getty Images at Government's Exhibits 17, 25, and

24   33 as fair and accurate depictions of the events at the Capitol

25   on January 6.

1        We would also move for those admissions.

2            MR. BURNHAM:  No objection.

3            THE COURT:  Without objection, 7, 25, and 33 are in.

4        (Government Exhibits 7, 25, and 33 received into evidence.)

5            BY MS. CHO:

6   Q.   Mr. Bennett, let's pull up government's video Exhibit

7   Number 7.

8        Now, before we start this clip playing, Inspector Loyd, do

9   you recognize where this is?

10  A.   Yes.  That's the scaffolding on the north side of the

11  stage.

12  Q.   Mr. Bennett, let's play the clip until 01:09.

13       (Video played.)

14  Q.   So Inspector Loyd, in reviewing this video, does it appear

15  to be the same stairs depicted in the last government exhibit?

16  A.   Yes.

17  Q.   Now, where we've paused here at 01:10, are there a group of

18  police officers at the top of these stairs?

19  A.   Yes.

20  Q.   Do you recognize any of them?

21  A.   Yes.  Most of them work for me.

22  Q.   Okay.  And what do they appear to be doing here?

23  A.   Setting up another temporary police line because all the

24  other ones had been breached.

25  Q.   And even before we got to this point, in thinking through

1    the last exhibit, Government's Exhibit Number 5, were there a

2    group of police officers stationed at the bottom of the stairs

3    as well right next to the scaffolding opening?

4    A.   Yes.

5    Q.   And were they overcome before the rioters reached this

6    group of police?

7    A.   Yes.

8    Q.   Mr. Bennett, let's keep playing the clip until 01:53.

9         (Video played.)

10   Q.   Actually, let's hit pause there, Mr. Bennett.

11        You said you recognized some of these officers, Inspector

12   Loyd.  For some of these officers, was this the first engagement

13   they had with rioters, or was it a subsequent engagement after

14   multiple?

15   A.   No, it was multiple.  The retreat of my officers started

16   down at P Circle with the initial breach, and they continued to

17   retreat all the way to the base of the building.

18   Q.   Okay.  Let's keep going until 01:53.

19        (Video played.)

20   Q.   Mr. Bennett, if you could zoom in on the lower left-hand

21   corner of the frame -- lower right hand.  I'm sorry.

22        Inspector Loyd, do you see a man with a red hat and a red

23   flag next to him?

24   A.   Yes.

25   Q.   Could you circle him?

1   A.   (Witness complied.)

2   Q.   So does this man appear to be a part of that initial rush

3   of rioters who broke through the scaffolding and the next --

4   A.   Yes.

5   Q.   -- line of police with bike racks?

6        Okay.  Let's go back.  Mr. Bennett, let's play to the end.

7        (Video played.)

8   Q.   So Inspector Loyd, if you could tell, by the end of this

9   video clip, where were we in terms of the location of the

10  building?

11  A.   You're on the Upper West Terrace towards the north side

12  heading to the Senate wing door.

13  Q.   Okay.  Let's take a look at this same area from another

14  video camera.  And, Mr. Bennett, let's look at government's

15  video Exhibit Number 9.  If you could start, Mr. Bennett, at

16  01:25.

17       While you're doing that, Inspector Loyd, is this the area

18  of the building where the last video left off?

19  A.   Yes, the Senate wing door.

20  Q.   Let's play the clip.  And, Mr. Bennett, let's pause at

21  02:08.

22       (Video played.)

23  Q.   It's hard to see.  Mr. Bennett, if you could go back one

24  second and go to 02:08.

25       (Video played.)

1    Q.   Let's hit pause right there.  And maybe, Mr. Bennett, you

2    could zoom in on the lower right-hand corner.

3         Inspector Loyd, did you see a man with a red hat and red

4    flag?

5    A.   Yes.

6    Q.   And what time is it on the video at this point?

7         Mr. Bennett, I'm sorry.  I'm having you go back and forth

8    here.  Thank you.

9    A.   2:12 in the afternoon.

10   Q.   And now, Mr. Bennett, let's go to that lower right-hand

11   corner, and if you could hit play to the end of the clip.

12        (Video played.)

13   Q.   And we can stop there.

14        Inspector Loyd, did you get a glimpse of where that man

15   with red hat and red flag was headed?

16   A.   Senate wing door.

17   Q.   Let's look at another video, this time from another angle,

18   video Exhibit Number 10, Mr. Bennett.  And let's hold off,

19   Mr. Bennett, on zooming in on anything, and let's just start

20   fresh here.

21        So before we get started, Inspector Loyd, where does this

22   appear to be taken from, this video?

23   A.   This is from the second floor of the Capitol directly above

24   the Senate wing door location.

25   Q.   Okay.  And let's start the clip from the beginning,

1    Mr. Bennett.  And let's stop at 00:05, please.

2        (Video played.)

3    Q.    Inspector Loyd, do you see in the lower left-hand corner

4    the man with the red hat and red flag?

5    A.    Yes.

6    Q.    And now, Mr. Bennett, can you zoom in on that lower

7    left-hand corner?  And let's follow him, and let's move that

8    zoom box a little bit towards the center, Mr. Bennett.  Great.

9    And now let's hit play.

10        (Video played.)

11    Q.    Okay.  We can take that video down.

12        So again, where does the man with the red hat and red flag

13    appear to be headed, Inspector?

14    A.    Senate wing door.

15    Q.    Now let's take a look at the video cameras within the

16    Senate wing doors, video Exhibit Number 11.

17        And before we get started, what is the time stamp on this

18    exhibit, Inspector Loyd?

19    A.    2:12 in the afternoon.

20    Q.    Okay.  And Mr. Bennett, let's zoom in on the window that is

21    closest to the right-hand side of the frame.  Let's capture the

22    whole window.  Let's stop at 00:19, Mr. Bennett.

23        (Video played.)

24    Q.    Inspector Loyd, did you see someone smash the windowpane on

25    the right side?

1    A.    Yes.

2    Q.    Does that person appear to be walking away?

3    A.    Yes.

4    Q.    Now, Mr. Bennett, can you move the zoom box so that we

5    capture the entire window and also slow down the speed by one

6    mark.  Thank you.  And let's hit pause at 00:36.

7          (Video played.)

8    Q.    Let's keep going a bit more.

9          (Video played.)

10   Q.    Now pause.

11         Inspector Loyd, do you see a second rioter approaching the

12   window wearing a black sweatshirt and reflective goggles?

13   A.    Yes.

14   Q.    Okay.  I would like you to keep an eye on his right hand.

15   And Mr. Bennett, let's keep going to 00:42 -- or 00:44.

16         (Video played.)

17   Q.    Inspector Loyd, did you happen to see something round in

18   that rioter's hand?

19              MR. BURNHAM:  Objection; leading.

20              THE COURT:  Sustained.

21              BY MS. CHO:

22   Q.    What did you just see in the last three seconds, Inspector

23   Loyd?

24   A.    I saw the gentleman breaking the glass at the door -- or at

25   the window.

1    Q.    Okay.  Let's keep going, Mr. Bennett.

2         (Video played.)

3    Q.    Let's hit pause.

4         Do you see that -- a white stick coming through in this

5    video, Inspector?

6    A.    Yes.

7    Q.    Okay.  Let's keep going, Mr. Bennett.

8         (Video played.)

9    Q.    Do you see another rioter now with a red flag attached to a

10   white flag pole?

11   A.    Yes.

12   Q.    Did you see the action of his hands over the last few

13   seconds?

14   A.    Yes.  The flag pole actually went through the window.

15   Q.    Okay.  Mr. Bennett, let's keep going.

16        (Video played.)

17   Q.    And let's hit pause.

18        What does it appear that this rioter is striking the first

19   windowpane with?

20   A.    I'm not -- there's something in his hand.  I can't make out

21   what it is.  There's something in his hand that's breaking the

22   glass.

23   Q.    And does this appear to be the same red hat/red flag man

24   we've been tracking in other videos?

25   A.    Yes.

1    Q.   Mr. Bennett, let's keep going.

2         (Video played.)

3    Q.   Let's hit pause.

4         Inspector Loyd, has the red hat/red flag man turned to the

5    next windowpane?

6    A.   Yes.

7    Q.   Mr. Bennett, let's keep going.

8         (Video played.)

9    Q.   Let's hit pause.

10        Was there another rioter who appeared to be attacking the

11   second windowpane?

12   A.   No.  I only saw the man with the red hat.

13   Q.   Okay.  Mr. Bennett, let's keep going.

14        (Video played.)

15   A.   And I just saw somebody else's knee go through.

16             THE COURT:  Sorry.  Could you go back to where the

17   windowpane on the left starts getting hit and just run through?

18             MS. CHO:  Mr. Bennett, let's go back to 01:05, just to

19   be safe.

20        (Video played.)

21             THE WITNESS:  I do see another foot, yep.

22             THE COURT:  Sorry.  I wanted you to go back further to

23   where there wasn't any damage to that window.

24             MS. CHO:  Then let's try to go back, Mr. Bennett, to

25   00:50.

1          Does that look about right?

2               THE COURT:  Yeah, let's play it from there.

3     (Video played.)

4               BY MS. CHO:

5     Q.   Let's hit pause.

6          Inspector Loyd, did you see something that looked like half

7     of a ball in the right hand of the red hat/red flag man?

8     A.   Yes, there's definitely something in his hand.

9     Q.   Let's keep going until the end.

10    (Video played.)

11    Q.   Inspector Loyd, by this time, according to that video, the

12    door and the other window appear to have been breached at the

13    same time as well; is that right?

14    A.   Yes.

15    Q.   As far as you know, was this the first breach of the

16    building itself that day?

17    A.   Yes.

18    Q.   Now I would like to return to the portion of your testimony

19    that relates to your experiences on January 6.  Can you remind

20    us again.  I believe you were outside for about an hour and ten

21    minutes, you testified.  And what prompted you to leave the west

22    side of the building?

23    A.   I received a phone call from Assistant Chief Thomas to

24    leave the area on the west front and to go to the east front

25    because they had also breached the barricades on the east front,

1    and there was no commander out there.

2    Q.   So were you able to immediately get over to the east front?

3    A.   No.  Once I entered the building through the Lower West

4    Terrace door, I heard the radio calls from Officer Goodman that

5    rioters had breached the building and were headed to the Senate

6    chamber.  So I redirected to the Senate chamber on my own.

7    Q.   Let's take a look, Mr. Bennett, at video Exhibit Number 13,

8    previously admitted.

9        And before we get started, Inspector Loyd, does this look,

10   at least from the view you can see, familiar to you?

11   A.   Yes, the Senate wing door.

12   Q.   Okay.  Let's -- what happens when windows or doors are

13   broken at the Capitol building?

14   A.   If it's an exterior door, you actually have two alarms that

15   go off.  You have a local alarm, which is a buzzing or a sound

16   there to alert the officers where the actual breach is, but it

17   also sends an electronic alarm to our headquarters building so

18   our communications can dispatch an officer to check on the

19   breach.

20   Q.   Okay.  Let's play the video until 00:11.

21       (Video played.)

22   Q.   Inspector Loyd, did we just hear the alarm you were

23   describing?

24   A.   Yeah.  That's the local alarm to guide the officers towards

25   the area of the breach.

1    Q.    Mr. Bennett, let's play until 00:55.

2         (Video played.)

3    Q.    Let's go back one second, Mr. Bennett, maybe just a touch

4    more.  Too much to ask.  If you could hit play one more time.

5         (Video played.)

6    Q.    Inspector Loyd, do you see a man with a red hat right

7    there?  It's rather blurry in this frame.

8    A.    Yes.

9    Q.    And, Mr. Bennett, let's just back up four seconds and hit

10   play from there.

11        (Video played.)

12   Q.    So Inspector Loyd, is that a Capitol police officer right

13   there in the frame?

14   A.    Yes.

15   Q.    At 01:08.  And who is it?

16   A.    That's Officer Goodman.

17   Q.    Did you hear a rioter yelling something to the effect

18   of "where are they counting the votes?"

19   A.    Yes.

20   Q.    And generally, where are we in the building at this point?

21   A.    You're near the Senate Carriage door.  In this particular

22   hallway, you can see the gentleman to the left of Officer

23   Goodman.  That's the Senate grand east staircase.

24   Q.    Okay.  Let's continue, Mr. Bennett.

25        (Video played.)

1    Q.    And Mr. Bennett, let's pull up Government's Exhibit 13A.

2          So Inspector Loyd, does Government's 13A look like a

3    screenshot from that last video?

4    A.    Yes.

5    Q.    And can you see the red hat man clearly in this screenshot?

6    A.    Yes.

7    Q.    Okay.  Now let's go back, and let's pull up Government's

8    Exhibit Number 14, Mr. Bennett.

9          All right.  Inspector Loyd, before we get this video

10   started, where are we if you recognize the location?

11   A.    We are on the second floor of the Capitol just outside the

12   Senate chamber.  The stairwell to the left is the Senate east

13   grand staircase.  If you go all the way to the left around the

14   corner, that's the rear of the Senate chamber.  The door in the

15   middle of the frame is actually facing the Ohio clock area.

16   Q.    Thank you.

17         Mr. Bennett, let's play until 00:26.

18         (Video played.)

19   Q.    Let's hit pause there at 00:33, Mr. Bennett.  Well, we're

20   at 00:35.

21         Inspector Loyd, do you see the man with the red hat and red

22   flag?

23   A.    Yes.

24   Q.    And did you also see Officer Goodman at the front of this

25   crowd of rioters?

1    A.   Yes.

2    Q.   What's the time on this?

3    A.   2:15.

4    Q.   Mr. Bennett, let's continue for just ten more seconds --

5    no, let's continue to the end.

6         (Video played.)

7    Q.   Inspector Loyd, by this time, 2:15, had you entered the

8    Ohio clock corridor?

9    A.   Yes.

10   Q.   Once you got there, what did you do?

11   A.   Set up a police line with about four other officers.

12   Q.   Were you there when rioters first began entering that

13   corridor?

14   A.   Yes.

15   Q.   Did you issue any orders to them?

16   A.   Yes.  I told them to stop and leave.

17   Q.   Okay.  Mr. Bennett, let's pull up video Exhibit Number 15.

18        (Video played.)

19   Q.   Mr. Bennett, let's hit pause.

20        Inspector Loyd, are you in this frame?

21   A.   Yes, all the way to the top left with the Garrison hat on.

22   Q.   Okay.  Is Officer Goodman in this frame?

23   A.   Yes.  He's directly in the middle.

24   Q.   Okay.  Did you have any concerns with the fact that rioters

25   were in this area at this time?

1    A.    Yes.

2    Q.    What were those concerns?

3    A.    Well, it was a riot.  It was a mob.  They had broken

4    through several police lines on the exterior of the building,

5    and they had broken into the building, and now they were

6    threatening the United States Senate and the Vice President of

7    the United States.

8    Q.    Mr. Bennett, let's play until 01:06.

9         (Video played.)

10   Q.    Inspector Loyd, do you see the same man with the red hat

11   and red flag?

12   A.    Yes.

13   Q.    And based on this video and the last video, did it appear

14   that he immediately entered into the corridor?

15   A.    It seemed like he paced just prior to going into the Ohio

16   clock corridor.  Once more people got in there, he followed the

17   group in there.

18   Q.    Okay.  Mr. Bennett, let's continue until the end.

19        (Video played.)

20   Q.    Inspector Loyd, what was the man in the red hat with the

21   red flag doing at the end of the video clip?

22   A.    He's walking to head east away from the Ohio clock area.

23   Q.    So let's pick up with video Exhibit Number 16 and play

24   until -- now, Inspector Loyd, is this the same view that we saw

25   in a previous video clip?

1   A.   Yes.

2   Q.   Is it just outside of the Ohio clock corridor?

3   A.   Yes.

4   Q.   Mr. Bennett, let's play until 00:13.

5        (Video played.)

6   Q.   And where is the man with red hat and red flag now,

7   Inspector Loyd?

8   A.   He's at the Senate east grand staircase on the second floor

9   looking up at the middle landing between the second and third

10  floor of the Capitol.

11  Q.   Mr. Bennett, let's keep playing until 01:04.

12       (Video played.)

13  Q.   Inspector Loyd, do you see someone who appears to be taking

14  a photograph at the foot of the stairs?

15  A.   Yes.

16  Q.   Let's continue and see if we can understand what he's

17  taking a photo of.   Mr. Bennett, let's pause at 01:14.

18       (Video played.)

19  Q.   Inspector Loyd, do you see the tip of a red flag in the

20  frame?

21  A.   Yes.

22  Q.   And what time is it?

23  A.   2:18 in the afternoon.

24  Q.   Mr. Bennett, let's keep going.

25       (Video played.)

1    Q.   Let's hit pause.

2         Inspector Loyd, did you see the man with the red hat and

3    red flag again?

4    A.   Yes.

5    Q.   Where did he appear to be going?

6    A.   He appeared to be heading down to the first floor of the

7    Capitol via the Senate east grand staircase.

8    Q.   Mr. Bennett, let's keep going until the end.

9         (Video played.)

10   Q.   Inspector Loyd, if you saw the man with the red hat and red

11   flag, where did he end up by the end of the frame?

12   A.   He returned and was heading back into the Ohio clock area.

13   Q.   Okay.  Mr. Bennett, let's pull up Exhibit Number 17.  If

14   you could maximize it, please.

15        Inspector Loyd, where does this photo appear to be taken?

16   A.   That's being taken from the second floor of the east grand

17   staircase on the Senate side looking up at the first landing in

18   between the second and the third floors.

19   Q.   Do you also see something round in the right hand of the

20   red hat/red flag man in this frame?

21   A.   Yes.

22   Q.   Now let's look at government's video Exhibit Number 18.

23        So Inspector Loyd, are we back in the Ohio clock corridor?

24   A.   Yes.

25   Q.   What time is it?

1    A.    2:19 in the afternoon.

2    Q.    Mr. Bennett, let's keep going until 00:13.

3          (Video played.)

4    Q.    Inspector Loyd, did you see the man with the red hat and

5    red flag re-enter?

6    A.    Yes.

7    Q.    Now, did you end up leaving this corridor shortly after

8    this time?

9    A.    Yes.  I'm up in the top left-hand corner.  I'm speaking

10   with Deputy Chief Waldo.  I told him, considering the

11   circumstances, things were relatively calm there.  My officers

12   were locked down in the Senate chamber with the vice president

13   and the entire United States Senate.  So I asked him for

14   permission to go down and check on the status of the House

15   chamber on the opposite side of the building, and I left.

16   Q.    Okay.  Mr. Bennett, we can take down the exhibit.

17         At some point that day, Inspector Loyd, did you learn that

18   the Senate and the House went into recess?

19   A.    Yes.

20   Q.    Why did they go into recess?

21   A.    Because of the breach into the building.

22   Q.    When approximately did these two Houses of Congress begin

23   going into recess?

24   A.    I'm just estimating probably right before this occurred,

25   2:10, 2:15.

Q.   So was that just right after the man with the red flag and red hat had broken those two windowpanes next to the Senate?

MR. BURNHAM:  Objection.

THE COURT:  Sustained.

BY MS. CHO:

Q.   Were the House and Senate unable to resume their business until every rioter had been cleared out?

A.   Correct.

Q.   Why is that?

A.   The building was not safe.  It was not secure.  We also had a homicide investigation, because there was a homicide at the rear of the House chamber.  So we had to clear the homicide investigation.  We had to clear out all the unauthorized people within the building.  We had to sweep the building to make sure there's nothing nefarious that was left in the building after everybody was put out.  And we had to clean the building, make sure it was safe for the members of Congress to actually walk the halls.

Q.   What time approximately was that when the members of Congress were able to go back to their business?

A.   Approximately 8:00 in the evening.

Q.   Were you still in the building at that time?

A.   Yes.

Q.   Were you able to see that they were able to begin their proceedings again?

1   A.   Yes.

2        MS. CHO:  Just one moment, Your Honor.

3        (Government counsel conferred.)

4        MS. CHO:  No further questions, Your Honor.

5        THE COURT:  All right.  Thank you.

6   Mr. Burnham?

7        MR. BURNHAM:  Thank you, Your Honor.

8                    CROSS-EXAMINATION

9        BY MR. BURNHAM:

10  Q.   Good morning, Inspector.

11  A.   Good morning.

12  Q.   Sir, just a couple questions about your background.

13       You testified on direct that on January 6 the Capitol was

14  locked down due to COVID and also the electoral count.

15       Do you recall that?

16  A.   Yeah, it was closed to the public.  It wasn't -- that's not

17  the proper term, locked down.  Lockdown occurred at 1:00 when

18  there was a breach on the west front.

19  Q.   Isn't it true in normal times, so prepandemic, outside of

20  special occasions, members of the public can, after following

21  proper procedures, visit the Capitol?

22  A.   Yes.

23  Q.   And that's journalists, that's school children, that's

24  whoever; right?

25  A.   That's correct.

1    Q.   Okay.  Was it a part of your job leading up to January the

2    6th to keep yourself reasonably informed about protest activity

3    and social unrest going on in the District of Columbia

4    generally?

5    A.   Yes.

6    Q.   All right.  And as a part of that generally keeping up to

7    speed on the happenings, you would have been aware that

8    throughout the summer of 2020 there was -- and into the fall,

9    there was a pretty high degree of social unrest in the District?

10   A.   Correct.

11   Q.   Is that fair?

12   A.   Correct.

13   Q.   And as a part of that, there were periodic physical

14   confrontations between, let's say, Trump supporters and groups

15   of people opposed to the Trump administration?  That happened;

16   right?

17   A.   Yes.

18   Q.   All right.  Is it true that you previously stated that you

19   were involved in securing the Capitol in response to protests

20   associated with Black Lives Matter groups?

21   A.   Yes.

22             MS. CHO:  Objection, Your Honor.

23             THE COURT:  On what basis?  Relevance?

24             MS. CHO:  Yes.

25             THE COURT:  Where are we going, Mr. Burnham?

1     MR. BURNHAM:  Your Honor, the government has put this

2  witness forward, not just for his firsthand knowledge of things

3  he saw on January 6, but also for his general knowledge about

4  how the Capitol operates, how to secure it, the command

5  structure.  So I would ask for a little latitude, not a long

6  time, to explore his general background and his knowledge of

7  antiprotest security measures.  It will take about two minutes.

8     THE COURT:  All right.  I will give you a little

9  latitude.

10     MR. BURNHAM:  Thank you, Your Honor.

11     THE COURT:  Overruled.

12     THE WITNESS:  What was the question?

13     BY MR. BURNHAM:

14  Q.   I had asked if you were involved in security measures in

15  response to Black Lives Matter protests.

16  A.   Yes.  In the summer of 2020, after the George Floyd death,

17  Black Lives Matter made several visits.  They would ping back

18  and forth between the Capitol and the White House.  As a result

19  of the large crowds, we installed bike rack on the east front of

20  the Capitol so when the protestors came up they would stay on

21  the other side of the bike rack so that Congress and the staff

22  could get in and out of the building.

23  Q.   And as a part of that protest, law enforcement actually had

24  individuals embedded in the crowds, I understand, to sort of

25  give minute-to-minute updates about where they were going; is

1    that right?

2    A.    Yes.  We received verbal updates from our undercover people

3    on the status of the crowds, yes.

4    Q.    And you apparently had none of that type of information on

5    January 6 at all?

6    A.    No, we did not have that, no.

7    Q.    Why was that?

8    A.    I have no idea.

9    Q.    Were you ever -- was it ever explained to you why such a --

10           MS. CHO:  Objection.

11           THE COURT:  Sustained.

12           MR. BURNHAM:  I will move on.

13           BY MR. BURNHAM:

14   Q.    You mentioned that there was a barrier -- on direct exam,

15   you testified there was a barrier consisting of bike racks and

16   snow fencing around the Capitol.

17          You recall that; right?

18   A.    Yes.

19   Q.    I take it you didn't -- being a higher ranking officer,

20   weren't the one actually dragging the bike racks out yourself;

21   is that right?

22   A.    No.

23   Q.    And I don't understand you to have done a personal

24   inspection of every link in the bike rack/snow fence barrier?

25   A.    Correct.  The Security Services Bureau handles that.

1   Q.   I'm sorry?

2   A.   The Security Services Bureau is in charge of installing and

3   checking the bike rack for us.  We have a bureau, and that's a

4   part of their responsibilities.

5   Q.   I understand.  And at various times throughout January 6,

6   some of which we've already seen, portions of that barrier got

7   removed?

8   A.   Yeah, they were breached, yes.

9   Q.   And there were at least a couple of instances where, for

10   whatever reason, law enforcement personnel moved them

11   themselves?  That did happen; right?

12   A.   I'm not aware of that.  What I'm aware of are retreats.  We

13   retreated from the initial beginning of the breach because we

14   were overwhelmed immediately.  I'm not aware of any officers

15   opening up the gates or anything like that.

16   Q.   So your testimony is you're not aware of any police

17   officers moving bike racks at any time on January 6?

18   A.   Well, they may have moved bike racks to set up temporary

19   police lines, yes.

20   Q.   Okay.  So the testimony is yes, they did move bike racks?

21   A.   Yes, yes.

22   Q.   And then when officers did that, protestors were then able

23   to proceed past where the bike racks used to be?

24   A.   I'm sure it's possible.

25   Q.   So you said you have been with the Capitol Police for

1  30-some years?

2  A.    32 years.

3  Q.    Okay.  So then you would have been through at least, what,

4  seven or eight Electoral College certifications in that time?

5  A.    Yes.

6  Q.    And so you're generally familiar with the way that process

7  works?

8  A.    Not really.  I was actually looking forward to seeing this

9  process play out, because it had not received a lot of attention

10 up until this latest one in 2020.

11 Q.    So you're aware at least that the proceedings to certify

12 the Electoral College vote are governed by the Electoral Count

13 Act; right?

14 A.    Yes.

15 Q.    And without getting into the weeds, that act provides for

16 an opportunity for senators or congressmen to raise objections

17 to the certification of the votes from the particular states;

18 right?

19 A.    Correct.

20 Q.    And leading up to January 6, 2021, several members of the

21 Senate and House of Representatives had publicly announced that

22 they did intend to object to various states' electoral

23 certifications?

24 A.    Correct.

25 Q.    And those announcements received significant media

1  attention in the lead-up to January 6; correct?

2  A.   Correct.

3       MS. CHO:   Objection; relevance, Your Honor.

4       THE COURT:   I'm going to overrule it.

5       BY MR. BURNHAM:

6  Q.   So we saw some video involving Officer Goodman, Capitol

7  Police Officer Goodman and a group of individuals that had

8  entered the Capitol.  You recall that; right?

9  A.   Yes.

10 Q.   Is it your understanding that basically what the officer

11 was trying to do there is divert those individuals from the rear

12 of the Senate to another location in the building?

13 A.   Correct.

14 Q.   And that was because if those folks had actually made it to

15 the rear of the Senate, they might have actually had access to

16 the elected representatives themselves; right?

17 A.   Correct.

18 Q.   Okay.  And by sort of leading those protestors into the

19 clock room, from a law enforcement perspective, that was a good

20 thing, because they were isolated from the people you had to

21 protect; right?

22 A.   Yes.  And it saved the lives of the demonstrators also.

23 Q.   All right.  As far as you were aware, there might have been

24 elected representatives that had gone to other parts of the

25 Capitol, like their offices, for example?

1   A.   Yes, that's possible.

2   Q.   Or their staff could have been in different parts of the

3   Capitol; correct?

4   A.   Yes.

5   Q.   And so one of the things you had to be concerned with was

6   not only that the rioters didn't go to the Senate itself, but

7   that they didn't wander around and possibly harm anybody else

8   that was there; right?

9   A.   Correct.  But at that point, we had retreated as far as we

10  could go.  Our focus at that point was the House and Senate

11  chambers, because that's our primary mission, is protect the

12  Congress.  So we had to protect the senators and House of

13  Representatives on the House side.

14  Q.   I understand.  Shifting gears here for a second, on

15  January 6, notwithstanding the need for security and COVID,

16  members of the press were still allowed in; right?

17  A.   If you are a credentialed press by the U.S. Congress, yes.

18  Q.   You testified on direct that you actually became aware of

19  the initial breach of the first part of the Capitol.  I don't

20  take it that you issued any orders at that point --

21  A.   No.

22  Q.   Well, let me finish the question.

23  A.   Sorry.

24  Q.   I have a specific question.

25  A.   Yeah.

1   Q.   You didn't issue any orders at that point to send a team of
2   officers out to replace the bike racks; correct?
3   A.   No.
4   Q.   All right.  Because you were shorthanded, and you had
5   bigger problems, I assume, at that point?
6   A.   Correct.
7   Q.   So you testified that in response to the breach of the
8   Capitol or the breach of the grounds, I think it was, that the
9   Capitol then actually was placed on lockdown at that point?
10  A.   Yes.  Once I made my way to the inaugural stage around
11  1:00, I saw how bad it was, and I ordered the lockdown of the
12  Capitol, yes.
13  Q.   Once the Capitol was on lockdown, let's say if somebody
14  needed to exit the Capitol, perhaps law enforcement, perhaps an
15  elected official, how would you do it?
16  A.   You don't.  You have to go through the tunnels to get out
17  of the Capitol at that point.
18  Q.   Okay.  We saw a video the government introduced of the
19  protestors coming up the stairs, and then there was the sort of
20  pushing and shoving between the front line of the protestors and
21  your officers there.  You recall that video; right?
22  A.   Yes.
23  Q.   It's fair to say those officers were relatively restrained
24  in the amount of force they used to resist --
25  A.   Yes, and tired by that point.

1    Q.   They could have used, for example, deadly force?

2    A.   No, absolutely not.

3    Q.   Okay.  Were they under orders not to do that?

4    A.   No, it's not under orders.  We still have to abide by the

5    Supreme Court decisions that covers use of force.  That did not

6    change for January 6.

7    Q.   And would it be fair to say that the amount of hand-to-hand

8    combat could have been greater than it seemed to be from the

9    video?

10              MS. CHO:  Objection; relevance.

11              THE COURT:  Overruled.

12              BY MR. BURNHAM:

13   Q.   Go ahead.

14   A.   No.  At that point they were very tired, and they had done

15   several retreats.  They were overwhelmed at that point.

16   Q.   Okay.  Fair to say in that video and generally on January 6

17   there was a lot of yelling and shouting and loud talking from

18   the protestors?

19   A.   Yes.

20   Q.   And at least one, probably several protestors, had bull

21   horns and other devices like that?

22   A.   Yes.

23   Q.   There was another video where you testified in response to

24   questions from the government that one of the individuals in the

25   video had said something like where are they counting the votes.

1      Do you recall that?

2  A.   Yes.

3  Q.   You can't tell which one said that; right?

4  A.   No.

5  Q.   Okay.  You referenced a homicide investigation.  Would that

6  be the death of Ms. Babbitt?

7  A.   Yes.

8  Q.   All right.  You recall your testimony that -- this is going

9  now to the Ohio clock room period.  You testified that you told

10  the protestors to stop and leave.  You recall that; right?

11  A.   Yes.

12  Q.   You're not testifying, right, that you individually told

13  each one; right?

14  A.   No, it was done -- I yelled it once.  That was it.

15  Q.   Okay.  And in fact, wasn't it the plan at that point to

16  have the protestors stay there for a period of time until the

17  evacuation could be completed?

18  A.   We were trying to stabilize things.  I was aware that my

19  officers had done what they were trained to do, just from my

20  observations, because there was no way out in the hallway that

21  is guarding the U.S. Senate.  Everybody was inside, and the

22  doors were locked.  So my team had done what they were trained

23  to do when there was a threat of that nature.

24  Q.   All right.  And isn't it true, if you've seen the videos or

25  you know from some other source, that some of your officers

1   there in the clock room engaged in some polite conversation,

2   perhaps even a little bit of banter with the individuals who

3   were in there?

4   A.   I don't remember any polite conversations or banter, no.

5   Q.   Wasn't a part of the plan there to defuse the situation and

6   stall everybody until the evacuation could be completed?

7   A.   Yes.

8   Q.   Okay.  And as a part of that, would it surprise you if

9   there was some kind -- some polite conversation pursuant to that

10  objective?

11  A.   I guess that's possible.

12  Q.   All right.  So in fact, the desire on the part of law

13  enforcement wasn't that the individuals who had entered the

14  clock room immediately leave that second; right?  That wasn't

15  the goal?

16  A.   That was the primary goal, but they didn't listen to my

17  order.

18  Q.   Okay.  Haven't you previously stated to law enforcement

19  that the plan there was for the individuals who had breached the

20  Capitol to stop and eventually leave?  Haven't you described it

21  in those terms?

22  A.   When I said it, I wanted them to leave immediately.

23  Q.   But my question is, haven't you previously to law

24  enforcement described it as you wanted them to stop and

25  eventually leave?

1   A.    I just wanted them to stop and leave.

2   Q.    Can I show you something that might refresh your

3   recollection on this point?

4   A.    Okay.

5   Q.    Actually, strike my prior question.

6         The proper question I should have asked is, do you recall

7   testifying in a prior proceeding, prior January 6 trial?

8   A.    Yes.

9   Q.    Okay.  Do you recall being asked the following question by

10  the government and giving the following answer?  And I'm going

11  to read it to you.

12        "Question:  When the group entered the Ohio clock corridor,

13  did you instruct them to do anything?

14        "Answer:  Yeah.  I told them to stop and eventually then to

15  leave."

16        Did you give that testimony?

17  A.    If it's in the narrative, yes, I did.

18              MR. BURNHAM:  No further questions.  Thank you.

19              THE COURT:  Thank you, Mr. Burnham.

20        All right.  Ms. Cho?

21              MS. CHO:  Just one moment, Your Honor.

22        (Government counsel conferred.)

23              MS. CHO:  Just a few questions, Your Honor.

24                         REDIRECT EXAMINATION

25              BY MS. CHO:

Q.   Inspector Loyd, on cross-examination, you testified about
the removal and moving of bike racks.  Do you remember that?

A.   Uh-huh.

Q.   So if we go back to some of the exhibits that we discussed,
did you see rioters knock down bike racks?

A.   Yes.

Q.   And thereafter, did you see police officers use the
knocked-down bike racks as barriers once rioters had broken
through the bike racks initially?

A.   Yes.

          MR. BURNHAM:  Objection; leading.

          THE COURT:  Sustained.

          BY MS. CHO:

Q.   When police were moving bike racks, was it because -- why
were they moving the bike racks?

A.   More than likely to set up another police line to stop the
wave of the rioters coming, you know, up to the building and
into the building.

          MS. CHO:  Okay.  No further questions, Your Honor.

          THE COURT:  Thank you, Inspector.

          THE WITNESS:  Thank you, sir.

          THE COURT:  You may step down.  You are free to go.

     Ms. Cho, you may call your next witness.

          MS. CHO:  Your Honor, the government calls U.S.
Capitol Police Officer Brian Morgan.

1          MS. ALSWORTH:  Your Honor, may we have a very brief

2     recess, maybe two minutes?

3          THE COURT:  You said two minutes?

4          MS. ALSWORTH:  Two to three minutes.  I just need

5     to --

6          THE COURT:  Why don't we just go ahead and take a ten-

7     minute break.  I was going to do it shortly.  So this is fine.

8        All right.  See you all in ten minutes.

9       (Recess taken from 10:55 a.m. to 11:02 a.m.)

10          THE COURT:  Yes, ma'am.

11          MS. ALSWORTH:  Thank you, Your Honor.  The government

12     calls Brian Morgan.

13          THE COURT:  All right.  If you could approach, Officer

14     Morgan.

15            BRIAN MORGAN, WITNESS FOR THE GOVERNMENT, SWORN

16          MS. ALSWORTH:  May I proceed, Your Honor?

17          THE COURT:  You may.  Thank you, Ms. Alsworth.

18                        DIRECT EXAMINATION

19          BY MS. ALSWORTH:

20     Q.   Would you state and spell your name for the record.

21     A.   Brian Morgan, B-r-i-a-n M-o-r-g-a-n.

22     Q.   Where do you work?

23     A.   United States Capitol Police.

24     Q.   And what's your position there?

25     A.   I'm a police officer with the Senate Chamber Section.

1    Q.   How long have you worked for the Capitol Police?

2    A.   Approximately 15-and-a-half years.

3    Q.   And how long have you been assigned to the Senate Chamber

4    Section?

5    A.   Almost ten years.

6    Q.   Were you working on January 6 of 2021?

7    A.   Yes, ma'am.

8    Q.   Are you having trouble hearing me?

9    A.   A little bit.

10    Q.   Okay.  Let me know if at any point it's not -- the sound

11    isn't making it to you.

12    A.   Okay.

13    Q.   And on January 6 of 2021, were you assigned to the Senate

14    Chamber Section?

15    A.   Yes, I was.

16    Q.   And can you tell us generally what your job duties and

17    responsibilities were that day?

18    A.   That day, we knew that the counting of the electoral votes

19    were going to happen.  So that day, we were responsible for

20    protection of the senators, the process, and all the staff and

21    the proceedings of the Senate.

22    Q.   At some point on January 6, did you learn that the Capitol

23    building had been breached?

24    A.   Yes, ma'am.  Around 12:45 was the first that we had heard

25    that the outer snow fences had been breached.

1    Q.    Okay.  And just so we're understanding each other, at

2    12:45, was it the interior or the exterior that had been

3    breached?

4    A.    That was our exterior perimeter.

5    Q.    Okay.  At some point did you learn that there was a breach

6    on the interior of the building?

7    A.    Yes, ma'am, around 2:15.

8    Q.    And what did you do once you heard about that breach?

9    A.    Once I heard the breach, we have protocols that we have to

10   follow.  I shuttered staff in their offices.  We did some lock-

11   down procedures, and then I proceeded downstairs to the second

12   floor.

13   Q.    And why did you go to the second floor?

14   A.    I had heard a colleague of mine, Officer Goodman, yell over

15   the radio "second floor."  He sounded intense, panicked, and I

16   knew that -- he only gave us second floor.  That means that

17   he -- he's an experienced officer.  So something was going on to

18   where he couldn't give us more information.

19        So I went down to where my best guess he was heading

20   because it's not a very big floor.

21   Q.    And where specifically did you go?

22   A.    The Ohio clock corridor.

23   Q.    What did you see when you made it to the Ohio clock

24   corridor?

25   A.    So as I made it down to the Ohio clock corridor, I had seen

1    a makeshift police line starting to be formed, and I saw some of

2    the rioters coming into the hallway itself, and some were

3    already there.

4    Q.   Okay.  And when you say "a makeshift police line," there

5    were other Capitol police officers already in that area?

6    A.   Yes, ma'am.  There was a handful.

7    Q.   What was the purpose of the makeshift police line?

8    A.   We didn't want the rioters to come past us, because we

9    cannot tell if the doors to the Senate chamber had been secured

10   yet.  We could see where we were by the Ohio clock corridor that

11   they were secured, but behind us, we didn't know, and if they

12   weren't secured, then that's easy access to the members and the

13   floor.

14   Q.   Okay.  Did you know at that point whether or not the

15   members of the Senate and the staff members had been evacuated?

16   A.   By the time I got to the Ohio clock, they were still in the

17   chamber.

18   Q.   Okay.  And did you join the police line?

19   A.   Yes, ma'am, I did.

20   Q.   What did you see as you joined the police line?

21   A.   As I joined the police line, I saw rioters.  They were

22   yelling.  They were screaming.  They were calling us traitors.

23   They were walking up and down our police line yelling.  I had an

24   individual approach me in a black skull cap.  I confronted him.

25   We spoke.  I had my baton out because over the radio you could

1    hear that officers were being drug into police lines, officers

2    were wounded and being hurt.  So I took my ASP baton out.

3                MR. BURNHAM:  Objection; hearsay.

4                THE COURT:  Overruled.

5                THE WITNESS:  And he had said something to the effect

6    of, If you don't stand down, then I will have to stand up.

7                BY MS. ALSWORTH:

8    Q.   Mr. Bennett, if you could, please, pull up government's

9    video Exhibit Number 23.

10        Your Honor, I believe this video exhibit was previously

11   admitted.

12        Officer Morgan, do you recognize what's shown here?

13   A.   Can you, please, repeat?

14   Q.   Sure.  Do you recognize what's shown in this still frame?

15   A.   Yes, ma'am.

16   Q.   Where is that located?

17   A.   That's the Ohio clock corridor.

18   Q.   Okay.  And let's see.  Is there a date and time stamp at

19   the top of the screen?

20   A.   Wednesday, January 6, 2021.

21   Q.   And the time is 2:21 p.m.?

22   A.   2:21:30.

23   Q.   Okay.  And Mr. Bennett, if you could, please, zoom in on

24   the upper left quadrant.  Thank you.

25        Officer Morgan, are you shown in this video?

1    A.    Yes, ma'am, I am.

2    Q.    If you could, please -- there should be, in the upper

3    right-hand corner, if you tap your screen, and do you see that

4    there's a dot that showed up up there?

5    A.    Yes, ma'am.

6    Q.    If you could, please, circle yourself in this particular

7    frame.

8    A.    (Witness complied.)

9    Q.    Okay.  And do you also see an individual with a red hat and

10   holding a red flag?

11   A.    Yes, ma'am.

12   Q.    And where is he located?

13   A.    (Witness complied.)

14   Q.    And I see that you've circled him.  Just for reference for

15   the record, can you say where he is in relation to the crowd?

16   A.    He is currently standing in the back.

17   Q.    Okay.  And if you could, please, in the top right go ahead

18   and clear those circles.

19         Mr. Bennett, if you could, please, play the first five

20   seconds of the video.

21         (Video played.)

22   Q.    Now, while you're in the Ohio Clock corridor, do you recall

23   any disturbance that took place?

24   A.    There was screaming, yelling, angry individuals.

25   Q.    Okay.  And do you recall anything that was set off?

1    A.    Yes.  There was a -- at one point, there was a fire

2    extinguisher that was set off into the crowd.

3    Q.    Okay.  And at this point, Mr. Bennett, if you could,

4    please, play the video.  If you could pause it here, please.

5          What happened when the fire extinguisher was set off?

6    A.    It blasted us right in the face almost, and it set off --

7    we were coughing.  I was struggling to breathe for several

8    seconds, almost gagging, and just lost where I was for a second

9    but quickly regained my composure to --

10   Q.    Did the police line have to move?

11   A.    Yes, ma'am.  We moved back several feet.

12   Q.    Okay.  And what happened with the rioters?

13   A.    The rioters, they eventually confronted us again at our

14   police line.  Several of them were affected by the fire

15   extinguisher; several of them weren't.  They mulled around, and

16   then once we formed our line again, they came back.

17   Q.    Okay.  Mr. Bennett, if you could, please, play the video.

18         (Video played.)

19   Q.    Mr. Bennett, if you could go back to the last maybe three

20   seconds of that video and press pause.  That's good.  Thank you.

21         Officer Morgan, looking at the video, do you see whether or

22   not the individual wearing the red hat and carrying the red flag

23   has moved?

24   A.    Yes.  He's moved forward towards the police line.

25   Q.    Okay.  And do you see anyone else that's closer to the

1    front of the police line that you remember from January 6?

2    A.   Yes, the man with the black skull cap.  He had a black

3    shirt with a "Q" on it.

4    Q.   Once again, if you could circle that individual's location

5    with the black skull cap.

6    A.   (Witness complied.)

7    Q.   Thank you.  And please clear the screen.

8         Mr. Bennett, if you could next pull up Government's Exhibit

9    24, also a video exhibit.  And if you could remove the zoom

10   function for just a moment, please.  Thank you.

11        Now, Officer Morgan, does this also appear to be the Ohio

12   clock corridor?

13   A.   Yes, ma'am.

14   Q.   And what is the time stamp in the upper left top of this

15   screen?

16   A.   2:32.

17   Q.   And for purposes of the record, I believe this exhibit was

18   also previously admitted.

19        Now, Mr. Bennett, can you, please, zoom in, focusing on the

20   upper left quadrant.  Thank you.

21        And Officer Morgan, do you see yourself in this frame?

22   A.   Yes, ma'am.

23   Q.   If you could, please, circle yourself.  All right.

24        And at this point, are there rioters closer to you in the

25   police line?

1    A.    Yes, ma'am.

2    Q.    You previously testified that the individual wearing the

3    red hat and carrying the red flag had approached; is that

4    correct?

5    A.    Yes, ma'am.

6    Q.    Okay.  And were you able to get a good look at that

7    individual at that time?

8    A.    Yes, ma'am.

9    Q.    I would like to show you two exhibits.

10         Mr. Bennett, if you could first pull up Government's

11   Exhibit 25.

12         Officer Morgan, do you recognize what's shown here?

13   A.    Yes, ma'am.

14   Q.    What do you recognize it to be?

15   A.    I'm sorry.  Repeat.

16   Q.    Sure.  What do you recognize it to be?

17   A.    The Ohio clock corridor.

18   Q.    And is there anyone in particular that's pictured here that

19   you remember being present in the Ohio clock corridor on

20   January 6?

21   A.    Yes.  I remember the man with the mustard sweatshirt, the

22   man with the flag and the bull horn, the man with the red hat

23   with the red flag.

24   Q.    And the man with the red hat holding the red flag, can you

25   tell what his shirt says?

1    A.    Let's see.  It says inauguration, the president, and then

2    the date at the bottom says January 20, 2017, Washington, D.C.

3    Q.    Okay.  And does he also seem to be wearing some sort of

4    identification?

5    A.    Yes, almost like an identification card of some sort.

6    Q.    And if I could also have you take a look at Government's

7    Exhibit 33.  Do you recognize what's in this photograph?

8    A.    Yes, ma'am.

9    Q.    And what does this appear to be?

10   A.    This is the Ohio clock corridor.  This is our makeshift

11   police line still holding.

12   Q.    Okay.  And is this the same individuals that were shown in

13   Government's Exhibit 25, just from a different angle?

14   A.    Yes, ma'am.

15   Q.    And again, the individual with the red hat/red flag is in

16   this photograph; correct?

17   A.    Yes, ma'am.

18   Q.    Okay.  And do you recall where you were standing in

19   relation to the individual wearing the red hat/red flag on

20   January 6?

21   A.    In this photo right here, I believe either right in front

22   or a little bit to his left.

23   Q.    And can you estimate the distance, to the best of your

24   memory?

25   A.    Not more than several feet.

1   Q.   Okay.  Do you see that individual here in the courtroom

2   today?

3   A.   Yes, ma'am.

4   Q.   And where do you see him?

5   A.   He's sitting at the table behind you in a white shirt with

6   a beard.

7            MS. ALSWORTH:  Okay.  And if the record could reflect

8   that he has identified the defendant, Your Honor.

9            THE COURT:  It will so reflect.

10            BY MS. ALSWORTH:

11   Q.   You mentioned that you were several feet from the

12   defendant.  Was there anything that caught your attention about

13   him?

14   A.   Yes.  He had what seemed to be cradled next to him what I

15   thought -- I'm a Civil War buff.  So to me at first glance, it

16   looked to me like a Civil War-era cannonball.  He had it cradled

17   against his left hip, almost indicating that it was of some

18   weight.  Generally, those cannonballs weigh about 12 pounds.  He

19   had it cradled up against him, and we could only see a portion

20   of it, but to me, that's what it looked like.  And it raised an

21   alarm to not only myself but Officer Gelfand, who was standing

22   right next to me.

23   Q.   Why did it raise an alarm to you?

24   A.   Because all day we had heard over the radio that there had

25   been bomb threats.  We were currently investigating several

1    bombs throughout the complex.  And I know that this not only can

2    be used as a weapon by striking someone with it, but had

3    munitions in it.  So --

4    Q.   Okay.  And Mr. Bennett, if you could, please, return to

5    government's video Exhibit 24, leaving the zoom function

6    activated, please, and if you could, please, play the first 26

7    seconds.

8         (Video played.)

9    Q.   And Officer Morgan, if you could look towards the left

10   center of the screen, there seems to be an individual pointing

11   there.  Do you see that?

12   A.   I'm sorry.  Repeat.

13   Q.   There seems to be an individual pointing in the middle left

14   of the screen?

15   A.   Yes, ma'am.

16   Q.   Do you recognize who that individual is?

17   A.   Yes.  That's myself.

18   Q.   Okay.  And what are you pointing at there?

19   A.   The object the defendant's carrying.

20   Q.   What, if anything, did you do when you saw that object?

21   A.   So first, I asked him, What is that?  Like I said, I

22   thought it could be a Civil War cannonball, and that day, we had

23   seen everything so far.  So we had to expect the unexpected.  So

24   he wouldn't really give us an answer to what it was.

25   Q.   Did he offer to show it to you?

1    A.    Eventually, yes.

2    Q.    Okay.  And Mr. Bennett, if you could, please, pull up

3    Government's Exhibit 26 and remove the zoom function, please.

4    There we go.

5         Officer Morgan, do you recognize what's shown in

6    Government's Exhibit 26?

7    A.    Yes, ma'am.  That's the object that the defendant had

8    cradled up against his left side when I first saw it.

9    Q.    Okay.  And after you walk up, begin a conversation with

10   him, what happened next?

11   A.    He eventually had showed it to us, and it ended up being

12   almost like a hollowed-out bowl.  So Officer Gelfand and I had

13   asked him to place it back into his bag, and as he went to put

14   it back into his bag is when he pulled out a 10- to 12-inch

15   hatchet.

16   Q.    Okay.  And just so I make sure we're understanding each

17   other, you say 10 to 12 inches.  When I think of a hatchet, I

18   think of something that's very large or has a very large knife.

19   Can you be more specific than just 10 to 12 inches?

20   A.    10 to 12 inches, but it has a sharp blade on it still.

21   Where I'm from, we use that to cut small trees and stuff down

22   like that.

23   Q.    Okay.  And what happened next?

24   A.    Immediately, I asked, Why do you have that?  And the

25   defendant answered, For protection.

1    Q.    Okay.  Did you make any further inquiry at that point?

2    A.    Not at that point.

3    Q.    Okay.  And did you confiscate the hatchet?

4    A.    No, we did not.

5    Q.    Was there a reason you didn't do that?

6    A.    Yes.  It was a hectic, chaotic scene.  We didn't have a

7    secure place to take it or put it.  We did not want to put it on

8    ourselves.  Our building had been compromised.  To what point,

9    we didn't know.  Even if we would take it down to our office, we

10   had no idea if our office had been overran.  There was just no

11   safe place to put it.  There was no place I would be comfortable

12   taking it.  At the end, we just decided that it would be best if

13   it was placed back in the bag, zippered, and we went from there.

14   Q.    Okay.  And is that, in fact, what happened?

15   A.    Yes, that did happen, but before that, the officer I was

16   with, Officer Gelfand, searched the defendant's bag.

17   Q.    Okay.  And were you present for the search?

18   A.    Yes, ma'am, I was.

19   Q.    While Officer Gelfand was searching the bag, what were you

20   doing?

21   A.    I was engaging verbally with the defendant trying to get

22   his attention onto me instead of Officer Gelfand for officer

23   safety reasons.

24   Q.    Okay.  And when you say you were engaging him, were you

25   having a conversation with him?

1    A.    Yes, ma'am.

2    Q.    And what was that conversation?

3    A.    I had asked him where he was from.  He stated that he was

4    from Frederick, Maryland.  I asked him how he got here.  He had

5    stated that he had gotten here with the man in the mustard

6    sweatshirt.  I asked him why were you here.  He stated that he

7    was here in support of President Trump and to stop the steal.

8    Q.    Okay.  And backing up just a moment, why specifically -- is

9    there a reason that you remember he said he was from Frederick,

10   Maryland?

11   A.    Yes.  I have family up there.  So it kind of raised some

12   hairs on the back of my neck.

13   Q.    Okay.  And Mr. Bennett, if you could return to Government's

14   Exhibit 24, please, and beginning at 00:26, please play the

15   video to the end.

16         (Video played.)

17   Q.    If you could pause for just a moment, please.

18         Officer Morgan, who is that standing next to you?

19   A.    Standing next to me is Officer Gelfand.

20   Q.    Okay.  And, Mr. Bennett, could you resume playing.

21         (Video played.)

22   Q.    After the bag was zipped up, did your interaction with the

23   defendant end?

24   A.    It ended pretty much, yes.

25   Q.    Okay.  And did you remain in the Ohio clock corridor for a

1    period of time?

2    A.   Yes, I did.

3    Q.   Did the defendant remain there as well?

4    A.   He did for a time.  I remember he was standing in front of

5    me waving his flag, and I believe someone was taking photos of

6    him.

7    Q.   Okay.  And, Mr. Bennett, if you could, please, pull up

8    government's video Exhibit Number 27.

9         And, Officer Morgan, is this still the Ohio clock corridor?

10   A.   Yes, ma'am, it is.

11   Q.   And the time stamp is 2:41 p.m.; is that correct?

12   A.   Yes, ma'am.

13   Q.   Almost 2:42.

14        Okay.  Mr. Bennett, if you could, please, play it.

15        (Video played.)

16   Q.   And I apologize.  Pause for a moment.  If you could remove

17   the zoom function.

18        (Video played.)

19   Q.   Did the defendant and others eventually leave the Ohio

20   clock corridor altogether?

21   A.   Yes, ma'am.

22   Q.   And at some point did you leave as well?

23   A.   Yes, ma'am.

24   Q.   At any point when you were in the Ohio clock corridor, did

25   you hear any other officers tell the rioters to stay in the

1  corridor --

2  A.   No, ma'am.

3  Q.   -- because it was safer?

4  A.   No, ma'am.

5  Q.   Were any of them ordered to leave at any point?

6  A.   We tried telling them to exit the building, but they didn't

7  listen.

8  Q.   Okay.  I'd like to show you one other video.

9       Mr. Bennett, if you could pull up Government's Exhibit 28.

10       (Video played.)

11  Q.   That's good there, if you can pause it, please.

12       Officer Morgan, do you recognize where this is located?

13  A.   Yes.  This is on the first floor right below the Senate

14  chamber.  We call it the Senate carriage door.

15  Q.   And is it a point of entry or exit for the building?

16  A.   Yes, ma'am.

17  Q.   And, Mr. Bennett, if you could, please, play, stopping at

18  00:07.

19       (Video played.)

20  Q.   And do you see the defendant in this video?

21  A.   Yes, ma'am.

22  Q.   Okay.  And which way is he going?  Towards the entrance --

23  or exiting the building?  I guess that's a better way to put it.

24  A.   Yes, he's exiting the building.

25  Q.   And what is the time stamp at the top of the screen?

A.    2:55.

Q.    Okay.  And, Mr. Bennett, if you could finish playing the video, please.

        (Video played.)

            MS. ALSWORTH:  May I have just a moment, Your Honor?

            THE COURT:  You may.

        (Government counsel conferred.)

            MS. ALSWORTH:  I will pass the witness, Your Honor.

            THE COURT:  Thank you, Ms. Alsworth.

        Mr. Burnham?

            MR. BURNHAM:  Thank you, Your Honor.

                         CROSS-EXAMINATION

            BY MR. BURNHAM:

Q.    Good morning, Officer Morgan.  I'm Charles Burnham.

A.    Good morning, sir.

Q.    Give me just one moment to get set up here.

        Okay.  Officer Morgan, you were just shown a series of videos from the Ohio clock room.  You recall that; right?

A.    Yes, sir.

Q.    So that room, it's not a small room, but it's by a long shot not the most spacious room in the Capitol; would that be fair?

A.    Correct.

Q.    And there were at various times at least several dozen people in there?

1  A.   That's correct.

2  Q.   Between officers and protestors; right?

3  A.   That is correct.

4  Q.   And so -- and these people are talking, they're shouting,

5  they're saying stop the steal.  There's all sort of cacophony;

6  would that be right?

7  A.   That is correct.

8  Q.   And then with all those folks talking in a small space,

9  there's at least going to be a little bit of an echo effect;

10  right?

11  A.   A little bit.

12  Q.   And at least among the officers and at least a couple of

13  the protestors had masks on seemingly; right?

14  A.   Yes.

15  Q.   All right.  So a part of your concern here, I assume, is

16  that these individuals, to your knowledge, hadn't passed through

17  the normal security procedures into the Capitol; right?

18  A.   That's correct.  Normally, we have metal detectors and ESP

19  body scanner machines, and nobody went through those that day.

20  Q.   So part of your concern here is you don't know if any of

21  these protestors had weapons or anything else that --

22  A.   That's correct.

23  Q.   -- they weren't allowed to have?  Okay.

24       So who was the first person who -- is it your testimony

25  that you spotted the hatchet first, or was that Officer Gelfand

1    who saw it first?

2    A.    We may have seen it simultaneously.  I remember as we asked

3    him to put what I thought was the cannonball away, he had pulled

4    it out.  Officer Gelfand and I were both there.  So it was

5    probably simultaneously.

6    Q.    And your testimony is not, to be clear, that he took it out

7    in an aggressive way; right?

8    A.    He had took it out to make room to put the object away.

9    Q.    Okay.  So your testimony is that there wasn't space in the

10   bag to put both the hatchet and the cannonball-looking thing?

11   A.    He had taken the hatchet out to make space for what I

12   presumed was a cannonball at first.

13   Q.    Okay.  And then he put in the cannonball; is that right?

14   A.    Yes.

15   Q.    So there was enough space in the bag for both the hatchet

16   and the cannonball; right?

17   A.    Yes.

18   Q.    Okay.  So your testimony is not that he needed to take the

19   hatchet out to make room for the cannonball, because they both

20   could fit; right?

21   A.    Well, he needed to take it out because it was on top.

22   Q.    And what are you basing that on?

23   A.    That the first thing he took out was that.

24   Q.    Okay.  So in the presence of multiple law enforcement

25   officers at the United States Capitol, he had no choice but to

1   display a hatchet; is that right?

2   A.   Correct.

3   Q.   Okay.  And the absolute safest thing you could think to do

4   was to just give him the hatchet back?  That's your testimony?

5   A.   There were no good decisions that day.  That was -- we made

6   a judgment call at that time, and that's what we decided to do.

7   Q.   And you had no idea who this person was?

8   A.   No.

9   Q.   Had you looked at his ID?

10  A.   No.

11  Q.   You didn't know why he was there?

12  A.   He had told me.  He had told me he was there to support the

13  president and stop the steal.

14  Q.   All right.

15  A.   He had told me where he came from.  He told me who he was

16  with.

17  Q.   Uh-huh.  And you claim he told you that he came there with

18  the man in the mustard sweatshirt?

19  A.   Yes, sir.

20  Q.   This is the gentleman we saw on the video with the ponytail

21  and the beard?

22  A.   Yes, he had a long ponytail, yes.

23  Q.   And you've been interviewed by law enforcement in

24  connection with this case at least three times; is that right?

25  A.   By law enforcement?

1    Q.   Or U.S. Attorneys or someone -- by the prosecution team in

2    connection with this case at least three times; right?

3    A.   Yes.

4    Q.   Okay.  And you were questioned about -- specifically about

5    the defendant in this case during those interviews; right?

6    A.   Yes.

7    Q.   And you've never previously said, have you, that he stated

8    that he had come to the Capitol with the gentleman in the

9    mustard shirt?

10    A.   Repeat that, please.

11    Q.   I don't think you've -- you haven't previously stated, have

12    you, in interviews with law enforcement that Nicholas Rodean

13    told you he came to the Capitol with a man in a mustard

14    sweatshirt?

15    A.   I did; yes, I did.

16    Q.   Did you?

17    A.   I did.

18    Q.   And you're aware that the government has often charged

19    people that came to the Capitol together as co-defendants?

20    A.   No, I'm not aware.

21          MS. ALSWORTH:  Objection.

22          THE COURT:  Sustained.

23          MR. BURNHAM:  I will move on.

24          BY MR. BURNHAM:

25    Q.   You deny that any officer in the Ohio clock room told any

1     of the individuals there that they couldn't leave because it

2     wasn't safe?

3     A.   No, I didn't hear that at all.

4     Q.   You didn't hear anybody say anything like that?

5     A.   No, I didn't.

6     Q.   All right.  Isn't it a fact that Officer Goodman had

7     specifically, in his recounting, lured those individuals into

8     the Ohio clock room to prevent them from gaining access to the

9     Senate chamber; right?

10     A.   He did.

11     Q.   So it was in law enforcement's interest at that time, in

12     fact, that the individuals stay in the Ohio clock room; right?

13     A.   Yes --

14     Q.   You would not have wanted them wandering unsupervised

15     wherever looking for exits; right?

16     A.   Correct.

17     Q.   Because as you already said, you don't know who had

18     weapons, who didn't have weapons, and so on.  All right.

19         And in fact, the building was locked down; right?  The

20     doors were locked, so you could not exit; right?

21     A.   At the time.

22     Q.   All right.  So these individuals could not have just left;

23     right?

24     A.   Eventually, yes.

25     Q.   Right.  But at the time when you first encountered them,

1    they were physically prevented from leaving by the lockdown

2    status; right?

3              MS. ALSWORTH:  Objection, Your Honor.

4              THE COURT:  Overruled.

5              THE WITNESS:  That's not true.  They could go out the

6    same way they came in.  The doors and the wings were open.

7              BY MR. BURNHAM:

8    Q.   So your testimony is you were telling them to leave with

9    the expectation that they would --

10   A.   I --

11   Q.   Let me finish my question.  Is it your testimony that you

12   were telling them to leave with the expectation that they would

13   crawl back out broken windows?

14   A.   I did not tell anyone that, but there were doors that were

15   breached and open on the first floor.

16   Q.   Okay.  So you're telling me that your testimony is you told

17   these individuals to leave with the expectation that they would

18   go back out through breached doors?

19             MS. ALSWORTH:  Objection, Your Honor.  I think that

20   mischaracterizes his testimony.

21             MR. BURNHAM:  Well, it's the question.

22             THE COURT:  All right.  You can answer.

23             THE WITNESS:  Repeat it, please.

24             BY MR. BURNHAM:

25   Q.   Your testimony is you told the individuals in the Ohio

1    clock room to leave immediately with the expectation that they

2    would exit through illegally, in your mind, breached doors?

3    A.    Doors that were already open and -- yes.

4    Q.    So you had no concern -- you didn't have the manpower to do

5    an escort at that time?

6    A.    No.

7    Q.    All right.  So they would have been wandering unsupervised,

8    possibly with weapons, to illegally breached doors, and that was

9    what you wanted to see happen?

10   A.    No.  What I wanted to see happen is get these people as far

11   away from the members and staff as we could.

12   Q.    Which is what was accomplished by corralling them in the

13   Ohio clock room; correct?

14   A.    To a point.

15   Q.    Okay.  So isn't it true that they were told, Stay here and

16   eventually we'll escort you out when it's safe?

17   A.    That never came --

18   Q.    You adamantly deny that?

19   A.    No, no one said that.

20   Q.    Okay.  Isn't it true you've previously told law enforcement

21   that you were trying to stall and distract the rioters in the

22   Ohio clock corridor while senators, staff, and the vice

23   president were evacuated?

24   A.    To a point, yes.

25             MR. BURNHAM:  Court's indulgence.

1           BY MR. BURNHAM:

2    Q.   The Capitol Police posted signage and on the Internet have

3    lists of things you can't bring in the Capitol; right?

4    A.   That's correct.

5    Q.   Knives, obviously guns; correct?

6    A.   Bombs.

7    Q.   Bombs.  In fact, hollow half cannonballs are not a

8    prohibited item?

9    A.   That's correct.

10   Q.   And neither are hatchets actually?

11   A.   Hatchets, yes, that can be considered a dangerous weapon.

12   We would not let that in.

13   Q.   But the term "hatchet" is not listed on the website or on

14   the posted signage; correct?

15   A.   Not to my knowledge.

16           MR. BURNHAM:  All right.  No further questions.  Thank

17   you.

18           THE COURT:  Sorry.  So is it your testimony that it

19   was a hollowed-out cannonball or it was a bowl?

20           THE WITNESS:  When he finally showed it to us, it

21   looked to me like a bowl, but like I said, we were worried,

22   because of everything that was going on outside that we were

23   hearing over the radio, that it could be a cannonball.

24           THE COURT:  Sure.  No, you thought it was a cannonball

25   initially, but then you saw it?

```
 1              THE WITNESS:  Yeah.

 2              THE COURT:  Okay.  Thank you.

 3         Any redirect, Ms. Alsworth?

 4              MS. ALSWORTH:  May I have just a moment, Your Honor?

 5              THE COURT:  Yes.

 6         (Government counsel conferred.)

 7              MS. ALSWORTH:  No redirect, Your Honor.

 8              THE COURT:  Okay.  Thank you, sir.  You may step down,

 9    and you're free to go.  I appreciate your testimony here today.

10              THE WITNESS:  Thank you.

11              THE COURT:  The government may call its next witness.

12              MS. ALSWORTH:  Your Honor, the government calls Jason

13    McIntyre.

14              THE COURT:  All right.  Sir, if you could come right

15    up here.

16         JASON MCINTYRE, WITNESS FOR THE GOVERNMENT, SWORN

17              THE COURT:  Good morning, sir.  You can have a seat.

18                        DIRECT EXAMINATION

19         BY MS. ALSWORTH:

20    Q.   Good morning.  If you could, please, state and spell your

21    name for the record.

22    A.   Yes.  Jason McIntyre, J-a-s-o-n, McIntyre, M-c-I-n-t-y-r-e.

23    Q.   And, Mr. McIntyre, where do you work?

24    A.   I work for the Architect of the Capitol.

25    Q.   What's your position there?
```

A.    I am the deputy superintendent for the United States
Capitol.

Q.    How long have you worked for the Architect of the Capitol?

A.    A little over 14, almost 15 years now.

Q.    And how long have you been a deputy superintendent?

A.    Since late 2019.

Q.    Okay.  And if you could, please, describe what the purpose
of the Architect of the Capitol is and specifically what your
job duties and responsibilities are.

A.    Yes.  The role of the Architect of the Capitol is to
preserve and maintain the United States Capitol and the Capitol
complex.  I work for the Capitol Superintendent's Office.  So
our office is specifically designated to maintaining and
preserving the United States Capitol and the Capitol Visitor
Center.

      My role is to oversee and help guide the 225 staff that are
the hands-on staff that maintain and preserve the Capitol.

Q.    Okay.  And what all is involved in maintaining and
preserving the Capitol?

A.    We perform work anywhere from light maintenance to major
construction.  We perform masonry, architectural services,
cleaning, the whole wide arrangement of a facilities management
company.

Q.    I would like to direct your attention to January 6 of 2021.
Were you aware that the Capitol building was damaged that day?

1    A.    Yes.

2    Q.    And when did you receive that information?

3    A.    On the 6th.

4    Q.    Okay.  And once you were notified that the building had

5    been damaged, what did you do?

6    A.    My supervisor, myself, and a team of individuals had

7    several conference calls on the afternoon and the evening of the

8    6th to determine what our next steps would be.  And we

9    determined that first thing in the morning on the 7th we would

10   stand up what we call our disaster assessment teams, and those

11   disaster assessment teams would come into the building and

12   determine what damage there was and put in plans to correct that

13   damage.

14   Q.    Okay.  And did you, in fact, go to the Capitol building on

15   January 7?

16   A.    On January 7, yes.

17   Q.    What time did you arrive?

18   A.    Shortly before 5:00 a.m.

19   Q.    And what did you do?

20   A.    The first thing we did, we had --we established four teams

21   of multiple individuals ranging in different skill sets.  We

22   then identified how to safely go through the building and

23   identify what damage there was and identify the level of damage,

24   whether it was an immediate safety issue or if it was something

25   that was -- that could be taken care of at a later time.

1      And then my team, we began assessing the building on the

2  interior of the building.

3  Q.   Okay.  And the teams that you're referring to, is that the

4  disaster assessment team that you previously referenced?

5  A.   Yes.

6  Q.   And generally, as you walked around the Capitol building on

7  the morning of January 7, what did you see?

8  A.   You know, at first, much of the damage was broken glass,

9  broken doors, graffiti, damaged objects within the building,

10  whether it be signs or flag poles or things of that nature, a

11  lot of -- a lot of damage to the exterior facade of the

12  building.

13  Q.   Okay.  Did you see broken windows?

14  A.   Yes.

15  Q.   Did you see debris and other trash strewn around?

16  A.   Yes.

17  Q.   Did you see whether or not any doors had been breached?

18  A.   Yes.

19  Q.   And I would like to talk to you specifically about an area

20  referred to as the Senate connecting corridor.  Do you know

21  where that is?

22  A.   Yes.

23  Q.   Where is that located?

24  A.   The Senate connecting corridor is the corridor that

25  connects the original main Capitol to the Senate wing extension

1   that was built in the 1850s.

2   Q.   Okay.  And your office is in the Capitol; correct?

3   A.   It is, yes.

4   Q.   Are you familiar with the layout of the Capitol and the

5   different rooms?

6   A.   Yes.

7   Q.   Okay.  And on the morning of January 7 or any time that

8   day, did you notice whether there was any damage in the Senate

9   connecting corridor?

10   A.   There was some extensive damage in the Senate connecting

11   corridor.  Not only was there a significant amount of debris in

12   that corridor, but there was also multiple broken windows, as

13   well as a door that had been breached and damaged.

14   Q.   Okay.  And in addition to the windows, was there anything

15   else that was damaged?

16   A.   Some furniture.  So in that room, we have some information

17   kiosks that kind of explain different historic items throughout

18   the building.  Those kiosks had been broken.  The shutters from

19   the windows had been broken.  I think that -- and at that time

20   when I got there on the 7th, some had already been cleaned up

21   just from a safety and security perspective on the evening of

22   the 6th.

23   Q.   You mentioned the kiosk.  Where is that typically located?

24   A.   There are -- typically, there is a kiosk underneath each

25   window.  And so as a -- someone who is walking through the

1    building, whether it be on a tour or whether it's a person who

2    has access to that section of the building is walking through,

3    there's some information they can read while looking out the

4    window.

5    Q.    Okay.  And if you're standing inside the Senate connecting

6    corridor facing the door, how many windows are there?

7    A.    There are two.  There's one on either side of that door.

8    Q.    And how are you defining a window?

9    A.    So a window would be that entire opening.  So it's -- so if

10   you're looking at that door, the window to the right-hand side

11   of that is -- so the windows on either side are identical.  That

12   window to the right-hand side is, you know, multiple panes of

13   glass, I think it's four panes of glass on the bottom sash and

14   then four panes of glass on the top sash.

15   Q.    Two and two?

16   A.    Two, two, and that would be one sash, and then the upper

17   sash -- so if you were to lift your window in your house, you

18   would life the bottom sash.  That has multiple panes of glass as

19   well.

20   Q.    Okay.  And after you saw that there was damage in the

21   Senate connecting corridor or generally damage to the Capitol,

22   what happened?

23   A.    All of our teams recorded all of the damage that we were

24   able to find.  We did about a four-hour assessment of the

25   building with all the different teams, both interior and

1    exterior.  And then for the next several days, we determined

2    what was the highest priority from a safety and security

3    perspective and then put plans in place in order to have

4    those -- that damage corrected.

5    Q.   Okay.  Prior to January 6, was there another project that

6    the Architect of the Capitol was responsible for?

7    A.   Many, yes.

8    Q.   In particular, was there an upcoming event later in the

9    month of January?

10   A.   Yes.  The presidential inaugural was approaching.  It was

11   in about two weeks after January 6.  And there was a significant

12   amount of construction occurring on the west front of the United

13   States Capitol.  That's where the presidential inaugural stands,

14   the viewing stands, as well as all of the audio/visual,

15   everything that goes along with the inaugural is staged out on

16   the west front of the Capitol.

17   Q.   Okay.  And you testified a moment ago that you all had to

18   establish some priorities.  What were those in making the

19   repairs?

20   A.   Immediate danger items, if there were any, would obviously

21   be -- that's imminent danger to safety.  But then also with the

22   upcoming presidential inaugural, a worldwide televised event, we

23   had some immediate damage that had to be corrected since it was

24   in the vicinity of both the inaugural itself as well as all of

25   the impending television broadcasts.

1    Q.   And where is the Senate connecting corridor, specifically

2    the windows and the door, in connection to where the stage was

3    set up?

4    A.   If you are outside looking at the Capitol from, let's say,

5    the mall area, if you're standing on the mall looking at the

6    Capitol, so looking east, the Senate connecting corridor is just

7    north of the inaugural stands.

8    Q.   Okay.  And was part of -- did the damage assessment team

9    determine whether or not the Architect of the Capitol and its

10   employees could make necessary repairs?

11   A.   That was part of our assessment after the -- after the

12   damage assessment teams identified the damage, there was a group

13   of us that then determined how to repair that.  And that was one

14   of the -- that was one method that was considered, was to use

15   Architect of the Capitol employees to repair or to identify if

16   we had to use outside resources.

17   Q.   Okay.  And what, if any, outside resources were used,

18   specifically with reference to the Senate connecting corridor?

19   A.   We did not have the quantity or the type of glass needed to

20   repair these windows.  And so we hired a contractor who had the

21   glass available and had the manpower available in order to

22   repair -- to remove any broken glass and replace it with new

23   glass.

24   Q.   And what was the process to identify an outside vendor and

25   get that person on board to make these repairs?

1    A.    On the -- after the disaster assessment team identified

2    approximately the number of windows that were broken across the

3    entire United States Capitol, we then began looking at how much

4    glass we would need, and we started reaching out to glass

5    vendors and glass companies that we had used in the past.  We

6    identified a glass contractor who has done work for us, not

7    frequently but often enough, that they have gone through all of

8    the necessary background checks and had previously had Capitol

9    ID badges as part of a contract that we've had with them before.

10   And so we reached out to them to identify if they could assist

11   us with the repairs.

12   Q.    Okay.  And as a part of that process, are they required to

13   give you some sort of proposal or tell you how much they think

14   it's going to cost?

15   A.    Yes.  On the morning of the -- let me see here.  The 8th,

16   we brought them out to begin looking at the initial damages for

17   the first set of windows that we needed repaired immediately.

18   Following that walk-through, they provided us a proposal of how

19   much it would cost to repair those windows.  We also then

20   inquired if they had the glass necessary to repair all the

21   windows that we needed, and from there, they provided us the

22   initial proposal for the initial set of windows.

23        And we used that information, along with the urgency to

24   repair and the timeliness of when they could do it, to develop a

25   sole source justification to go out to that company to do all of

1  the necessary glass repairs.

2  Q.   Okay.  And Mr. Bennett, if you could, please, pull up

3  Government's Exhibit 37.

4        Mr. McIntyre, do you recognize what's shown in Government's

5  Exhibit 37?  And we can show you page 2 as well.

6  A.   I'm familiar with this document.

7  Q.   You recognize it?

8  A.   I do, yes.

9  Q.   And what is it?

10  A.   This is our glass contractor's proposal that they provided

11  for a group of windows that included the Senate connecting

12  corridor windows to be repaired.

13  Q.   Okay.  And what specifically is included in the estimate?

14  A.   Labor and materials in order to remove the glass, any

15  broken glass pieces that remained inside that opening and then

16  replace the glass.

17        MS. ALSWORTH:  Okay.  The government moves to admit

18  Exhibit 37.

19        MR. BURNHAM:  No objection.

20        THE COURT:  Without objection, 37 is in.

21  (Government Exhibit 37 received into evidence.)

22        BY MS. ALSWORTH:

23  Q.   In looking at this proposal, does it reflect different

24  sizes of panes?

25  A.   It does, yes.

Q.   And are there some that are even thicker or more dense than others?

A.   Yes.  If you would show page 2, the last three windows on this -- so there are multiple sizes.  If you can imagine, windows in a building that's several hundred years old has windows that are of all different sizes, and the panes of glass are different sizes.  In addition, this estimate also included three windows that required a much thicker piece of glass in that opening.

Q.   And for the materials and labor that were covered in this estimate, they gave you a total cost; is that right?

A.   They did.  They gave us a lump sum cost for labor and a lump sum cost for materials.

Q.   And what was that total cost?

A.   The $16,000.

Q.   Okay.  And it's $16,095?

A.   $16,095, yes.

Q.   What did you do next?

A.   One of the employees who works for me reviewed this to be -- for fair and reasonableness.  They reviewed this for the different windows that were required to be quoted for this walk-through that they went through.  If you recall earlier, I said we did multiple different walk-throughs with the glass vendor.  That was in order to have them price individual repairs and then come out and perform those repairs, and that process

was repeated for different openings.

    So once the gentleman who works for me reviewed this for
fair and reasonableness, we would have then submitted this to
our contracting officer, who would have then made the award for
this dollar amount to the contractor.

Q.    Okay.  The contractor was hired?

A.    The contractor was hired, yes.

Q.    And did the contractor complete the work?

A.    Yes, they have.

Q.    And was the contractor paid this amount, the $16,095?

A.    I'm sorry.  Can you repeat the question?

Q.    Was the contractor paid the amount shown in the proposal?

A.    Yes, they were.

Q.    And does the proposal cover any additional expenses that
may have been incurred by the Architect of the Capitol?

A.    This proposal does not.  So this proposal was just for the
labor and materials to remove the broken glass and replace with
new glass.  But there were other charges in order to repair
those windows as well.

Q.    What were those charges?

A.    Our Architect of the Capitol employees.  So you can
imagine, these windows are from the 1850s.  The first thing we
had to do was identify if there was any hazardous materials that
would be disturbed, like paint in particular, and if so, we
would have to perform a different set of removal prior to the

1   glass contractor coming in.

2          In addition, once the glass was replaced, our paint shop

3   then had to repaint the windows, as well as touch up any of the

4   surrounding damage to the window itself.

5   Q.   And just backing up for a moment, were there any temporary

6   repairs that were made on January 6 to these windows?

7   A.   Yes.  On the evening of the 6th, the Capitol Police had

8   asked our carpentry shop to install plywood on any opening that

9   had been -- any location that had been breached and was still

10   open to the outside.

11   Q.   With regard to the two windowpanes that are, if you're

12   facing the Senate wing door, to the right side, did you assist

13   in preparing an estimate for the total cost to repair those two

14   windowpanes?

15              THE COURT:  And that's for looking out; right?

16              MS. ALSWORTH:  If you're looking out, correct.

17              THE WITNESS:  Yes.

18              BY MS. ALSWORTH:

19   Q.   And, Mr. Bennett, if you could pull up Government's Exhibit

20   36.

21          Mr. McIntyre, do you recognize what is shown here?

22   A.   Yes.  That is the Senate connecting corridor.

23   Q.   Okay.  And there are two windows on the right side; is that

24   correct?

25   A.   One window, two panes of glass.

1    Q.    Two panes.  Thank you for correcting me.  One window, two

2    panes, okay.

3        And did you assist in preparing the estimate that's shown

4    here?

5             MR. BURNHAM:  Your Honor, I have an objection to this

6    exhibit before we get into the details of it.

7             THE COURT:  Okay.

8             MR. BURNHAM:  This seems to have been prepared in

9    anticipation for litigation, which would take it out --

10            THE COURT:  Actually, could you approach the

11   microphone, sir.

12            MR. BURNHAM:  I'm sorry.  This appears to have been

13   prepared in anticipation for litigation from the nature of the

14   document and the way it contrasts with the prior one, which

15   would take it out of the business records exception.  So I

16   object on hearsay grounds.  Hearsay is the objection.

17            THE COURT:  Okay.  Ms. Alsworth?

18            MS. ALSWORTH:  Your Honor, I think I can clarify

19   through the witness, if I may.

20            THE COURT:  You may.

21            BY MS. ALSWORTH:

22   Q.    After the Capitol was breached, did your office collect and

23   keep a record of the amount of damage and the amount of costs

24   that were associated with repairs to the Capitol?

25   A.    We began that process, yes.

Q.   Okay.  And did that process result in one lump sum
essentially or an estimate?

A.   Yes.  So over time, we were asked to provide estimates in
different formats.  And so when we were initially approached in
order to record and track damage associated with the building,
the initial time that we were asked to provide damage estimates
was by room.  And so an initial estimate for the Senate
connecting corridor would have been -- for all damage in that
corridor would have been the first dollar amount that we would
have provided.

Q.   And any of the estimates that were provided were based on
expenses that were actually incurred by the Architect of the
Capitol?

A.   Or estimated, yes, yeah.

          THE COURT:  So did you create this document, sir?

          THE WITNESS:  I did not.

          THE COURT:  Okay.  So I guess I'm still wondering --
you're arguing this is a business record?

          MS. ALSWORTH:  May I clarify with one other point with
him?

          THE COURT:  Sure.

          BY MS. ALSWORTH:

Q.   There's a dollar amount that's listed in this particular
exhibit; is that correct?

A.   Yes.

1   Q.   Okay.  And did you assist in coming up with this dollar

2   amount, this particular figure?

3   A.   Yes, I did.

4   Q.   And did you provide that to legal counsel for the Architect

5   of the Capitol?

6   A.   I did, yes.

7   Q.   And that's where this dollar figure comes from?

8   A.   Correct.

9         MR. BURNHAM:  I maintain my objection.  That's just

10   1 percent of the document is that figure.  The document speaks

11   for itself.  It was provided to legal counsel.  I maintain my

12   objection.  It's not a business record.

13         THE COURT:  Ms. Alsworth, do you have a response?

14         MS. ALSWORTH:  Your Honor, I think from the

15   government's perspective, it was, but I do understand that in

16   connection with this case it was a piece of the estimate that

17   was given to the government.

18         THE COURT:  Okay.  So I'm going to sustain the

19   objection.  I think you can certainly ask him about information

20   he's aware of, but I don't think the document comes in.

21         MS. ALSWORTH:  Sure.  Thank you, Your Honor.

22         BY MS. ALSWORTH:

23   Q.   Mr. McIntyre, I would like to take you back to the

24   estimated costs -- Mr. Bennett, you can take that exhibit down.

25   Thank you -- specifically for those two windowpanes.  Were you

able to estimate, based on the documentation from the proposal

and the expenses that were incurred by the Architect of the --

MR. BURNHAM:  Objection, Your Honor.

THE COURT:  What basis?

MR. BURNHAM:  This calls for -- we're getting into, I

think, expert testimony here.  Before, he was just factually

laying out the process for, you know, assessing the damage and

who they called and so on.  But now the testimony, I think,

that's about to be elicited is his mathematical apportionment of

the $16,000 bill and how that applies to the two windows, which

absolutely is in the territory of technical and specialized

knowledge.

If you look at the *Daubert* cases, there's cost estimating

cases, and they're all over the place.  This witness was not

noticed as an expert, for one, and he hasn't been qualified as

one here today.  That's my objection.

THE COURT:  Response?

MS. ALSWORTH:  As to the math, Your Honor, I'm not

sure he has to be an expert to testify as to the math.  He is a

fact witness and has testified that he made the calculations.

THE COURT:  All right.  I think I want to go ahead and

hear the testimony, and I'll -- we can come back to this.  I'm

inclined to agree with Ms. Alsworth that this sounds like this

is going to be fact testimony and an area within his knowledge.

But I'm happy to -- you're welcome to renew it afterwards.  I'd

1    like to hear the testimony, though.

2         You may proceed, Ms. Alsworth.

3              MS. ALSWORTH:  Thank you, Your Honor.

4              BY MS. ALSWORTH:

5    Q.   And you've testified that you looked at the proposal that

6    was prepared in connection with, in part, these windows; is that

7    right?

8    A.   That is correct.

9    Q.   Okay.  And in your role as deputy superintendent, were you

10   also able to look at other records for time and materials spent

11   by the Architect of the Capitol's office?

12   A.   Yes.

13   Q.   In connection with these window repairs?

14   A.   Yes.

15   Q.   Okay.  And based on those figures, were you able to

16   estimate how much it cost to repair these two particular

17   windowpanes?

18   A.   Yes.

19   Q.   And can you explain to us how you did that?

20   A.   In working with our -- the contractor who provided the

21   material and labor, as you stated earlier, there are three

22   windows that are a different thickness of glass.  We worked with

23   them to identify the order of magnitude that those are more

24   expensive than the remainder of the quarter-inch glass that's

25   for all of the remaining windows.

1          Those three pieces of glass were about four times as

2     expensive as the quarter-inch glass.  And in having the

3     contractor assist us, we determined that at four times as

4     expensive, we weighted those windows as -- gave them a

5     mathematical factor to make them more expensive than the

6     remainder of the glass.

7          That estimate there has 28 pieces of glass that were

8     replaced.  When you mathematically weight those three thicker

9     pieces at a four-time factor, you divide both the labor and

10    materials by a factor of 37, which then gets you an average cost

11    per windowpane.

12    Q.   And what was the average cost per windowpane?

13    A.   It's -- I believe that it was a little over $200 for the

14    glass and -- I don't remember the exact number.  I think it's

15    like $250.

16              MR. BURNHAM:  Objection; speculation.  He doesn't

17    remember the number.

18              THE COURT:  Overruled.

19              BY MS. ALSWORTH:

20    Q.   Did you prepare a document that shows the breakdown of what

21    your estimates were based on those mathematical figures?

22    A.   Yes, I did.

23    Q.   Okay.  And, Mr. Bennett, if you could, please, pull up

24    Government's Exhibit 31.

25         Mr. McIntyre, do you recognize what's shown here?

1   A.   Yes.  This is the estimate that we provided for these

2   windows.

3   Q.   Okay.  And does it show a breakdown of expenses associated

4   with the replacement?

5   A.   Yes, it does, per windowpane.

6   Q.   Per pane?

7   A.   Per windowpane, correct.

8   Q.   Okay.  And having taken a look -- I'm sorry.

9        Your Honor, at this time the government would move to admit

10   Government Exhibit 31.

11        MR. BURNHAM:  Objection based on it's not a proper

12   business record, and I maintain to all of these questions my

13   objection based on improper expert testimony from a lay witness.

14        THE COURT:  I will hear your response on 31.  You're

15   arguing this is a business record?

16        MS. ALSWORTH:  Pardon, Your Honor?

17        THE COURT:  You're arguing this is a business record?

18        MS. ALSWORTH:  No, but I can lay a different

19   foundation for it at this time, if that's --

20        THE COURT:  Okay.

21        BY MS. ALSWORTH:

22   Q.   Mr. McIntyre, taking a look at Government's Exhibit 31,

23   does it document the mathematical calculations per pane?

24   A.   It does not document --

25   Q.   I'm sorry.  The estimate's based on the mathematical

1    calculations?

2    A.   Yes, it is.

3    Q.   And would it refresh -- let me back up.

4         Mr. Bennett, can you take the exhibit down.

5         You prepared a document; is that correct?

6    A.   I did prepare a document.

7    Q.   And it documents the estimate per pane?

8    A.   It does, yes.

9    Q.   And you testified that you couldn't remember the specific

10   numbers; is that correct?

11   A.   Correct, I could not remember the specific number.

12   Q.   Okay.  And if you took a look at the document that you

13   prepared, would that help refresh your recollection?

14   A.   It would, yes.

15   Q.   Okay.  Mr. Bennett, if you could pull up Government's

16   Exhibit 31.

17        MR. BURNHAM:  I object.  If it's for refreshing

18   recollection, not that I'm doubting Your Honor's ability to

19   mentally categorize things, it shouldn't be displayed.

20        THE COURT:  If that's what you're trying to do, I

21   think it's fine to show it, but also, you're not moving it into

22   evidence; right?

23        MS. ALSWORTH:  I'm not moving it in at this time.

24        BY MS. ALSWORTH:

25   Q.   And do you recognize that to be the document that you

1    prepared?

2    A.   This is the document I prepared.

3    Q.   Does it help refresh your recollection as to the figures in

4    this case?

5    A.   Exact dollar amounts, yes.

6    Q.   Okay.  And, Mr. Bennett, if you could take the exhibit

7    down.  Thank you.

8         And what do you recall the calculation for the glass to be?

9    A.   We provided a calculation -- the calculation per -- $203

10   and $231 for materials and labor in that order.

11   Q.   And was there also -- you mentioned earlier that there was

12   hazmat testing that was involved?

13   A.   We did pull a hazmat sample, correct.

14   Q.   What was the dollar amount for that?

15   A.   $50.

16   Q.   And was there a -- you testified that there was paint as

17   well?

18   A.   We had some miscellaneous paint supplies, as you can

19   imagine, the painters needed, whether it be calk, paint, paint

20   brushes, tape, plastic, things of that nature, miscellaneous

21   paint supplies.

22   Q.   Okay.  And is that specifically related to the Architect of

23   the Capitol employees?

24   A.   Yes.

25   Q.   Okay.  And do you recall that dollar figure?

1   A.   I do not recall that dollar figure.

2   Q.   Okay.  I will come back to that.  Let me redirect you to --

3           THE COURT:  Sorry.  Can I just interrupt.  Tell me the

4   difference between the $203 and $231.

5           THE WITNESS:  The $203 was the material costs, and the

6   $231 was the labor costs.  The contractor provided us a separate

7   dollar figure for those two on their proposal.

8           THE COURT:  Understood.  And these two panes in the

9   lower right-hand corner that we're talking about, are those the

10  thicker pieces of glass or not?

11          THE WITNESS:  They are the thinner piece, quarter-inch

12  thick.

13          THE COURT:  Okay.

14          MS. ALSWORTH:  May I proceed, Your Honor?

15          THE COURT:  You may.  Thank you.

16          BY MS. ALSWORTH:

17  Q.   Sticking with the materials and supplies related to the

18  contractor at this point, was there also something connected

19  with paint?

20  A.   Yes.

21  Q.   And do you recall that dollar figure?

22  A.   As I stated just a moment ago, I don't recall the exact

23  dollar figure for how much the paint supplies were.

24  Q.   Okay.  And would it help refresh your recollection to take

25  a look at the document that you prepared?

1    A.    Yes.

2    Q.    Mr. Bennett, if you could briefly show Government's Exhibit

3    31.  And if you could take it down, please.

4          And do you recall now what that dollar amount was?

5    A.    Yes.  It was $35.

6    Q.    Okay.  And a moment ago, you started discussing the

7    supplies and things or other expenses that the Architect of the

8    Capitol incurred.  Was there also an expense for labor?

9    A.    Yes, there would have been.  We would have had both our

10   insulators, who are our qualified hazardous material handlers,

11   they're the ones who do that work, they would have taken the

12   sample.  They would have physically taken a sample but then also

13   transported the sample for testing and then read the results of

14   that.

15   Q.    Okay.

16   A.    So there would have been an hourly charge for their time,

17   as well as for the painters to do their work after the glass was

18   replaced.

19   Q.    And do you recall how many hours you estimated?

20   A.    My apologies.  I believe it was five hours and three hours.

21   Q.    Okay.  And do you recall the dollar amounts for the

22   estimate of what the Architect of the Capitol incurred for these

23   two panes?

24   A.    I would have to see the -- my apologies.  I would have to

25   see the document to know the exact dollar amount.

1    Q.    Okay.  That would help refresh your memory?

2    A.    Yes.

3    Q.    Mr. Bennett, if you could, please, display Government's 31.

4    Thank you.  You can take it down.  Thank you.

5          And did that assist you in refreshing your recollection?

6    A.    Yes.

7    Q.    What was the dollar amount?

8    A.    $171 and $113 or $131.

9    Q.    For a total of $283?

10   A.    That is correct.

11   Q.    Okay.  And again, these are estimates per pane; is that

12   correct?

13   A.    Yes, it is.

14   Q.    And what is the total estimate for both of the panes that

15   are to the right of the Senate wing door?

16   A.    Each pane was $774.  So it was -- my math is not on right

17   now.  So my apologies.  Two times the 774.

18   Q.    $1,548, does that sound correct?

19   A.    $1,548, yes.

20         MS. ALSWORTH:  May I have just a moment, Your Honor?

21         THE COURT:  You may.

22   (Government counsel conferred.)

23         BY MS. ALSWORTH:

24   Q.    Mr. McIntyre, just a few additional questions.  You

25   testified that there were some temporary measures taken to

1    secure these windows, such as plywood; is that correct?

2    A.   That is correct.

3    Q.   And that is not included in this estimate that you just

4    gave, the $1,548?

5    A.   It is not.

6    Q.   And you previously testified that there was some damage to

7    the shutter around this window, too; is that correct?

8    A.   Correct.  Both shutters that are -- the bottom shutters --

9    this window has multiple shutters just based on the height of

10   it, and both bottom shutters were damaged on January 6.

11   Q.   And the $1,548 estimate doesn't include that damage?

12   A.   It does not.

13   Q.   What about the damage to the kiosks?

14   A.   It does not.

15             MS. ALSWORTH:  Pass the witness, Your Honor.

16             THE COURT:  All right.  So why don't we circle back.

17   Mr. Burnham, tell me what you're objecting to at this point.

18       I know this is a little unorthodox, but we're doing a bench

19   trial.  I felt like it was more helpful for me to actually

20   understand what the proffered evidence was.

21       You tell me, what remaining objections do you have to that

22   testimony?

23             MR. BURNHAM:  I think the remaining objection --

24             THE COURT:  If you could just approach.

25             MR. BURNHAM:  Oh, sorry.  The remaining objection at

this point is that once the government departed from the

business record estimate of the amount of money necessary to

damage -- to repair the damage of a number of windows that were

broken, the witness departed from admissible, you know, lay

testimony into expert testimony.

In his description, he assigned a mathematical factor to

the overall numbers and then relied on methodologies that he

knew based on, I think the Court can conclude, based on his

experience as an architect and his knowledge of construction and

the materials that go into the Capitol.  He referenced, you

know, various aspects of that.  That involves his knowledge, his

judgment to a certain extent to assign the proper mathematical

factors.

A layperson -- imagine if I had to try to make the estimate

this witness just did.  I wouldn't know where to start.  But he

obviously knew what the appropriate methods of calculation were,

what materials to include and what not to include, and engaged

in some fairly sophisticated calculations to provide an estimate

to the Court.

And my argument at this point is completely consistent with

that estimate being totally fair and accurate.  This is not

attacking the methodology.  It's just it's sufficient for -- at

this point for Your Honor to find that the witness relied on a

methodology that would have been beyond the ken of the average

layman, which this witness clearly did.

1            THE COURT:  Okay.

2            MR. BURNHAM:  Thank you.

3            THE COURT:  Ms. Alsworth?

4            MS. CHO:  Your Honor, if I may?

5            THE COURT:  Yes.

6            MS. CHO:  Your Honor, the mathematical calculations

7    are not beyond the ken of a layperson.  If Your Honor wants to

8    engage in the calculation yourself, I think that we would all be

9    able to do that.  If you look at Government's Exhibit 37, which

10   is in evidence, we've got two dollar amounts.  One is the total

11   dollar amount for glass, and the second is the total dollar

12   amount for labor.

13       You can see from exhibit -- from this exhibit that there

14   are different types of glass listed.  And the type of glass that

15   the witness testified was thicker is listed on the second page.

16   It's the last type of glass that's listed.  I believe it's

17   listed at 1-3/4 inches, and you can see there's a quantity of

18   three.

19       As the witness testified, he assigned that glass four times

20   more dollar amount than the rest of the glasses listed in that

21   exhibit.  If you count up all of the glass pieces listed in this

22   exhibit, you will find that there are, I believe, 35 pieces of

23   glass.  The remaining 28 get a value of one -- or 35 pieces of

24   glass or is it 25 pieces of glass.  Then three pieces of glass

25   get multiplied by a value of 4.  And that is how --

1          THE COURT:  Why wasn't that piece hearsay?

2          MS. CHO:  I'm sorry?

3          THE COURT:  That the thick glass is four times as

4     expensive?

5          MS. CHO:  Your Honor, I don't believe it's hearsay

6     because that's a part of the admitted exhibit, that it's thicker

7     than the other pieces of glass which are all a quarter-inch

8     thick.

9          THE COURT:  But not the cost.

10         MS. CHO:  Well, that was the issue.  This proposal,

11    the government exhibit, has a lump sum.  So the government was

12    left with saying that the cost of replacing these two panes of

13    glass -- I mean, we could have relied on 16,000 as the most

14    accurate estimate of the cost of glass, but that did not seem to

15    take into account the defendant's conduct here.  So we walked

16    through and tried to zero in on the specific property that's at

17    issue in this case.  And this was a common sense, practical, and

18    reasoned approach to doing that.

19         And Your Honor, there are cases on 1361 and the damage

20    amount that discuss how the government goes about establishing a

21    damage amount.  And there's a wide range of permissible ways to

22    show damage.  Certainly, expert testimony is one, but estimates

23    in general are very permissible.

24         And here, the government undertook an estimate analysis in

25    order to benefit the defendant and not hit the defendant with

the damage that's attributed to many other pieces of property.

THE COURT:  So I get that.  I get that probably -- my instinct would have been just to divide the 7,000 or whatever by 35, and that might well have gone against the defendant.

But why isn't this kind of expert evidence here that he's putting together what he knows combined with information he received from the glass company?  I mean, I'm not sure that it's simple math, is it?

MS. CHO:  Well, Your Honor, certainly as you just indicated, we could originally have divided the 16,000 by the number of glasses, but because we were concerned once we understood that some of the glass was thicker than the glass that Mr. Rodean broke, we did not want to provide what would be an unfavorable to him but a reasonable estimate of those two panes of glass.

So we asked for some additional information regarding the heavier glass, and that is how we came to weight it by 4.

THE COURT:  All right.  I will hear you very briefly, Mr. Burnham.

MR. BURNHAM:  Your Honor, I'm confident in stating that there's not a 1361 case that has a procedure remotely like this where damages are estimated by having some large general contractor bill followed by an architect or other specialist testifying allocating it to a particular part of the bill. Unless my research wasn't as good as I thought it was, that is

1 not out there.

2  So I think the argument that this favors us is clearly

3 incorrect.  To the extent it's not already in the record,

4 clearly, I expect to elicit testimony that not all the windows

5 are the same, different labor and material goes into it.  It's

6 clearly inadequate to divide this giant number by the number of

7 windows.

8  So where does that leave us?  I think that leaves me in the

9 same position that I started, that simply dividing the 16

10 whatever number by the number of windows is insufficient, and to

11 the extent they've tried to give a particularized assessment

12 which might have been accomplished through expert testimony,

13 they haven't gone through the proper steps to offer it that way.

14  THE COURT:  All right.  This feels like a good place

15 for lunch.  Why don't we come back at 1:30.

16  Mr. McIntyre, I will ask you not to discuss the content of

17 your testimony over the lunch break with anyone.

18  Thanks, folks.

19  (Recess taken from 12:24 p.m. to 1:35 p.m.)

20  THE COURT:  All right.  Before Mr. McIntyre retakes

21 the stand, I want to address the outstanding objection on expert

22 testimony from the defense, and I'm going to rely pretty heavily

23 on *Atlanta Channel vs. Soloman* from Judge Contreras.  That's

24 2021 U.S. District Lexis 176981, from this district from 2021.

25  He explains the line between the two kinds of testimony is

a fine one.  To discern one from the other, a court must focus on the reasoning process by which a witness reached his proffered testimony.  And there, Judge Contreras is citing to *United States v. Williams*, 827 F.3d 1134 from the D.C. Circuit in 2016, page 1160.

In general terms, lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field, according to F.R.E. 701, Advisory Committee's Note to the 2000 Amendment.

A lay opinion's defining characteristic is that it arises from the personal knowledge or firsthand perception of the witness, according to *Lord & Taylor v. White Flint*, 849 F.3d 567, page 575, from the Fourth Circuit in 2017.

A witness offering a lay opinion grounds his baseline in personal experiences, then uses that baseline to evaluate an event that he personally observed, according to *McCormick on Evidence*, Section 11, page 1, Eighth Edition, 2020.

By contrast, an expert can derive his baseline from specialized techniques or the research of others and then assess an event at issue in the case, even if he did not witness it. An expert testifying in a will dispute could draw on familiar handwriting analysis techniques known only to professionals in that field to opine about the author of the will, regardless of whether he had any personal connection to that case.

1    There, Judge Contreras is contrasting like a widow who

2    would be a lay witness as to recognizing her husband's

3    handwriting versus an expert who wouldn't have been at all

4    familiar initially with the decedent's handwriting, but based on

5    his training and experience and expert knowledge is able to look

6    at the will and look at other pieces of handwriting from the

7    decedent and determine whether or not they are the same.

8    Returning to Judge Contreras's opinion on *8, the two forms

9    of reasoning, thus, differ in two ways:  One, how the witness

10   establishes baseline and, two, how the witness can learn about

11   the facts of the case.  A witness's perceptions based on

12   industry experience are sufficient foundation for lay opinion

13   testimony, according to *United States v. Oldrock*, 867 F.3d 934,

14   page 940, from the Eighth Circuit in 2017.

15   Looking to the Advisory Rules of Evidence 701, Advisory

16   Committee's Note to the 2000 Amendment, it says most courts have

17   permitted the owner or officer of a business to testify to the

18   value or projected profits of the business without the necessity

19   of qualifying the witness as an accountant, appraiser, or

20   similar expert.  Such opinion testimony is admitted not because

21   of experience, training, or specialized knowledge within the

22   realm of an expert, but because of the particularized knowledge

23   that the witness has by virtue of his or her position in the

24   business.

25   The Fourth Circuit, for instance, held that a company

bookkeeper could provide lay opinion testimony about projected
lease-related profits on the basis of records kept by her
personally.

And I think perhaps the Court of Appeals case most on point
here would be an Eleventh Circuit case which admitted lay
opinions from officers at a ship repair company regarding the
reasonableness of the company's charges for repairing a ship,
because they testified upon their particularized knowledge
garnered from years of experience within the field.  And that's
*Tampa Bay Shipbuilding and Repair Company v. Cedar Shipping
Company*, 320 F.3d 1213, page 1223, from the Eleventh Circuit in
2003.

So going back to those two prongs, how a witness
establishes baseline and how the witness can learn about the
facts of the case, here, I think Mr. McIntyre would not be an
expert because he's established his baseline based on his many
years of experience in this job working on the repairs and
upkeep of this building.  And most importantly, going to the
second prong, how the witness can learn about the facts of a
case, here, Mr. McIntyre was intimately involved in the handling
of the repairs in this case.  He's not someone who was
uninvolved and just looking at the documents and giving his
opinion regarding the costs.  Rather, he was in charge of the
team that did the assessment.  He worked with the contractors.
He supervises the employees who do the AOC work.  And so he is,

1    rather than kind of sitting outside and opining about something

2    he saw or documents he's reading, he was very much involved in

3    the facts of this case.

4        I think he would be an expert if he was being asked to

5    opine on the cost of repairs of the White House windows based

6    upon his knowledge of repairs at the Capitol.  But given his

7    very deep involvement in repairing the windows here, I think

8    he's properly a lay witness.

9        So for all those reasons, I will deny the objection.

10       Mr. McIntyre, if you could retake the stand.  I will remind

11   you, sir, you're still under oath.

12       And, Mr. Burnham, the floor is yours.

13           MR. BURNHAM:  Thank you, Your Honor.

14                          CROSS-EXAMINATION

15           BY MR. BURNHAM:

16   Q.   Good afternoon, Mr. McIntyre.  I'm Charles Burnham.

17   A.   Good afternoon.

18   Q.   I have a couple questions for you.  Do you know when the

19   glass that was damaged on January 6 had been installed?

20   A.   I do not have a date of when that glass was installed.

21   Q.   And there are different -- as a general matter, it's true

22   that there's different types of glass; right?  It's not like all

23   glass is created equally?  They have different characteristics

24   and so on and so forth; would that be right?

25   A.   I'm not sure I understand your question.  Are you -- can

1    you rephrase that for me?

2    Q.   Is all window glass created equal, or are there different

3    kinds of window glass?

4    A.   There could be different kinds of window glass, yes.

5    Q.   All right.  And some window glass is more expensive than

6    other window glass, as a general matter?

7    A.   Correct.

8    Q.   Thank you.  You mentioned some costs to painters.  You

9    recall that; right?

10   A.   Yes.

11   Q.   I assume this is painting, for example, the -- I forget the

12   word for it, but the very thin piece of wood in between the two

13   panes of glass?

14   A.   The muntin bars?  Yes.

15   Q.   And there also had to be repainted, I assume, the frame of

16   the glass, you know, around the panes?

17   A.   The sash, yes.

18   Q.   The sash, okay.

19   A.   And the window sill, things of that nature.

20   Q.   The window sill, I assume that's from people stepping on

21   it, other kinds of damage?

22   A.   I'm not sure how it was damaged.

23   Q.   All right.  And then there would have been painting to the

24   wall surrounding the window to the extent there was damage there

25   as well; would that be right?

A.   This estimate only considered the damage to the window

itself.

Q.   How about the hazmat?  Can you explain a little more?  What

did the hazmat process entail?

A.   In general, any time you're looking to determine if a

substance contains hazmat, you take a sample of it.  So in this

case, one of our employees would have gone up and taken a sample

of the material using some form of metal tool to take a small

sample.  They would send that away to a laboratory.  That

laboratory would then determine if it contained any of the

substances you're looking for.  In this case we would have been

looking for asbestos, lead, and PCBs.  In this case it came back

negative.

Q.   And are there actually vendors out there these days selling

glass or other materials with lead or asbestos in them?  Is that

a problem you face?

A.   The material that was sampled here is what's called glazing

putty.  So if you think about your window when it sits inside

the wooden glass stops or the muntin bars, the only thing that

keeps it from falling out, one way, is the wood.  The other way,

where you install the window, you have to put in kind of like a

calk, but it's glazing putty.  That glazing putty, depending on

the age of the glazing putty, over time, considering these

windows would have been originally installed in the 1850s, over

time could have contained hazardous materials.

1   Q.   And you testified on direct that the hazmat analysis was

2   $50.  Is it possible that figure actually could have actually

3   been 25?

4   A.   It was 25.  After looking at the document again, you are

5   correct.  It was 25.

6        MR. BURNHAM:  Court's indulgence.  I was examining

7   partly based on something on my computer.  I'm having a

8   technical problem.  If I could take a moment to bring it back

9   up.

10       (Pause.)

11       MR. BURNHAM:  No further questions.  Thank you.

12       THE COURT:  Ms. Alsworth, any redirect?

13       MS. ALSWORTH:  No, Your Honor.

14       THE COURT:  All right.  Thank you, Mr. McIntyre.  You

15  may step down, and you're free to go.  Thank you for your

16  testimony here today.

17       MS. CHO:  Your Honor, the government next calls

18  Lawrence, or Larry, Pettit.

19       LAWRENCE PETTIT, WITNESS FOR THE GOVERNMENT, SWORN

20       THE COURT:  Good afternoon, sir.  If you don't mind

21  removing your mask.

22       Ms. Cho?

23                      DIRECT EXAMINATION

24       BY MS. CHO:

25  Q.   First, could you state and spell your name for the record.

1   A.   It's Lawrence Pettit, L-a-w-r-e-n-c-e, Pettit, P-e-t-t-i-t,

2   the Third.

3   Q.   Thank you, Mr. Pettit.  Where are you from?

4   A.   Frederick, Maryland.

5   Q.   Are you familiar with Nicholas Rodean?

6   A.   Yes.

7   Q.   How long have you known him?

8   A.   About six to eight months.

9   Q.   Are you counting the time -- well, let me back up there.

10       Do you see him in the courtroom today?

11   A.   Yes.

12   Q.   Could you identify him by where he is or what he's wearing?

13   A.   He's right over your shoulder with the blue tie and white

14   long shirt.

15        MS. CHO:  Let the record reflect, Your Honor, that he

16   has ID'ed the defendant.

17        THE COURT:  It will so reflect.

18        BY MS. CHO:

19   Q.   So let me back up, Mr. Pettit.  How do you know Mr. Rodean?

20   A.   We worked with each other.

21   Q.   Where did you work?

22   A.   Navistar Marketing, Direct Marketing, Frederick, Maryland.

23   Q.   And that's in Frederick?

24   A.   Yes.

25   Q.   What does Navistar do?

1    A.   We're a full printing company, printing and mailing

2    company.

3    Q.   How long did you and Mr. Rodean both work at Navistar?

4    A.   I've been there since it -- probably four or five years.

5    He wasn't there that long, probably less than a year, I believe.

6    Q.   Were you there the entire time Mr. Rodean worked there?

7    A.   Yes.

8    Q.   Okay.  So what do you do at Navistar?

9    A.   I'm a warehouse supervisor.

10   Q.   What kind of materials do you have in the warehouse?

11   A.   Pamphlets, flyers, envelopes, stuff like that.

12   Q.   What did Mr. Rodean do at Navistar?

13   A.   He actually was in charge of once the -- they process the

14   mail and put it all together, he would put it on the scale and

15   shrink wrap it and punch in the weight, and then it was -- he

16   basically would hand-truck a pallet of mail, shrink wrap it,

17   pull it down, and put it in a certain area ready to be shipped

18   out.

19   Q.   If you remember, how frequently per week did he work?

20   A.   Every day, as far as I know.

21   Q.   Okay.  Did you ever see Mr. Rodean outside of work?

22   A.   Yes.

23   Q.   And what was that interaction?

24   A.   I just drove him home.  So it wasn't that much of an

25   interaction.

1    Q.    Okay.  Why did you drive him home?

2    A.    There was times where he had limited, I guess, access to

3    money to get an Uber or whatever.  And I found out he lived

4    pretty close to me.  So when I pretty much left, I would ask him

5    if he needed a ride home.

6    Q.    Did he live with anyone?

7    A.    As far as I know, I don't know.  His two dogs, as far as I

8    know.

9    Q.    Okay.  Let's talk about January 6.  Did the defendant

10   request time off to travel to Washington, D.C., on January 6?

11   A.    I remember he did, I want to say, three days before.

12   Q.    What, if anything, did he say his reason for requesting

13   that time off was?

14   A.    Just to go down there and, I guess, protest or whatever.

15   Q.    Let me take that apart a little bit with you.  Did

16   Mr. Rodean ever talk about the election of President Trump?

17   A.    Yes.

18   Q.    What did he say about that?

19   A.    He was a big Trump supporter.  He just basically would

20   always say that he's still going to be president no matter what

21   was going on.  He was still going to be the President of the

22   United States.

23   Q.    What about after the election concluded?  Did he ever talk

24   about the results of the election?

25   A.    That it was pretty much a fraud, I guess you would say,

1    election fraud.

2    Q.    Did Mr. Rodean seem knowledgeable about politics to you?

3    A.    My opinion, yes, he did, very much.

4    Q.    At some point on January 6 or 7, did you learn that

5    Mr. Rodean had been at the Capitol?

6    A.    Yes, the night of.

7    Q.    How did you learn that?

8    A.    Through social media.

9    Q.    And what did you see or read?  I'm assuming that, but

10   please --

11   A.    That night it was all going on, I saw his face and

12   recognized that it was him and was pretty much shocked.

13   Q.    What did you do, if anything, once you saw that?

14   A.    I didn't do anything until the next day.

15   Q.    And then what did you do?

16   A.    I actually called him.

17   Q.    Why were you calling him?

18   A.    Basically to ask him what the hell he was doing or what was

19   he thinking.

20   Q.    Were you able to reach him when you called?

21   A.    I believe it was the second or third time.

22   Q.    What was his response?

23   A.    He basically just said it needed to be done.

24   Q.    And what did you understand "it" to be referring to?

25                MR. BURNHAM:  Objection; calls for speculation.

1        THE COURT:  Overruled.

2        THE WITNESS:  Repeat the question.

3        BY MS. CHO:

4    Q.   What did you understand "it" to be referring to when you

5    testified that he said it needed to be done?

6    A.   That him and everybody else being in that position, it

7    needed to happen.

8    Q.   And just to clarify, you were calling him to talk about

9    seeing him inside the Capitol; is that right?

10   A.   Yes.

11   Q.   Okay.  I would like to put on the screen, Mr. Bennett,

12   government's previously admitted Exhibit 17.

13        Mr. Pettit, do you recognize the person in this exhibit?

14   A.   Yes.

15   Q.   Who is it?

16   A.   That's Mr. Rodean.

17   Q.   Are there any distinctive characteristics or items that

18   lead you to --

19   A.   He's wearing our work badge, and his backpack looks

20   familiar.

21        MS. CHO:  Okay.  Your Honor, just one moment, please.

22        (Government counsel conferred.)

23        MS. CHO:  No further questions.

24        THE COURT:  All right.  Mr. Burnham?

25        MR. BURNHAM:  Thank you, Your Honor.

                        CROSS-EXAMINATION

            BY MR. BURNHAM:

Q.   Good afternoon, Mr. Pettit.  I'm Charles Burnham.

A.   How are you?

Q.   Good.  How are you?

     When you and Mr. Rodean would take these drives home, I
assume you chitchatted about nonwork-related matters?

A.   Not much really.

Q.   Okay.  Did you ever talk about, for example, Mr. Rodean's
interest in animal rights?

A.   No.

Q.   You never talked about his --

A.   No.  I just remember him saying something about he liked to
go to the zoo.

Q.   Okay.  Did you ever have lunch together at work or anything
like that?

A.   No.

Q.   Did he ever talk to you about his interest in veganism?

A.   No.

Q.   He never did?  Okay.  Are you familiar with the
phrase "neuroatypical"?  Do you know what that refers to?

A.   No, I have no clue.

Q.   How about when you say "someone's on the spectrum," do you
know what that means?

A.   I guess not, no.

1    Q.    You never heard that?  All right.  You ever heard of autism

2    or Asperger's?

3    A.    Yes.

4    Q.    Mr. Rodean has those conditions.  Would that be consistent

5    with your experience?

6              MS. CHO:  Your Honor, objection.

7              THE COURT:  On what basis?

8              MS. CHO:  Lawyer testifying to facts not in record.

9              THE COURT:  Overruled.

10             BY MR. BURNHAM:

11   Q.    That would be consistent with your interactions with

12   Mr. Rodean, he being someone that lives with autism/Asperger's;

13   is that fair?

14   A.    Yeah.

15   Q.    And when you learned that he was going to take time off for

16   January 6, one of the thoughts that you had was that you didn't

17   think he was capable of buying a Metro ticket and taking the

18   Metro down to the Capitol; is that right?

19   A.    I really didn't think how he was going to get down there,

20   to be honest.

21   Q.    Haven't you previously told law enforcement that you didn't

22   consider him capable of navigating the Washington, D.C., subway

23   system?

24   A.    I recall saying that he always Uber'ed, he didn't have a

25   car, so he always Uber'ed, so I didn't know how he got down

1    there.

2    Q.   Let me show you something that might refresh your

3    recollection on this.

4         Court's indulgence.

5         (Pause.)

6              MR. BURNHAM:  Your Honor, can I approach the witness?

7              THE COURT:  You may approach.

8              BY MR. BURNHAM:

9    Q.   I'm going to hand you a document here.  And feel free to

10   take as much time as you need and read as much or as little of

11   it as you want, but I would like you to read the last sentence

12   of the first full paragraph on the page that is facing out, and

13   let me know when you're finished.

14   A.   Where is that?

15             MS. CHO:  I just had one objection.  I don't think the

16   witness testified that he's familiar with the item that's being

17   used to refresh his recollection.

18             BY MR. BURNHAM:

19   Q.   I will represent to you that this is a report of your

20   interview with the government.

21   A.   Okay.

22   Q.   And if that would refresh your recollection, I'd like you

23   to take a look at it.

24             THE COURT:  I think he can take a look at it.  If it

25   refreshes his recollection, we will find out.

1          THE WITNESS:  Yeah, I don't recall saying that, to be

2    honest.

3          BY MR. BURNHAM:

4    Q.   Okay.  Would it be fair that Mr. Rodean has somewhat

5    unusual mannerisms and personal grooming habits?

6    A.   Yes.

7    Q.   And sometimes when talks he kind of like gets stuck on

8    words --

9    A.   Uh-huh.

10   Q.   -- a little bit?

11   A.   Uh-huh.

12   Q.   Okay.  And it's fair to say that he idolizes Donald Trump?

13   That wouldn't be too strong to say?

14   A.   Yeah.

15          MR. BURNHAM:  Thank you.

16          THE COURT:  Any redirect, Ms. Cho?

17          MS. CHO:  Just briefly, Your Honor.

18                    REDIRECT EXAMINATION

19          BY MS. CHO:

20   Q.   Mr. Pettit, from what you could observe, was Mr. Rodean

21   able to follow instructions at work?

22   A.   Yes.

23   Q.   Did he come in as he was scheduled to come in?

24   A.   Yes.

25   Q.   And did he have any issues carrying out that work, as far

1    as you could tell?

2    A.    No.

3              MS. CHO:  Thank you, Your Honor.

4              THE COURT:  Thank you, sir.  You may step down, and

5    you're free to go.  I appreciate your testimony here today.

6              THE WITNESS:  Thank you.

7              THE COURT:  Does the government have any other

8    evidence in this case?

9              MS. CHO:  Just one minute, Your Honor.

10        (Government counsel conferred.)

11             MS. CHO:  Your Honor, we have no further evidence, and

12   the government rests.

13             THE COURT:  Okay.  Why don't we take about a

14   five-minute break.  Mr. Burnham, if your client isn't intending

15   to testify, I will be having a brief colloquy with him.

16             MR. BURNHAM:  I have a motion; before we get to that,

17   I have a motion as well.  But he's prepared for that colloquy

18   whenever Your Honor wants.

19             THE COURT:  Okay.  Let's take a five-minute break.

20   Thank you.

21        (Recess taken from 2:03 p.m. to 2:09 p.m.)

22             THE COURT:  All right.  Mr. Burnham, do you have a

23   motion?

24             MR. BURNHAM:  I make a motion pursuant to Rule 29 to

25   dismiss the charges.  I will make the motion to every element of

1  every charge, but I will focus on the ones I think are most

2  pertinent.  And I will go through the indictment in order, which

3  starts with the destruction of property charge.

4      And there, I think the video -- I know the government has

5  an aiding and abetting theory that I will address at the end.  I

6  will start with just the substantive charge.  I think our

7  defense to that is very simple.  The video speaks for itself.

8  There's two panes there side by side, as Your Honor saw.  And

9  both of those -- Mr. Rodean appears to have struck at one time

10 both panes.  But with respect to both the left and the right

11 pane, another one of the protestors before Mr. Rodean touched it

12 had either kicked or hit it to the point where the glass was

13 shattered and, the Court can infer, would have had to be

14 replaced.

15     Part of the government's burden of proof is to show that

16 Mr. Rodean -- this is not a conspiracy case.  They have to show

17 that Mr. Rodean caused at least $1,000 of damage to the

18 property.  And so even taking as 100 percent solid the expert's

19 estimate of the costs --

20         THE COURT:  Nonexpert.

21         MR. BURNHAM:  I'm sorry?  Sorry.  I guess that was --

22 it was a slip of the tongue, I guess self-serving, it might have

23 been.  The government's witness, the architect.  There was no

24 attempt to apportion that to Mr. Rodean, and there couldn't have

25 been, because as soon as those windows were broken by the other

individuals, they were going to have to be replaced, and he

didn't change that.  I think that's the long and the short of

Count 1.

I will say a word about aiding and abetting because the

government did raise that for the first time in their trial

brief.  I don't think that theory has been properly pled, and

here's why.  I do understand there's not a bright line rule that

it has to be charged in the indictment, which it hasn't been.

They didn't put the little U.S.C. 2 that's almost routine

sometimes in the indictment.

And that's particular -- the law is that aiding and

abetting doesn't have to be particularly pleaded unless

neglecting to plead it would result in unfair surprise to the

defendant.  *United States v. Loscalzo*, I guess, is the

foundational case of that, 18 F.3d 374, Seventh Circuit, 1994.

That's in the U.S. Attorney's Manual.  That case is specifically

referenced.

And so what do we have here?  In this case this is the

superseding indictment.  So if we look at the first indictment,

which is ECF 12, there, the government did include an aiding and

abetting allegation as to the 1512 count, and that indictment,

which was since dismissed, did not include an aiding and

abetting allegation with respect to destruction of property.  So

they specifically declined to include aiding and abetting, which

gives Mr. Rodean a right to rely on that, especially because, I

1    can represent and I have e-mails to show this if it is

2    contested, is that I was very open with the government that we

3    were going to make this argument.  I put it in e-mail.  We

4    discussed it on the phone.  They knew it was our contention that

5    the destruction of property charge was not well founded against

6    Mr. Rodean for the reasons I've just argued to Your Honor.

7         And then the second superseding indictment, they again,

8    after having an opportunity to make a change with full knowledge

9    that this was going to be one of our defenses, they declined to

10   include an aiding and abetting allegation in Count 1.

11        So as a matter of law, we would submit that's unfair

12   surprise, and that resolves the aiding and abetting allegation

13   right there.

14        Secondly, however, the government hasn't identified, you

15   know, who exactly the principal is here that Mr. Rodean was

16   supposed to have been aiding and abetting, let alone they have

17   to prove every element of destruction of property with respect

18   to the principal before Your Honor even gets to the question of

19   whether Mr. Rodean could have aided and abetted.  We don't know

20   who the principal was, nor do we know the government's theory as

21   to how the $1,000 could be proven with respect to that unnamed

22   person.  So the question of aiding and abetting isn't even

23   properly teed up for the Court.

24        Even if it were, however, the gravamen of aiding and

25   abetting is one person assisting another to commit a crime.

It's not enough simply to prove that two people commit similar crimes close in time.

The example I would offer is if, you know, the dividing line between petty larceny and grand larceny is $1,000, it's not enough to prove that one person steals a product from a store that's $500 and the second person steals a product from a store that's $501 and you can add them together.  It doesn't work that way.  They have to prove that two people were knowingly helping each other, which they haven't done.

So for all of those reasons, we would ask Your Honor to dismiss Count 1.

That brings us to Count 2, which is the first of the 1752 counts, of which there are three.  All three of those have a precondition that the defendant enter restricted grounds.  And restricted, of course, means posted, cordoned off, or otherwise restricted.  And it has to be knowingly, knowingly enter restricted grounds.

And so we have the testimony from the inspector that there were -- there was a barrier placed.  But do we have evidence sufficient to prove that Mr. Rodean was on notice of that barrier?  And the answer is, no, we don't.  In each case Mr. Rodean was well to the back of the front line of the individuals entering the barricades, many, many people in between him and the individuals that were there pushing the bike racks, tangling with police, and so on.  And so there's no proof

that he would have seen those barricades and, therefore, been on notice that he was in a restricted area.

By the time Mr. Rodean was in a position to approach the area where the barricades had been placed, the video is very clear that the barricades had been removed and the police were standing aside and no longer attempting to prevent the individuals there from proceeding on past where the barricades had been.

Obviously, if Mr. Rodean had been one of the ones pushing the barricades, we would be in a very different position. But that's not the government's evidence here.

Obviously, breaking the window has its own independent significance, but that's an independent alleged offense than entering a restricted area. The two have to be considered separately.

So now we come to Mr. Rodean, was he entering a restricted area at some point within the building. Well, I don't think we have proof that he was. When he first entered, we have Officer Goodman interacting again with the very first people to walk in, but even there, Mr. Rodean, you can see this in the video, was well to the back of the individuals who first encountered Officer Goodman. By the time he got there, Officer Goodman had gone up the stairs into the clock room.

And so then Mr. Rodean, you can see him going to the clock room, and there we have this allegation that -- two officers

testified they were immediately told you have to leave.  Perhaps
that could be the government's argument for being in a
restricted area.  The leading case, *Bursey*, does rely on
officers' oral admonitions.  That can be a way to restrict an
area.

     And I would just simply urge the Court not to credit that
testimony.  With all due respect to the officers, I don't think
it makes any sense that that would have been the instruction to
the individuals in the Ohio clock room, that they had to leave
right away.  We have the testimony about Officer Goodman
specifically led these individuals.  That was his whole purpose.
That's why he's a national hero, is he was able to lead them
away from the Senate into the clock room, which is, common sense
would tell you, exactly where police would have wanted them to
be.

     And there was testimony that they engaged in kind of --
some kind of nonaggressive conversation.  They were concerned
who had weapons.  It makes no sense that they would proceed, as
Officer Morgan suggested they did, and tell everybody just to
head for the hills when all the doors were locked.  I urge the
Court not to accept the testimony that he wanted Mr. Rodean to
crawl back out the window.  That's not plausible.

     So I would urge this Court to find, in summary, that what
most likely happened is what Investigator Loyd -- or Inspector
Loyd first testified to, apparently before Your Honor, where he

1   said the orders to the individuals in the clock room was to stop

2   and eventually to leave.  That is much more consistent with

3   everything else we know about those events, and that's what I

4   would urge the Court to find probably happened.  He was not

5   ordered to leave immediately, and therefore, there wasn't an

6   oral restriction for 1752 purposes that was communicated in the

7   clock room.

8       So then what happens is he stays there in the clock room,

9   and eventually, he does leave, and there's video of that.  And

10   you can see, he's being escorted out by a police officer, which

11   is exactly consistent with my theory of the instructions that

12   probably were communicated by police to the individuals in the

13   clock room, and he does leave.

14       And there's a case that, I think, is on point there that I

15   have copies if anybody wants to review it.  But I will offer the

16   cite.  Court's indulgence.  It's *McCabe v. Macaulay*,

17   515 F.Supp.2d 944.  It's a District Court case.  But that

18   distinguishes the *Bursey* case on the grounds that the

19   individuals in question were not ordered to leave by police the

20   way they had been in the *Bursey* case.  So there was no

21   restriction of the area.  And I think that's the case we have

22   here.  So that's Count 2.

23       Count 3 is again a 1752 count.  So all the arguments about

24   the restricted area still apply.  But Count 3 requires proof of

25   intent to impede and disrupt the orderly conduct of government

business, in this case being the Electoral College.

Really, for this count and one other is the reason why I elicited the testimony I did about the Electoral Count Act from the inspector.  As that witness testified, the Electoral Count Act provides for objections from members of Congress to the certification of the votes.  Several members of Congress had indicated an intention to do just that, and that was widely publicized.

And so the government's burden with respect to Count 3 is to prove beyond a reasonable doubt that the intent of Mr. Rodean was not simply to protest in favor of the actions he wanted to see the elected members take, namely objecting to the votes, but his intent was somehow to disrupt the actual counting of the votes in an illegal way.  Breaking the window is not enough. The testimony was clear that the electoral -- Congress remained in session even after that.  That itself didn't disrupt, nor could it have been intended to disrupt the actual proceedings, independently illegal, though the government argues that it was.

I submit what the Court needs to be looking for for proof of intent to impede and disrupt the orderly conduct of government business is statements like we heard from some people, "Hang Mike Pence," or people that were asking, "Where are they?  We got to go find them.  Where is Nancy Pelosi?" Perhaps those kinds of statements manifest that sort of intention, but we don't have that here.  So that's Count 3.

1            And Count 4, we will submit to the Court, to Your Honor's

2      discretion.

3            Count 5, we switch to the 5104 series of counts, but Count

4      5, like Count 3, requires proof of intent to impede, disrupt,

5      and disturb.  So for all the reasons I previously argued, the

6      government has failed to meet its burden on that one.

7            Count 6, we will submit to Your Honor's discretion.

8            Count 7, the final count, requires proof of parading,

9      demonstrating, or picketing.  The government has conceded in the

10     trial brief that parade and picket, we don't have great cases

11     for those.  I couldn't find any either.  But those should be

12     given their plain meaning by the Court.  So I would suggest that

13     parading, based on its plain meaning, implies some kind of

14     coordinated activity among multiple persons.  That's what we

15     think of when we hear parade, maybe seven or eight people

16     chanting in unison "stop the steal" or something, and we

17     certainly don't have that allegation.

18           The closest thing that even approaches that is we have the

19     testimony from Officer Morgan that Mr. Rodean went there with

20     the gentleman in the tan sweatshirt and the ponytail, which the

21     government has never alleged, there's absolutely no other proof

22     of.  It's inconsistent with the way we see those two gentlemen

23     interacting on the videos.  I would urge the Court not to credit

24     that.  So parading I don't think is a sufficient basis for 5104.

25           Picketing, the classic example of picketing we think of,

again going off plain meaning, is a labor protest where you

picket outside, you know, General Motors or something.  And the

idea there is you're sort of camping out until some condition

precedent is met, and then you agree to leave.  I think that's

the plain meaning of picketing, and we don't have that either.

And so that leaves demonstrating, and really, just simply

being decked out from head to toe in Trump regalia is

insufficient there.  He didn't have a bullhorn.  We don't know

anything he said really other than the brief conversation he

had -- he answered the officer's questions, but he wasn't going

around holding signs or making political statements.  Really,

for the most part, he was very subdued, following the crowd,

kind of looking a little lost at times, nothing that would

approach sufficient finding for demonstration.

So for that reason, we would ask Your Honor, even taking

into account the deferential standard that applies at the Rule

29 stage, to dismiss all charges against Mr. Rodean.

Thank you.

THE COURT:  Sir, can you talk on the unfair surprise

point?  What would you have done differently?

MR. BURNHAM:  Well, before I answer the question

specifically, when I look at these cases, there is not an

explicit, anyway, requirement of prejudice.  I didn't see it in

any of the cases.  Unfair surprise is enough.  And I would

submit that as a matter of law revealing basically an entirely

new theory -- when was the trial brief submitted?  Last
Tuesday? -- would be unfair surprise as a matter of law.  And it
would have been helpful to us to be able to prepare for that for
the past year, or at least the past, say, three months would
have put us in a better position to defend against that
allegation.

          THE COURT:  Okay.  Thank you, sir.

          MR. BURNHAM:  Thank you, Your Honor.

          THE COURT:  Ms. Cho?

          MS. CHO:  Your Honor, using the favorable for the
government standard, taking and crediting all witnesses as
credible, the government has more than satisfied the burden
under Rule 29.

     As far as the window breaking, so the government's
presented evidence that Mr. Rodean broke two windowpanes at the
building, and that knocks out the elements of several of the
crimes with which he's charged.  It knocks out an element of
Count 1, and it knocks out the element of disorderly and
disruptive conduct of other charges.  It also encompasses
engaging in an act of physical violence in some of the other
charges.

     Your Honor, and finally, simply breaking the windowpanes
and crawling through also addresses entering into a restricted
building.  Surely having to break the window of a building
constitutes it being restricted.

From the videos submitted by the government and testified
to by the witnesses, no door was open, no window was open, and
the defendant went in in a patently unlawful manner.

As far as the other elements of the charges, we've already
discussed and there's sufficient evidence at least for a Rule 29
standard that the damage was over $1,000, as testified to by the
deputy superintendent.

As far as the restricted building and grounds testimony, we
have a witness who testified that the building and the grounds
were off limits to the public and that the vice president
guarded by the Secret Service entered the building that day.

I don't think that the defense contests that there were
official proceedings occurring that day, but certainly, he
contests that the defendant had the intent to impede or disrupt.
And the government has introduced evidence to that point.  We
had a witness testify, two witnesses testify that Mr. Rodean
said he was there to stop the steal.  And that's certainly
sufficient to show that he had an intent to impede those
proceedings and that the proceedings were, in fact, disrupted
and impeded.

As far as the last element, I think the only one we haven't
discussed thus far is the parading, demonstrating, and
picketing.  The government has introduced at least two video
exhibits where Mr. Rodean is waiving his "Trump is my president"
flag around, and surely, that is within a straightforward,

1  practical, everyday definition of parading or demonstrating, to

2  wave one's flag around to support the candidate of one's choice.

3      Your Honor, do you have any other questions or elements

4  that we haven't covered?

5              THE COURT:  Did you discuss the unfair surprise point?

6              MS. CHO:  No, Your Honor.

7      As far as unfair surprise, Your Honor -- and forgive me.  I

8  don't have a case at hand.  But it's -- aiding and abetting need

9  not be charged in the indictment, and I think that's clear and

10 something that the defense conceded.

11      As far as unfair surprise, the defense has been in

12 possession of Government's Exhibit 11, the video of the window

13 breaking, for over a year now.  And that video, from just one

14 review, clearly anyone can say that there are multiple people at

15 the window.  So the idea that it's a surprise is belied by the

16 evidence itself.  And the idea that it's unfair is contradicted

17 by the length of time that the defense has had this evidence.

18      Moreover, the defense and the government have engaged in

19 phone calls in the last two months where we've tried to come to

20 agreement on stipulations and other matters concerning trial.

21 And at no point was this issue raised.  And admittedly, the

22 government did not say we're pursuing an aiding and abetting

23 theory.  But the defense had every opportunity.  The government,

24 at the conclusion of everything, said are there any issues we

25 need to be discussing, and there was no raising of that issue.

1    So we don't think it's a surprise, Your Honor.  The video

2    speaks for itself, as the defense has conceded, and we don't

3    think it's unfair, because it is established law that aiding and

4    abetting need not be charged in the indictment.

5         THE COURT:  All right.  Thank you.  Do you wish to be

6    heard on brief rebuttal, sir?

7         MR. BURNHAM:  Just as to one point.  I dispute that

8    the breaking of the window is sufficient to satisfy the

9    requirement that the area be restricted.  The restriction is an

10   independent requirement to just simply having a building.  If

11   the government's theory was correct, then any building that

12   didn't have all its doors open and its windows up would be, by

13   definition, restricted.

14        Whereas, the statute, obviously, requires something

15   additionally to just having a building in order to have the

16   restriction.  I think that's clear.  There's no cases -- there's

17   not that many cases for that section at all, but there certainly

18   are none that say simply going into a -- every trespass on a

19   government building is equivalent to a 1752 violation.  That's

20   not the law.

21        Thank you.

22        THE COURT:  All right.  Thank you.

23        Under Federal Rule of Criminal Procedure 29(a), the Court

24   must enter judgment of acquittal for any offense for which the

25   evidence is sufficient to sustain a conviction.  In considering

this motion, the Court should not assess witness credibility,
weigh evidence, or draw inferences of fact.  The applicable
standard is whether the evidence viewed in the light most
favorable to the government is sufficient for any rational trier
of fact to find the essential elements of the crime beyond a
reasonable doubt.

Going through the arguments that Mr. Burnham has raised, I
find that the defense objection should be denied.

First as to Count 1, Mr. Burnham suggests that his client
was the second one who damaged the panes in each case.  I think
while it may be true that at some point the windowpanes would
have been repaired, I think it's fair to say that at least at
this point and drawing the evidence in the light most favorable
to the government, I think it's fair to say that the windows
still provided a certain amount of protection, both from the
elements and from trespassers, before the defendant did
significant damage to them.  So I think at least at this stage I
wouldn't agree with the proposition that if a window isn't
pristine, that it can't be further damaged or injured within the
realm of 1361 liability.

Mr. Burnham's second argument is that the aiding and
abetting theory is an unfair surprise to him.  I think both
parties agree that it need not be separately pled or indicted
and that the question here is whether it should -- he was
unfairly surprised by this additional theory.  In *United*

*States v. Powell*, 652 F.3d 702, 708, Note 4, from the Seventh Circuit in 2011, the Seventh Circuit said, "We question whether it is ever possible for a defendant to be unfairly surprised by an aiding and abetting instruction.  Neither Powell nor have we found any published cases finding such unfair surprise.  Aiding and abetting is not a separate crime but is a fundamental principle of criminal liability, and every competent member of the defense bar should be aware of it."

Mr. Burnham is not suggesting that he was prejudiced by this, or at least he hasn't pointed to any prejudice and says he doesn't need to.  And whether that may be true in a theoretical sense, I agree with the government here that it would have been -- the video which the defense has had for some time would have made it very obvious that a likely theory would be aiding and abetting.  And so I don't see how that can be unfair surprise here.

Count 2, the defense claims that the defendant didn't knowingly enter a restricted building or grounds.  Mr. Burnham asked me not to credit Inspector Loyd's testimony.  Of course, I can't do that at this point.  That's certainly an argument that he can make in closing.  But at this point I do need to draw the evidence in the light most favorable to the government, which includes two officers saying that the rioters were repeatedly told to leave and failed to do so.

I also -- I agree with the government that breaking into

the building, which is what the defendant did, is certainly --
or at least as they've alleged here, certainly could be entering
a restricted building or grounds.  I think the government's
argument is not that entering into any government building is
entering into a restricted building.  It's that this whole area
was restricted, and people would have known that through
multiple means, including all the snow fencing, the bike racks,
but also the fact that all the doors were closed and locked.
And here, the defendant had to break into the building, at least
according to the government, because there was no legal or
normal way into the building.

So I think the government has met its burden at this point
as to that element of knowingly entering a restricted building
or grounds.

I also agree with the government on Count 3.  At the very
least, the alleged statement that the defendant said that he
wished to stop the steal would help the government show that he
was intending to impede the certification, although frankly I'm
not sure that the government does need to show that he was
looking to impede certification rather than just the operation
of Congress in general.  And certainly, the actions of the
defendant, along with others roaming around the Senate building,
feet from where the senators were supposed to be operating
business, can certainly impede government business, and someone
would reasonably be expected to know that.

1          And finally, as to Count 7, I agree with the government

2     that the defendant waving his flag around, the participation

3     with others in a group right outside the Senate chambers would

4     count as demonstrating and/or parading.

5          So for all these reasons, I'm going to deny the defendant's

6     motion for judgment as a matter of law.

7          Mr. Burnham, do you wish to provide any evidence?

8               MR. BURNHAM:  No, Your Honor.

9               THE COURT:  Okay.  Mr. Rodean, could you approach the

10    podium, sir?  Sir, do you understand that you have an

11    unconditional right to testify or not testify at trial?

12              THE DEFENDANT:  Yes.

13              THE COURT:  Do you understand that you alone control

14    this decision whether to testify?

15              THE DEFENDANT:  Yes.

16              THE COURT:  Have you had adequate time to discuss this

17    decision with your attorney?

18              THE DEFENDANT:  Yes.

19              THE COURT:  And have you voluntarily decided not to

20    testify?

21              THE DEFENDANT:  Yes.

22              THE COURT:  All right.  Thank you, sir.  You may have

23    a seat.  And I think we'll ask you to sign a form to that

24    effect.  Mr. Burnham, maybe you can take a look at that with him

25    and have him sign that when you have a moment.

1          Is the government ready for closing?

2               MS. CHO:  Yes, Your Honor.

3               THE COURT:  Okay.  Mr. Burnham, are you ready?

4               MR. BURNHAM:  Yes, we're prepared.

5               THE COURT:  Okay.  So why don't we resume at 3:00 for

6     closings.  Thanks, folks.

7          (Recess taken from 2:38 p.m. to 3:00 p.m.)

8               THE COURT:  All right.  Some quick housekeeping.

9     Mr. Rodean, is this your signature on this right to testify

10    form?

11              THE DEFENDANT:  Yeah.

12              THE COURT:  And is this your signature on this waiver

13    of trial by jury form?

14              THE DEFENDANT:  Yes.

15              THE COURT:  Okay.  All right.  I will hear from the

16    government.

17              MS. CHO:  Thank you, Your Honor.  We would also seek

18    to reserve the opportunity to rebut.

19              THE COURT:  Okay.

20              MS. CHO:  Your Honor, Nicholas Rodean was motivated

21    and committed to breaching the building on January 6.  He took

22    the day off work, and he packed a hatchet in his bag.

23         Although the defense has talked about his being at the back

24    of the crowd of rioters who rushed construction scaffolding and

25    pushed down two lines of police officers to get to the building,

1    Your Honor can note in going back to the videos that Mr. Rodean,

2    in getting through that construction scaffolding, in rushing up

3    the stairs on the Lower West Terrace, in getting to that Senate

4    wing door, it took less than two minutes.

5        So Mr. Rodean was not in the back.  He was not at the tail

6    end of a group of people.  He was in the front, and he was the

7    first group of people who reached the building that day.  There

8    were two police lines between when he was in the scaffolding and

9    when he got to the building, and that's all in less than two

10   minutes.

11       Once he got to the building, we've discussed it at some

12   length, but he broke two windowpanes, and then he climbed

13   through that opening that he had created.  And as you could see

14   from the video, many other people climbed through the opening

15   that he had created by breaking those two windowpanes.

16       I'm going to devote most of my time here in closing to the

17   windowpane damage and the amount testified to by Deputy

18   Superintendent Jason McIntyre.

19       First of all, I want to clarify, Your Honor, that the

20   amount wasn't an estimate.  It wasn't an extrapolation that came

21   out of an expert analysis, as we've talked about.  That is the

22   amount that the government paid.  A glass contractor came, gave

23   a price for glass and labor.  The Architect of the Capitol's

24   representative today testified that in addition to the glass and

25   labor, they factored in hazmat sampling because of caulking and

glazing on the window.  They factored in painting the window
after it's installed and the labor involved in painting those
windows.

This was a very conservative valuation of that damage
amount.  Taking into account that Mr. Rodean broke the window
and many other people came through and taking into account
Mr. McIntyre's testimony that there were many other repairs in
that area that had to occur, for example the repair of shutters,
the repair of kiosks that were standing in front of the window
which Mr. Rodean, from one of the videos you can see, jumped
onto and many others jumped on after him because of the opening
he had created.  Those costs are not a part of the $1,500 amount
that the government has submitted in this case.  Instead, it
boils down to the bear minimum of materials and labor that were
expended in repairing the two windowpanes.

And here, the plain meaning of damage must include cracking
a window.  And Mr. Rodean, from the video, cracks two
windowpanes.  He cracks the first pane.  He takes the place of
another rioter who is standing in front of him, although
initially he begins attacking it while that rioter is also
attacking it.  He works in concert with that first rioter.  He
receives this round object from that first rioter that the first
rioter appeared to have used when he had cracked the windowpane,
and Mr. Rodean creates even more cracks in that first pane.
Then he turns to the second pane, and he's able to create more

cracks again at the exact same time as another rioter who had
already begun to crack the windowpane himself.

THE COURT:  Putting aside the aiding and abetting
theory for a moment, would you be able to show the felony or the
amount as to this defendant, given that you have this other
person who had already damaged it?

It strikes me that either you've got to say it was going to
be repaired anyway even before he came along because of the
damage the first man did, or else there's some sort of composite
damage that would presumably, you know, defuse the amount that
he's actually responsible for.

MS. CHO:  Your Honor, he would be liable for the --
all of the people who cracked that window would be liable for
the full amount of damage.  I think one thing to factor in is
Mr. McIntyre's testimony regarding urgency and how that factored
into how he went about engaging and repairing these windows.
Again, it's certainly an inference that the Court, the fact
finder can make.  Let's say it was only cracked; maybe it
wouldn't have been replaced immediately.  Maybe a different
glass contractor could have been engaged if the windows were all
cracked instead of fully knocked out.

I think that testimony was what it was.  That urgency, the
need to repair things, the need to use someone who could come in
immediately essentially meant that they were going to repair
those windows very quickly because they were gone.  And he did

1    mention security as another risk -- as another reason for the

2    urgency, and perhaps security would have been less if the window

3    hadn't been entirely knocked out.

4        So we believe that all of those rioters who broke the

5    windowpane, again because damage must include cracking glass,

6    are inflicting the same dollar amount of damage as each other.

7            THE COURT:  So the first guy was responsible for

8    $15,000 per pane, he's responsible for $15,000 per pane and any

9    subsequent person?

10           MS. CHO:  Yes, Your Honor, 1,500.

11           THE COURT:  1,500.

12           MS. CHO:  Technically, it's more like 700 and change

13    per pane, 1,500 for both panes.

14           THE COURT:  Have you found any case law on this?

15           MS. CHO:  No, Your Honor, we haven't.  The case law we

16    found, which I referred to earlier, gives some latitude in

17    proving up this damage.  And one example is, you know, when a

18    defendant cuts down a tree in a federal forest or federal land

19    and the government is trying to show that the value is over

20    $1,000, the government, you know, has a wide range of options

21    that have been sort of affirmed by appellate courts.  They can

22    talk about how much it costs to plant a new tree in its place

23    and clear out what the defendant had done.  They've proven that

24    amount by having an expert testify that the biodiversity of the

25    entire forest has been affected by removal of three trees.  And

1   in that vein, there's a lot of ways to establish this, and

2   certainly, it seems like an area in which there's flexibility

3   for the fact finder.

4       Your Honor, at this point, if the Court has any questions

5   or would like to see any more videos, we also have a thumb drive

6   of all the exhibits for the Court's independent review.  We're

7   happy to show those.  But otherwise, we will rest.

8           THE COURT:  Can we watch 11 again?  Is that the one --

9           MS. CHO:  Yes, Your Honor.

10      Mr. Bennett, could we pull up Government's Exhibit 11.

11      Your Honor, would you like us to zoom in on the two

12  windowpanes at issue?

13           THE COURT:  That would be great, yeah.

14      (Video played.)

15           THE COURT:  So, I mean, it seems like -- would you

16  agree aiding and abetting is your stronger theory there?

17           MS. CHO:  Yes, Your Honor.  He's working in concert

18  with at least two other rioters in that video.

19           THE COURT:  And why don't you need to show who they

20  are?

21           MS. CHO:  Your Honor, there's no requirement that we

22  name the individuals that the defendant is aiding and abetting,

23  and I do believe the video shows the individuals he is aiding

24  and abetting.  A conspiracy charge wouldn't require naming the

25  individual that the person is -- that the defendant is

1    conspiring with.  It simply needs to show the connection.  And

2    here, the connection, the assistance, the aid that Mr. Rodean is

3    providing and the others are providing him is clear.

4         THE COURT:  And that damage, that's what you're

5    relying on for the subsequent counts that talk about physical

6    violence?

7         MS. CHO:  Yes, Your Honor.  For the 1752(a)(4) and

8    5104(e)(2)(F) charges, the act of physical violence we're

9    referring to is the video we just watched, Your Honor, as well

10   as the disorderly and disruptive conduct in 1752(a)(2) and

11   5104(e)(2)(D), although we would also include other conduct as

12   part of that disorderly and disruptive conduct.  But certainly,

13   breaking the windowpanes is first and foremost.

14        THE COURT:  Okay.  What do you think about -- on Count

15   3, do you agree with Mr. Burnham that you've got to show kind of

16   an intent to disrupt the certification proceeding?  Is that the

17   evidence here?

18        MS. CHO:  No, Your Honor.  Looking at the plain

19   language in the charging instrument, it requires intent to

20   impede and disrupt the orderly conduct of government business

21   and official functions.  And certainly, breaking the window of

22   the Capitol building evinces an intent to impede, and certainly

23   telling a police officer within the building that he's there to

24   stop the steal, certainly breaking through the scaffolding on

25   the Lower West Terrace of the building, and certainly breaking

through the police lines that were set up just outside of the scaffolding and up the stairs next to the scaffolding, those evince an intent to impede and disrupt orderly government business.

And then moving into the building, again, Mr. Rodean was not far away from Officer Goodman.  If you review that video carefully, the *ProPublica* video at Government's Exhibit 13, he was in the same hallway as Officer Goodman, and there is a screenshot that the government introduced showing his location. And again, you can observe the video.  You can observe Officer Goodman's body language.  You can tell he doesn't want those people right there in that hallway.

So in all of those ways, that's disruption of the government's business right there.  Certainly, charging through the police officers who are protecting the building on the outside and within is disruptive, and that's part of the orderly conduct that they're trying to carry out, those police officers.

THE COURT:  All right.  Thank you, Ms. Cho.

MS. CHO:  Thank you, Your Honor.

THE COURT:  Mr. Burnham?

MR. BURNHAM:  Thank you, Your Honor.  I'll proceed however the Court wants, but absent direction, I will hit a couple of points and proceed to destruction of property last, because that has a lot of issues that go along with it.

As to the issue of the restricted area, which applies to

several charges, I want to refocus the argument and emphasize

that that has to go to Mr. Rodean's knowledge and intent.  It's

not restricted in the abstract, platonic sense.  As I understand

the government's theory, they're not -- they're maintaining --

well, they've got several arguments, but my first argument is

that one way that he could be put on notice was seeing a

barricade, and there's no proof he saw one.  By the time he got

there, the barricades were gone.  And the government even didn't

contest that all that much in closing.  They said well, he was

in the first wave or one of the first people to reach the

building, which is beside the point.  The issue is not was he

the first person to reach the building.  What we're looking for

is by what means was he put on notice that this was a restricted

area.

        So it's not the barricades.  And if it's not the

barricades, it has to be either by a police officer telling him,

which for all the reasons I stated in Rule 29 we don't have, and

now we've got a different standard there.

        And so where that leaves us is the government's theory that

basically a locked window is otherwise restricted.  That's the

catchall term.  It has to be posted, cordoned off, or otherwise

restricted.  So the theory is the fact that the window was

locked and there was not any other obvious way to get in is

otherwise restricted.  And there's no case that says that, that

simply locking the doors and locking the windows is otherwise

restricting.

And I don't see any good reason for Your Honor to be the first to make that finding.  It's not consistent with the purpose of the statute, particularly because there are ample other criminal laws sufficient to prosecute breaking windows.  I don't agree with how the government charged this particular one.  Certainly, there are different ways they could have done it.  And we shouldn't conflate the restricted area family of charges with other more classic criminal offenses that apply much more readily to the conduct.

THE COURT:  Why not just kind of the totality of the circumstances?

We have Exhibit 1, the map, showing where all the bike racks were.  He's gone through those.  I take your point that we don't know, that maybe there was a break in the wall.  But we saw those pictures on the Lower West Terrace, I think it is, where the defendant is coming up and things are getting thrown.

I mean, aren't there are a lot of indicators that you're not supposed to be here?

MR. BURNHAM:  Well, if you add it all up -- I understand Your Honor's point.  If you add it all up together, he just simply had to have known.  How could he not, right -- that's the argument -- with everything that was going on.  And there's a number of factors that weigh against that.

First, there's testimony that Mr. Rodean has autism.  We're

not putting on an insanity defense, but that's a reason to

proceed a little slower when we're making inferences about what

he had to have known, because he's not the same as the rest of

us.  That's one point.

Secondly is, there was testimony of the cacophonous

atmosphere, noise, people were wearing masks.  You couldn't hear

what was going on.  So there's no reason to infer that he would

have heard any of the back and forth between the officers either

at the bike racks or in the building.

And thirdly, if we put ourselves, sort of imagine ourselves

in his position, he's walking with a group of people towards the

Capitol where there's testimony that ordinarily people are

allowed to visit.  It's the people's house.  Journalists can

come, school kids, foreign dignitaries.  There's no obviously

illegal thing about visiting the Capitol, even in large numbers,

perhaps.

And so if you're in Mr. Rodean's position, you're walking

up with a lot of other people, none of whom are behaving in a

particularly violent manner that you can see, and by the time he

reaches the bike racks, he sees that the bike racks have been

moved and the police are standing placidly to the left and to

the right -- this is on the video -- not making an attempt to

restrain the progress of the crowd, not saying anything, not --

the police could have been on a loud speaker saying stop, stop,

you're going to be arrested.  They weren't doing that.  So from

1    Mr. Rodean's perspective, he can reasonably infer the police are

2    just standing there, they don't seem to have a particular

3    problem with what I'm doing, so I'm just going to go ahead on.

4         The same line of reasoning applies to the encounter that

5    some of the protestors had with Officer Goodman.  There's no

6    basis to find that Mr. Rodean would have been in any way on

7    notice of the content of that exchange.

8         And by the time he gets to the clock room --

9         THE COURT:  Sorry.  Just going back, the people's

10   house argument, doesn't that cut against you?  I agree that

11   people normally can come into the Capitol.  And so the very fact

12   that he had to break a window to get in suggests that, you

13   know -- like the Smithsonians are open every day.  I think I

14   normally can go in.  If I one day go over and find that it's

15   closed, I don't break a window and go in and say gee, I thought

16   I could be in here.  I'd say, rather, the fact that everything

17   is locked down suggests that today something is different and I

18   can't go in.

19        MR. BURNHAM:  And that's independently prosecutable as

20   an act of vandalism.  But the question I keep coming back to is,

21   you know, if he went up and spray painted "stop the steal" on

22   the wall, that would have been another illegal act.  But it's

23   beside the point from whether he was on notice that restrictions

24   were in place that day.  Right?

25        THE COURT:  Well, what I'm suggesting is that the very

fact that it had been locked down, using the term that Inspector

Loyd said, when people are coming, he puts the building on

lockdown, that's not how it normally is.  As you say, I think a

lot of people would know that's not how it normally is.

So going in, I mean, isn't that putting you on notice

that --

MR. BURNHAM:  Mr. Rodean wouldn't have been on notice

of the lockdown status.  He didn't know that.

THE COURT:  Well, sure, taking your point that this is

someplace you normally can go in and today, for some reason, you

can't.

And by the way, there's all these police officers coming

through here, articles being thrown, and that type of thing.

Doesn't that show a restriction?

MR. BURNHAM:  Not considering the evidence as a whole.

The breaking of the window is an independently illegal act of

protest, misdemeanor, we certainly think it is.

THE COURT:  My point is, having to go in through a

broken window.

MR. BURNHAM:  Well, I don't know that there's evidence

sufficient to find that he was on notice that that was the only

way he could have entered, and certainly, there were many people

there that day that didn't have to go in that way.

THE COURT:  Quite possibly a harder case for the

government to prosecute, for people who went through an open

door.

MR. BURNHAM:  I think it would be a much different situation if Mr. Rodean had tried to go in through a door and couldn't get in and then said okay, I'm going to go in through a window or, better yet, an officer told him no, you can't come in today and then he decided to go in through a window.  But we don't have that.

If he had broken a window in another government building where the vice president wasn't visiting, that wouldn't have been -- that wouldn't have been violating any of the 1752 statutes because there's no restriction in place.

THE COURT:  Right.

MR. BURNHAM:  So I think for Mr. Rodean's mens rea perspective, he's situated exactly the same way breaking a Capitol window as he would have been had he broken a window at the Pentagon.

THE COURT:  You're not suggesting that he had to know that things were locked down because the vice president was there?

MR. BURNHAM:  He had to know there were restrictions in place above and beyond simple run-of-the-mill locking the doors and closing windows.  That's what the statute clearly calls for, something beyond just the normal conditions that apply in any government building or, indeed, in any private home.  You lock doors; you close windows.  He had to know that

there was some other restriction going on that day, be it
cordoning off, be it signs, be it something else.  That's what's
missing here.

THE COURT:  Okay.

MR. BURNHAM:  A mention on intent to impede before
proceeding to destruction of property.  Simply proving he was
there to stop the steal is not sufficient.  The uncontested
testimony was that there was going to be ample opportunity, as
in fact there was, for senators and congressmen to object to the
certification of the electoral vote on the grounds that there
had been fraud and illegality.

So if the only proof we have was that Mr. Rodean was there
to express his opinion in support of those senators and
congressmen, that can just as easily be seen as protesting in
favor of what he saw as the better functioning of the Electoral
College.  That argument is completely consistent with a belief
that all the allegations about election fraud were false.

And again, this might draw us into the same back and forth
about what's the significance of breaking the window, isn't that
an intent to impede.  And I would argue that it isn't.  That's
destruction of property misdemeanor.  But there has to be
something -- there has to be some proof that by breaking the
window he had an intent in his mind that some function of
government would thereby be impeded or slowed down.  And I don't
see that that chain of inference applies at all.

If it was just for the broken window, if that was all that happened that day, the Electoral College could have proceeded on schedule.  The only reason why it didn't is because however many hundreds of other people did hundreds of other disruptive things, not because of the broken window.

And that line of reasoning is buttressed by Mr. Rodean's behavior, at least as depicted in the videos, in the Capitol. We know there were people screaming "hang Mike Pence," that were going around sticking -- I guess this isn't in evidence.  But at least based on what we've seen, there were people making statements that evinced an intention to go and cause trouble in the Capitol somewhere.  And we didn't see that from him.  He was docile.  He was cooperative with the search, cooperative with law enforcement.  He didn't make a run to try to get into the Senate or anything like that, which cuts against any finding that his intent was to impede the functioning of Congress in any illegal way.

I will come, then, to the destruction of property charge. And the government's theory, as I understand it, as explained to Your Honor, is that everybody that had anything to do with the window is chargeable with the $1,500 of damage, which the government commendably conceded there's not a case that says that.  That's a new theory that's being used to prosecute this situation here.

And there's a number of problems with it.  First, on a

legal level, I think the phrase the government used was there
has to be some flexibility for the fact finder.  Well, in
situations where there's flexibility for the fact finder, the
rule of lenity absolutely comes into play, and inferences should
be drawn in favor of the accused, not against the accused.  So
if there's ambiguity about the proof of damages and destruction
of property, that has to be resolved in favor of the defendant.
That's one.

Secondly, the few cases we do have seem to follow that
counsel.  The tree case the government referred to, the
defendant prevailed in that case on the loss amount argument.
Basically, the facts were the defendant stole some lumber from a
government -- some kind of government outdoor property, and the
government's theory to -- about loss was what the defendant
tried to sell it for.  And what the proof was the defendant had
chopped it up and improved it and was able to sell it for more.
And so that case was resolved in favor of the defendant, which I
think evinces exactly the type of cost approach to the damages
element that I'm urging this Court to take.

Finally, just on a practical level, a theory that anybody
who did anything with respect to the window is answerable to the
same amount of damages as the worst offender without a
conspiracy charge, it just would result in even more absurd
results than we see the government seeking here.  Imagine if
somebody just make a microscopic scratch on the window that

1    easily could have been buffed out and the next guy threw a chair

2    through it.  Are they both prosecutable for the damage caused by

3    the chair?  That just flies in the face of common sense.

4         THE COURT:  But here, where he's -- it really is hard

5    to think of a clearer example of somebody working in concert

6    with somebody else than one of them is kicking it, I think, and

7    he is using his flag.  And there really does -- I don't know

8    that I have to disagree with your argument about a scratch

9    versus a rock to say that here they're working hand in glove.

10        MR. BURNHAM:  I disagree they're acting in concert.

11   There's two people he conceivably could have been working in

12   concert with.  And I guess the government's argument is

13   strongest where they're alleging that the one individual handed

14   the shell to Mr. Rodean.  But even there, first of all, you

15   can't really see what's going on there.  The government's

16   alleging there was a hand-off from one to the other, but you

17   can't really see it.  I can't see it very well.

18       Secondly, that only applies to the one pane.  Remember, the

19   government's proof of damages was divided up by windowpane.  And

20   so that -- the individual who handed the half cannonball, the

21   half shell to Mr. Rodean, that would only apply to that window.

22   The other one, what happened, if Your Honor recalls from the

23   video, is somebody else kicked it who Mr. Rodean had absolutely

24   no interaction with, and then later, Mr. Rodean appears to have

25   struck it as well.

1    So that only gets the government to half the damages unless

2    the Court is prepared to find aiding and abetting as to both

3    individuals.  And I absolutely insist that two people committing

4    the same crime spatially and temporally close together is not

5    sufficient without more.  I mean, if you have these cases where

6    there's a riot and everybody runs into the 7-Eleven or the CVS

7    and carries stuff out, they're not acting in concert.  It's just

8    a bunch of people that decided to commit the same crime at the

9    same time.  There has to be some proof of coordination or

10   assistance between the two people, which we absolutely don't

11   have, especially to the -- let's see, the right windowpane where

12   you have somebody come out of nowhere and kick it, which appears

13   to have no interaction with Mr. Rodean at all.  And then he goes

14   somewhere.  And then, like I said, there's a period of time that

15   elapses, and then Mr. Rodean on his own comes around and does

16   the damage that he does to that window.

17       At most, at most, which we don't concede by any means, at

18   most, the government has an argument as to one of the

19   windowpanes, certainly not for both, which leaves them still

20   well shy of the $1,000 damage amount.

21       Any other questions from the Court?

22            THE COURT:  I don't believe so.  Thank you, sir.

23            MR. BURNHAM:  Thank you, Your Honor.

24            THE COURT:  Ms. Cho, any redirect -- or rebuttal?

25            MS. CHO:  One moment, Your Honor.

1        (Government counsel conferred.)

2        MS. CHO:  Just a few things, Your Honor.

3        First, on the issue of what is required for the building to

4   be restricted, there is no requirement that beyond being locked

5   that there is any other physical restriction that needs to be in

6   place.  The statute and the charging instrument talk about the

7   area needs to be posted, cordoned off, or otherwise restricted.

8   And a lock is otherwise restricted.  In fact, it's the most

9   straightforward of restrictions.

10        THE COURT:  I agree with that.  I think -- I take

11   Mr. Burnham's point to be about kind of the notice.

12        MS. CHO:  Sure.  And certainly, the thought that the

13   defendant is aware that the vice president is in the building is

14   not required as an element of proof.

15        THE COURT:  I agree, but that he knows that it's

16   restricted somehow --

17        MS. CHO:  Yes.

18        THE COURT:  -- which I don't think he needs to know

19   why, but that it's restricted beyond just kind of being locked

20   for the day or that that door is locked; right?

21        MS. CHO:  Sure.  And I think in looking at the videos

22   from that area, it's -- the door is locked.  The windows are

23   locked, both of them.  And Mr. Rodean is at that area.  And he

24   sees other people breaking in, and he is breaking in, too.  And

25   therefore, it does not appear that anywhere in his vicinity

1    anything is open to him to enter through.  And I think it's

2    logical to infer that's why he broke the window, because he

3    couldn't get in.

4         Your Honor, going again to the damage amount, I think it's

5    also fair to say that the defense can't have it both ways.  At

6    one point they're arguing that two people committing the same

7    crime in close timing proximity, that's not aiding and abetting.

8    Well, then that's simply committing the crime.  If he's not

9    aiding and abetting but they're conceding that he committed the

10   crime, then he damaged the two windowpanes independent from

11   those two other rioters.

12        The government is not arguing that anybody who does

13   anything to that window is liable for the 775, but the people

14   who did damage -- and here, there's no question that Mr. Rodean

15   did damage to that window in the plain language of the word

16   damage.  He is liable for that damage amount, Your Honor.

17        Could I have just one more moment?

18             THE COURT:  Sure.

19        (Government counsel conferred.)

20             MS. CHO:  And turning once more to the aiding and

21   abetting, Your Honor, as for the second window, Mr. Rodean

22   turned to that second windowpane after he had successfully

23   cleared out all of the glass in the first windowpane.  And yes,

24   somebody was working on it at the same time, and he contributed

25   to working on it at the same time.  They were both using the

1   implements that they had available to break out the rest of that

2   second windowpane.

3        That's it from the government, Your Honor.

4            THE COURT:  All right.  Thanks, folks.  I appreciate

5   the good arguing and preparation from both sides.  I will take

6   this under advisement.  Why don't we back at 11:00 a.m. tomorrow

7   for the verdict.

8        Anything further for the government, Ms. Cho?

9            MS. CHO:  Your Honor, would you like a copy of the

10  government's exhibits?

11           THE COURT:  I would like the video, yeah.  So if you

12  can get that to Ms. Chaclan this afternoon, that would be great.

13           MS. CHO:  Sure, Your Honor.

14           THE COURT:  Mr. Burnham, anything further for the

15  defense?

16           MR. BURNHAM:  No, Your Honor.

17           THE COURT:  All right.  See you all at 11:00 tomorrow.

18       (Proceedings adjourned at 3:35 p.m.)

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick                    August 7, 2022

SIGNATURE OF COURT REPORTER         DATE