**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-57-TNM** |
| **NICHOLAS RODEAN,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Nicholas Rodean, to 57 months' incarceration, the low end of the sentencing guideline range of 57-71 months, three years of supervised release, $2,048 in restitution, and the mandatory $205 special assessment for all counts of conviction.

## I.    INTRODUCTION

Nicholas Rodean smashed two windowpanes of the U.S. Capitol building with a flagpole and a metal object during the January 6, 2021 attack.   To get to the building, he, together with other rioters, pushed through or past snow fencing, makeshift bike rack barriers, scaffolding, and even a police line on the west side of the building.   Once inside, he and other rioters (some of whom were yelling "where are they counting the votes?") pursued U.S. Capitol Police Officer Eugene Goodman up the stairs to the hallway outside of the Senate chamber.   Outside of the Senate chamber, Rodean engaged in a stand-off with a line of police officers who warned rioters to stay back and to leave.   Instead of leaving, Rodean remained in the hallway for over forty

1

minutes, at one point, displaying a hatchet to an officer, and at another point, posing for a photo while waving his "Trump is my President" flag.   The next day, he told a supervisor at his job that he "did what needed to be done."

The government recommends that the Court sentence Rodean to 57 months' incarceration, which is within the advisory Guidelines' range of 57-71 months, as correctly calculated by the Probation Office.   *See* PSR ¶ 90.   A 57-month sentence reflects the gravity of Rodean's conduct.

## II.   FACTUAL BACKGROUND

### A.   The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters, Rodean among them, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the PSR, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting in separate chambers to certify the vote count of the Electoral College of the November 3, 2020

Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a

3

grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration

(May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

### B.    Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk.   The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted

area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.   They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).
> All people must leave the area immediately.   This order may subject you to arrest
> and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

**C.       Defendant's Role in the January 6, 2021 Attack on the Capitol**

This Court is familiar with the facts of this case, which proceeded to trial on July 11, 2022. In short, Nicholas Rodean, a 29-year-old from Frederick, Maryland, broke two large panes of glass in a window adjacent to a door in the Senate Wing of the U.S. Capitol building.   To break the two panes, he used a flagpole with a "Trump is My President" flag attached and a small round object that resembled half of a softball.   He entered the building at approximately 2:13 p.m.   He was the 15th rioter to illegally enter the U.S. Capitol building that day.

Before he entered the Capitol building, Rodean was part of a group of rioters who pushed past USCP officers stationed on terrace stairs next to scaffolding set up on the northwest side of the building.



After getting to the top of the terrace stairs on the northwest terrace, this group again pushed past police officers and also bike racks, in order to eventually get to the door and windows near the

Senate Wing of the building – where Rodean broke the window.   The two window panes that Rodean smashed became an entry point for many rioters thereafter.   Police were later able to clear rioters out of this area and keep rioters from breaching the windows Rodean smashed for a short period of time at around 2:45 p.m.   But within minutes, the rioters were able to breach the windows and doors again.   Their ability to quickly breach this area of the building a second time was made possible by the fact that Rodean had already smashed the glass in the windows.

As Rodean broke the window with his flagpole and ball, other rioters were breaking the window on the other side of the door with a riot shield and a wooden beam, while still other rioters were attacking the door.   Rioters swarmed the area and yelled over the noise of glass breaking.



0102 USCS 01 Senate Wing Door near S139
01/06/2021 19:13:04

After breaking the window glass, Rodean climbed through the emptied frame and into the building.   A high-pitched alarm sounded inside as Rodean and a small crowd of other rioters proceeded north down a hallway, and then east down a second hallway.   At that point, the small

crowd of people who first entered the building (including Rodean) encountered U.S. Capitol Police

(USCP) Officer Eugene Goodman.   Rodean and others pursued Officer Goodman up two flights

of stairs to the second floor of the building.

Rodean, as part of that crowd of rioters, then proceeded to a long hallway (the "Ohio Clock

corridor") outside of the floor of the Senate Chamber.   Just moments before, as Rodean broke into

the building, the Senate had gone into recess.   Rodean remained in the Ohio Clock corridor for

more than 30 minutes, facing off against USCP officers who had stationed themselves in the

middle of the corridor.



At one point, a USCP officer in the corridor noticed the small round object in Rodean's

hand.   He and another officer spoke with Rodean and convinced him to put away the object.

Rodean then took out a hatchet, which they also convinced him to put away.   At that point, the

officers requested permission to search one of his bags, and he consented.   Rodean told one of the

officers that Rodean was there to "stop the steal."

After posing for a photo while waving his flag, he was one of the last rioters to leave the Ohio Clock corridor.



He exited the building thereafter, at around 2:55 p.m.

Rodean had earlier informed his supervisor at the Frederick warehouse where he worked that he was going to miss work on January 6, 2021, to attend President Trump's rally. Late on the evening of January 6, 2021, the supervisor became concerned and angry after seeing what he believed was a photo of Rodean inside the Capitol building. He called Rodean, who didn't answer but called back the next day. According to the supervisor, Rodean's response to the supervisor's concern that he had unlawfully entered the Capitol was simply that "it needed to be done."

## III.     THE CHARGES AND CONVICTION

On July 12, 2022, at the conclusion of a bench trial, this Court convicted Rodean of all

charges,[1] which were:

| | |
|---|---|
| Count 1: | Destruction of government property valued at more than $1,000, 18 U.S.C. § 1361; |
| Count 2: | Entering and remaining in a restricted building or grounds, 18 U.S.C. § 1752(a)(1); |
| Count 3: | Disorderly and disruptive conduct in a restricted building or grounds, 18 U.S.C. § 1752(a)(2); |
| Count 4: | Engaging in physical violence in a restricted building or grounds, 18 U.S.C. § 1752(a)(4); |
| Count 5: | Disorderly conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D); |
| Count 6: | Act of physical violence in the Capitol Grounds or Buildings, 40 U.S.C. § 5104(e)(2)(F); |
| Count 7: | Parading, demonstrating, or picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). |

## IV.    STATUTORY PENALTIES

Rodean now faces sentencing on all of those counts.

As noted by the U.S. Probation Office, Rodean faces up to 10 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count One, Destruction of Government Property; up to 1 year of imprisonment, a fine up to $100,000, and a term of supervised release of not more than one year for Counts Two through Four; and up to six months of imprisonment and a fine up to $5,000 for Counts Five through Seven.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

---

[1] Rodean was previously charged with violating 18 U.S.C. §§ 1512 and 2, but this charge was dropped from the Second Superseding Indictment.   Dkt. 40.

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

### A.    The Revised PSR

The government agrees with the Guidelines calculations contained within the revised PSR. *See* PSR ¶¶ 32-5. But a count-by-count calculation would be more helpful than the format set forth in the PSR.   Indeed, the Sentencing Guidelines direct the sentencing court to repeat the applicable Guidelines for each count.

More specifically, sections 1B.1(a)(1)-(3) describe the steps a sentencing court must follow to determine the Guidelines range, which include determining the applicable Guideline, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.

The revised PSR does not follow these steps. It concludes (*see* PSR ¶ 39) that Counts Two and Three group—a conclusion with which the government agrees—but does not set forth the

Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That

Guidelines analysis follows:

<u>Count One: 18 U.S.C. § 1361</u>

| | | |
|---|---|---|
| U.S.S.G. § 2B1.5(a)[2] | Base Offense Level | 8 |
| U.S.S.G. § 2B1.5(b)(2)(B)[3] | Offense involved a National Historic Landmark | <u>+2</u> |
| | **Total** | **10** |

<u>Count Two: 18 U.S.C. § 1752(a)(1)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2J1.2(a)[4] | Base Offense Level | 14 |

[2] As described in the government's objections to the draft PSR, the starting point for the Guidelines analysis for Count 1 is U.S.S.G. § 2B1.1; however, under § 2B1.1(c)(4), if the offense "involved a cultural resource heritage . . . apply § 2B1.5 if the resulting offense level is greater than under § 2B1.1." Since that is the case here, § 2B1.5 applies to Count 1.

[3] Application Note 3(C) for U.S.S.G. § 2B1.5, defines a National Historic Landmark as "a property designated as such pursuant to 54 U.S.C. § 302102." Section 302102(a) states that "[a] property that meets the criteria for National Historic Landmarks established pursuant to section 302103 of this title shall be designated as a National Historic Landmark and included on the National Register, subject to the requirements of section 302107 of this title." 54 U.S.C. § 302102(a) (emphasis added).

Although the Capitol is exempt from inclusion on the National Register and other regulations in 54 U.S.C. § 300101 *et. seq.*, Section 302103(2)(B) gives the Secretary of the Interior the authority to designate and remove the designation of National Historic Landmarks. 54 U.S.C. § 302103(2)(B); 36 C.F.R. § 65.9 (discussing withdrawal of National Historic Landmark designation by the Secretary of the Interior). The Capitol was designated as a National Historic Landmark in December 1960, and the National Park Service (on the Secretary of the Interior's behalf) continues to recognize that designation to this day. *See* List of NHLs by State - National Historic Landmarks (U.S. National Park Service) (nps.gov), https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last visited September 9, 2022) (listing the United States Capitol as a National Historic Landmark and noting its December 1960 designation date); *see also* 36 CFR § 65.1(c) ("The National Park Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary").

[4] As described in the government's objection to the draft PSR, the starting point for the Guidelines analysis for Count 2 is U.S.S.G. § 2B2.3(a). Under § 2B2.3(c), if the offense is committed with an intent to commit another felony, § 2X1.1 applies. Here, trial evidence and this Court's factual findings in support of the guilty verdict demonstrated that Rodean intended to obstruct

| U.S.S.G. § 2J1.2(b)(1)(B) | Involved causing or threatening to cause property damage | +8 |
| U.S.S.G. § 2J1.2(b)(2)[5] | Resulted in substantial interference with the administration of justice | +3 |
| | **Total** | **25** |

Count Three: 18 U.S.C. § 1752(a)(2)

| U.S.S.G. § 2A2.4(a) | Base Offense Level | <u>10</u> |
| | **Total** | **10** |

Count Four: 18 U.S.C. § 1752(a)(4)

| U.S.S.G. § 2J1.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 2J1.2(b)(1)(B) | Involved causing or threatening to cause property damage | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in substantial interference with the administration of justice | +3 |
| | **Total** | **25** |

The Guidelines do not apply to Counts Five through Seven. But the analysis does not end with the count-by-count calculations. Next, "closely related counts" group if they "involve," inter alia, "the same victim and the same act or transaction." U.S.S.G. § 3D1.2(a). In general, "[a]mbiguities should be resolved in accordance with the purpose of [§ 3D1.2] as stated in the lead

_____

congressional business related to the election, which in turn would establish that he intended to obstruct a congressional proceeding, in violation of 18 U.S.C. § 1512. As a result, § 2X1.1(a) applies, and leads to the application of § 2J1.2 for the Guidelines calculation. *See* PSR ¶ 41.

[5] Rodean's conduct caused a disruption to Congress. As this Court found in announcing its verdict, "I also think the government has shown that he did, in fact, cause a disruption to the orderly conduct of government business. He was, in part, why the Senate needed to be on lockdown just feet from where he was facing off with the police."

[6] The rationale for this Guidelines calculation starting point is contained in the analysis for Count 2.

paragraph, i.e., to identify and group 'counts involving substantially the same harm.'"   *Id*. n.2.

The relevant counts of conviction are Counts 1 through 4.   All of these counts -- Counts 1 (destruction of government property), 2 (entering and remaining in a restricted area); 3 (disorderly and disruptive conduct in a restricted area), and 4 (act of physical violence in a restricted area) revolved around Rodean's breaking of two window panes at the Capitol, in order to disrupt the operation of Congress.   The convictions include his other conduct both outside and inside the building, but they focus on that act or set of acts.

Counts 1 and 4 involve the Architect of the Capitol as a victim, while Counts 2 and 3 involve Congress as the victim.   But, given the cross-reference to U.S.S.G. § 2J1.2 under § 2B2.3(c) in Counts 2 and 4, Counts 1, 2, 3, and 4 all group because Counts 1 and 4 "embod[y] conduct that is treated as a specific offense characteristic in" Count 2.   *See* U.S.S.G. § 3D1.2(c). That conduct is property damage under §2J1.2(b)(1)(B).   As a result, the total offense level is 25.

Rodean objects to the Guidelines calculation contained in the PSR for Counts 1, 2, and 4. In summary, he first contends that the U.S. Capitol is neither a "cultural heritage resource" nor a National Historic Landmark" because it is statutorily ineligible for inclusion on the National Register of Historic Places, and therefore, the Guidelines calculation for Count 1 should be controlled by U.S.S.G. § 2B1.1 instead of § 2B1.5.   He further argues that applying both would constitute impermissible "double-counting."   Second, he asserts that there is no evidence that in Rodean's violating Counts 2 and 4, there was any evidence of an "intent to commit a felony." Therefore, Counts 2 and 4 should be controlled by U.S.S.G. § 2B2.3(a) instead of § 2J1.2.   Should the Court apply § 2J1.2 to Counts 2 and 4, he further argues that the specific offense characteristics involving the "administration of justice" do not apply to a joint session of Congress.

For the reasons set forth below, his objections should be set aside, and the findings in the PSR adopted by this Court.

**B.      Section 2B1.5, relating to cultural heritage resources, and its enhancement regarding National Historic Landmarks should apply**

U.S.S.G. § 2B1.5 applies to offenses normally controlled by § 2B1.1 if the offenses involve a "cultural heritage resource." U.S.S.G. § 2B1.1(c)(4). In this case, section 2B1.5 provides for a base offense level of 8, as opposed to the level 6 provided under § 2B1.1(a)(2). The United States Capitol is a "historic property" and accordingly a cultural heritage resource, pursuant to Application Note 1(A)(i) for U.S.S.G. §2B1.5. The Application note refers to 54 U.S.C. § 300308, which defines a "historic property" as "any prehistoric or historic district, site, building, structure, or object *included on, or eligible for inclusion on, the National Register [of Historic Places]*…" 54 U.S.C. § 300308 (emphasis added). While the United States Capitol is not included on the National Register, as it is exempt from inclusion on the National Register and other attendant regulations in 54 U.S.C. § 300101 et. seq. pursuant to 54 U.S.C. § 307104, it would otherwise be *eligible for inclusion* on the National Register.

Section 16(l) of 36 C.F.R. pt. 800 clarifies that "eligible for inclusion" in the National Register includes "both properties formally determined as such in accordance with regulations of the Secretary of the Interior and *all other properties that meet the National Register criteria*." 36 C.F.R. § 800.16(l)(2) (emphasis added). The National Register criteria can be found at 36 CFR § 60.4 and focuses on the historical significance of the property, and the property's associations with historical events, significant historical figures, historical styles and artistic value, and important historical information:

*National Register criteria for evaluation*. The quality of significance in American history, architecture, archeology, engineering, and culture is present in districts, sites, buildings, structures, and objects that possess integrity of location, design, setting, materials, workmanship, feeling, and association and
(a) that are associated with events that have made a significant contribution to the broad patterns of our history; or
(b) that are associated with the lives of persons significant in our past; or
(c) that embody the distinctive characteristics of a type, period, or method of construction, or that represent the work of a master, or that possess high artistic values, or that represent a significant and distinguishable entity whose components may lack individual distinction; or
(d) that have yielded, or may be likely to yield, information important in prehistory or history.

Although no courts appear to have specifically addressed the issue of whether the Capitol meets one or more of the above criteria, actions and opinions of the Department of the Interior/National Park Service[7] and the Architect of the Capitol indicate that Capitol would easily meet one of more such criteria.

For instance, on December 19, 1960, the Department of the Interior designated the Capitol a National Historic Landmark under the Theme "Political and Military Affairs." *See National Register of Historic Places and National Historic Landmarks Program Record*, Washington, DC NHL United States Capitol, Department of the Interior Press Release, December 19, 1960, pp. 68, 72 < https://catalog.archives.gov/id/117691895 >.   The Press Release noted that the sites chosen as National Historic Landmarks "possess[ ] exceptional historic and archeological value," and notes for the Capitol specifically that "[i]t is not only a key structure associated with the historic

---

[7] The National Park Service (under the Secretary of the Interior) administers both the National Historic Landmark and the National Register Programs.   36 CFR § 60.3(h) ("The National Park Service is the bureau of the Department of Interior to which the Secretary of Interior has delegated the authority and responsibility for administering the National Register program."); *see also* 54 U.S.C.A. § 302103 (giving the Secretary of the Interior authority).

development of the nation, but a building of architectural and artistic interest." *Id.* Based on these discussions, it seems apparent that the Department of Interior/National Park Service recognized the historical import of the Capitol.[8]

Furthermore, generally, a property that meets the criteria for National Historic landmarks is automatically included on the National Register, and under federal regulations, the criteria for National Historic Landmarks is similar to that for the National Register with the added requirement that the landmark be of "national significance." *See* 54 U.S.C. § 302102(a) ("In general.--A property that meets the criteria for National Historic Landmarks… shall be designated as a National Historic Landmark and included on the National Register, subject to the requirements of section 302107 of this title."); 36 C.F.R. § 65.4(a) (discussing National Historical Landmark criteria). That approach is consistent with the National Park Service website, which (1) notes the Capitol's designation as a National Historic Landmark[9] and (2) states that "[a]ll National Historic Landmarks are included in the National Register of Historic Places, which is the official list of the nation's historic properties worthy of preservation," acknowledging that National Historic Landmarks constitute about 2,500 of approximately 90,000 entries in the National Register; while the others historic properties are of state and local significance.)[10] Although those rules do not apply strictly apply in the instant case – as the Capitol is statutorily exempt from the National Register, under the National Historic Preservation Act of 1966, 54 U.S.C. §3001, *et. seq.* – the

---

[8] Indeed, this description appears to address the criteria in 36 CFR §§ 60.4(a) and (c).

[9] *United States Capitol (U.S. National Park Service) (nps.gov)*, last visited May 11, 2022
https://www.nps.gov/places/us-capitol.htm >

[10] *Frequently Asked Questions - National Historic Landmarks (U.S. National Park Service)* (nps.gov)    last visited May 11, 2022
https://www.nps.gov/subjects/nationalhistoriclandmarks/faqs.htm#:~:text=All%20National%20 Historic%20Landmarks%20are,of%20state%20and%20local%20significance >

National Park Service's willingness to keep the Capitol as a National Historical Landmark indicates that not only would the Capitol be eligible for inclusion on the National Register, but would be eligible to be part of an elite subsection of the historic properties on the National Register with particular national historical significance.   In a May 5, 2022 letter to the Department of Justice Fraud Section, Valerie L. Hasberry, the Chief Security Officer for the Architect of the Capitol, noted that her office has made a similar determination regarding whether the Capitol is a "historic property" as that term is defined in 54 U.S.C. § 300308, and concluding that the Capitol's designation as a National Historic Landmark that it is a historic property, 54 U.S.C. § 307104 (formerly 16 U.S.C. § 470g) notwithstanding.

The United States Capitol was designated as a National Historic Landmark in December 1960 and the National Park Service continues to recognize that designation to this day,[11] and National Historic Landmarks are otherwise automatically included on the National Register pursuant to 54 U.S.C. § 302102(a).

In addition, the fact that the Capitol is exempt from the National Register does not mean that it is not *eligible for inclusion* on the National Register.   The National Historic Preservation Act separates eligibility from the legal ability to put a property on the National Register.   For instance, 54 U.S.C. § 302105(b) indicates that "[privately owned] property shall not be included on the National Register or designated as a National Historic Landmark until the objection [of the

---

[11] *See* List of NHLs by State - National Historic Landmarks (U.S. National Park Service) (nps.gov), https://www.nps.gov/subjects/nationalhistoriclandmarks/list-of-nhls-by-state.htm (last visited September 9, 2022) (listing the United States Capitol as a National Historic Landmark and noting its December 1960 designation date); *see also* 36 CFR § 65.1(c) ("The National Park Service (NPS) administers the National Historic Landmarks Program on behalf of the Secretary").

owner of the property to such inclusion or designation] is withdrawn."   However, 54 U.S.C. §
302105(c) indicates that the "Secretary [of the Interior] shall review the nomination of the property
when an objection has been made and shall determine *whether or not the property is eligible for
inclusion or designation*."   54 U.S.C. § 302105(c) (emphasis added).   At least one court has
acknowledged that those two provisions read together indicate that eligibility for inclusion on the
National Register is unrelated to any separate legal bars to actual inclusion on the National
Register:

> Further, as Defendants point out, there is a difference between a
> property's *eligibility* for inclusion on the National Register, and its *listing* on the
> National Register. A property that is eligible for listing is one that meets the criteria
> for evaluation, meaning it possesses significance in American history, architecture,
> archeology, engineering, and culture. *Id.* §§ 60.3(c), 60.4. However, an eligible
> property may not be listed on the National Register for a variety of reasons—for
> example, if more than a majority of owners object to the listing. Thus, when 54
> U.S.C. § 302105(c) states that '[t]he Secretary shall review the nomination of the
> property when an objection has been made and shall determine whether or not the
> property is eligible for inclusion or designation,' it references the Secretary's
> obligation to determine if the property is *eligible* for listing. Even if the property is
> eligible for listing, listing may not be appropriate. In those cases, the property can
> be deemed eligible but not be listed.

*Norton v. Beasley*, No. 5:17-CV-351-CHB, 2021 WL 4497149, at *36 (E.D. Ky. Sept. 30, 2021).

Although Congress' specific intent or reasoning for exempting the Capitol from the
National Historic Preservation Act (NHPA) is unclear, there is no indication in the legislative
history for that exemption that Congress believed the Capitol could not meet the criteria for the
National Register.   On the contrary, the Senate Committee on Interior and Insular Affairs ("Senate
Committee") Report on the NHPA indicates that initially Congress intended for the Capitol to be
on the National Register.   Indeed, the Senate Committee noted that the draft NHPA bill

> would permit the Department of the Interior to extend its national register program
> to include historic properties of national, State, regional, or local significance.

*Priority recognition would be given in this register to our prime national monuments, such as the Capitol*, the White House, Mount Vernon, and Monticello.

S.Rep.No.1363, 89th Cong., 2d Sess. 8 (1966), p. 6.   This language strongly indicates that the Senate Committee recognized the Capitol as a historic property of national significance that could easily meet the criteria for the National Register.   There appeared to be no disagreement from the general Senate, as, "[w]ith little general discussion…the Senate passed the bill on July 11, [1966,] and referred it to the House Committee on Interior and Insular Affairs."   *WATCH (Waterbury Action to Conserve Our Heritage Inc.) v. Harris*, 603 F.2d 310, 322 (2d Cir. 1979) (citing 112 Cong.Rec. 15165-69 (1966)).

In summary, the statutory language and regulations, as well as the legislative history, support the recognition of the Capitol as a "cultural heritage resource," and therefore, U.S.S.G. § 2B1.5 should apply.

Rodean also argues that applying the specific offense characteristic under § 2B1.5(b)(2)(B), for an offense involving "a National Historic Landmark," amounts to double-counting, when applying the base offense level for the cultural heritage resource.   But "impermissible double-counting does not occur if the enhancement does not duplicate an essential element of the offense."   *See United States v. Valdez-Torres*, 108 F.3d 385, 388-89 (D.C. Cir. 1997) (upholding application of base offense level and enhancement where base offense level for aggravated assault and enhancement for use of a car as a dangerous weapon were both based on defendant having driven a car at victims) (citing *United States v. Reese*, 2 D. 3d 870, 894-95).   It is possible to be sentenced under § 2B1.5 without the application of the enhancement under § 2B1.5(b)(2)(B), and therefore the base offense does not duplicate the specific offense characteristic.   In general, "the use of a single aspect of conduct both to determine the applicable

offense guideline and to increase the base offense level mandated thereby will constitute impermissible double counting only where, absent such conduct, it is impossible to come within that guideline." *See Valdez-Torres*, 108 F.3d at 389.   Here, there is no impermissible double-counting because the enhancement for a National Historic Landmark is "properly used to distinguish among sentences imposed pursuant to" § 2B1.5 for different kinds of cultural heritage resources. *See id*.

### C.    Enhancements regarding the administration of justice should apply

U.S.S.G. § 2J1.2, which applies to the "Obstruction of Justice," provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). It also provides for a three-level increase "if the offense resulted in substantial interference with the administration of justice." U.S.S.G. § 2J1.2(b)(2). Rodean objects to the initial PSR because he asserts that neither of these specific offense characteristics is applicable to his conduct in this case.   Instead, he asserts that situations involving the administration of justice do not apply to a joint session of Congress.

This Court has declined to apply the specific offense characteristics of causing or threatening to cause property damage in order to obstruct the administration of justice under Section 2J1.2(b)(1)(B) and substantial interference with the administration of justice under Section 2J1.2(b)(2) in Capitol breach cases. *See United States v. Hale-Cusanelli*, 1:21-cr-37-TNM; *see also United States v. Secor*, Case No. 21-cr-157-TNM. The government incorporates by reference the arguments it made in support of these enhancements in *United States v. Secor*, Case No. 21-cr-157, at Dkt. 49 at 23-29.

In addition, trial evidence and testimony showed that Rodean's conduct substantially

interfered with the administration of justice.   Unlike Hale-Cusanelli and Secor, Rodean destroyed windows in order to breach the Capitol, Trial Tr. at 170-71, and therefore his conduct plainly fits within Section 2J1.2(b)(1)(B).   His breaking of the windows in turn allowed rioters like Hale-Cusanelli and hundreds of others to breach the building.   *Id*. at 170.   Rodean also faced off with police directly outside the Senate chamber, *id*. at 175, and disrupted the orderly conduct of government business inside the chamber.   *Id*. ("I also think the government has shown that he did, in fact, cause a disruption to the orderly conduct of government business.   He was, in part, why the Senate needed to be on lockdown just feet from where he was facing off with the police.").[12]

The government agrees with the U.S. Probation Office's calculation of Rodean's criminal history category as I. PSR ¶ 53. The government also agrees with U.S. Probation Office's assessment that Rodean has not demonstrated acceptance of responsibility.   Therefore, using the total offense level of 25 results in a Guidelines sentencing range of 57 to 71 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court

---

[12]  In the event that the Court disagrees with both the government and U.S. Probation, the Guidelines calculation for Count 2 would be:

Count Two: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3[12] | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | The trespass occurred in at any restricted facility | +2 |
| | **Total** | **6** |

Under that scenario, either Count One or Count Three would supply the offense level for the group, which would be 10.   Using the total offense level of 10 results in a Guidelines sentencing range of 6 to 12 months' imprisonment.

must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a 57-month term of imprisonment.

### A.  Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each individual person who entered the Capitol and assaulted police on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed other extensive fighting with police.

While looking at Rodean's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence;

(3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Rodean's crimes weigh heavily towards the recommended sentence. Rodean prepared for the day by packing a bag with a hatchet and heading to Washington, D.C. to attend the Stop the Steal rally.   He then proceeded to the Capitol, where he joined in the first crowd of rioters to breach the police line at and around the scaffolding on the northwest side of the building.   While he was near the scaffolding, he would have been exposed to clashes between the police who were trying to fend off the rioters, and violent rioters who were climbing walls and attacking police.   He had to push past a police line stationed at the top of the northwest terrace stairs to get to the Senate wing of the building at around 2:11p.m.

Once he got to the Senate wing doors, Rodean rushed to get to the front of the crowd. He then used his flagpole to break the glass in two window panes next to the doors.   After cracking portions of the two panes with the flagpole, he took a hollowed-out half-ball-shaped object from another rioter and busted out the majority of the glass in both panes.   He climbed through one of the emptied-out panes with his flagpole and into the building.   Many other rioters followed, and were able to do so because of Rodean's destruction.

Inside the building, Rodean joined the group of rioters who pursued USCP Officer Eugene

Goodman up two long sets of stairs and to just outside the Senate chamber.   Rodean and his fellow rioters were clearly seeking to disrupt Congress, and once they reached the hallway outside the Senate chamber, they did not leave, even after encountering yet another police line.   In that hallway, Rodean caught the attention of a USCP officer, who noted that Rodean was cradling the half-ball object he had used to break the windows.   When the officer asked Rodean what the object was, Rodean did not immediately respond but eventually complied with the officers' order to put it away.   He then removed a hatchet from his bag.   The officer asked Rodean why he had the hatchet, and he said he had it for self-protection.   Through these actions, Rodean demonstrated that he was equipped for violence and destruction that day.   And once he arrived, he did engage in destruction.

Rodean remained inside the Capitol for approximately 45 minutes and was one of the last rioters to leave the hallway outside the Senate chamber.   He has not exhibited any remorse or contrition for his actions.

### B.  Rodean's History and Characteristics

Rodean is a 29-year-old man from Frederick, Maryland with a high school diploma.   PSR, Dkt. 63 ¶74.   Up until January 6, 2021, he was employed as a warehouse worker at Navistar, in Friendship, Maryland.   Trial Tr. at 161.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Rodean's destruction of windows at the Capitol building, and his standoff with police officers outside of the Senate chamber, is the epitome of disrespect for the

law. When he entered the Capitol grounds and the Capitol itself, it was abundantly clear to him that lawmakers, and the police officers who tried to protect them, were under siege. Police officers were overwhelmed, outnumbered, and in some cases, in serious danger. He took part in a mob pursuit of one of those officers, as his fellow rioters audibly sought to disrupt the Congressional proceedings. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.      The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[13] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the

---

[13] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Although Rodean has no criminal history, he has also expressed no remorse for his actions on January 6, 2021. The day after January 6, he told his work supervisor that he had done what "needed to be done," and as his supervisor testified, Rodean "idolized" former President Trump.   Tr. at 124. There is no indication that he holds any regrets regarding his participation in the riot that day. A lengthier term of incarceration will provide

necessary specific deterrence here.

###### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.   Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Rodean and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other felony defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this memorandum, only one Capitol siege defendant has been sentenced on a felony conviction under 18 U.S.C. § 1361 for destruction of government property. *United States v. Hunter Ehmke*, 21-cr-29-TSC In that case, the defendant pleaded guilty to a violation of 18 U.S.C. § 1361.   Ehmke, a 20-year-old from California, smashed a set of windows on the east front of the Capitol building.   He was quickly tackled by police, and he left the Capitol grounds after police told him to leave, and that a warrant would be issued for his arrest.   At sentencing,

the government requested, and the judge imposed, a sentence of four months' incarceration.[14]

Rodean deserves a substantially longer sentence than Ehmke for several reasons. Unlike Rodean, Ehmke never entered the Capitol, did not bring a weapon into the building, did not chase a police officer up a staircase as part of an angry mob, and did not confront a line of police officers as part of that mob. In contrast, Rodean engaged in a standoff with police inside the U.S. Capitol and remained in the hallway for over forty minutes.

Accordingly, given the unique combination of factors in this case, a 57-month sentence here would not create an unwarranted sentencing disparity.

## VII. RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[15] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).

---

[14] In *Ehmke*, the government agreed in the plea agreement that U.S.S.G. §2B1.1 was the applicable Guideline. Upon further review of the applicable law and principles, however, the government has concluded that U.S.S.G. §2B1.5 is the appropriate Guideline for a violation of 18 U.S.C. § 1361 involving destruction of a window in the Capitol building.

[15] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

Rodean was found guilty of Count 1, destruction of government property. This charge triggers mandatory restitution under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A. At trial, the Court found that the amount of damage to the government property Rodean destroyed was $1,548 or more. Trial Tr. at 172. Rodean was also found guilty of six misdemeanor offenses, some of which trigger mandatory restitution under the MVRA, and others of which trigger discretionary restitution under the Victim Witness Protection Act (VWPA), 18 U.S.C. § 3663. The Court made no findings at trial regarding damage amount in relation to those counts, but the typical amount that the government has sought in restitution for Capitol siege misdemeanor cases is $500. That amount reflects a misdemeanor defendant's relative responsibility for the damage and destruction that the rioters collectively caused on January 6, 2021. Therefore, the total amount of restitution in this case should be $1,548 + $500, for a total of $2,048.

This amount is consistent with the MVRA and VWPA, which require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction"). Both statutes call for coverage of certain costs, including lost property. *See* 18 U.S.C. §§ 3663(b) and 3663A(b). Finally, under both statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See United States v. Emor*, 850 F.Supp.2d 176, 202 (D.D.C. 2012). The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially

in cases in which an exact dollar amount is inherently calculable." *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted).

Rodean's conduct, in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol building and grounds and losses suffered by police officers deployed to protect Members of Congress, their staff, and other Capitol employees. A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which Rodean should be responsible is $2,048.   The evidence supporting $1,548 of that amount was established at trial.   Trial Tr. at 172. As for the $500 amount, it properly reflects Rodean's role in the offense and considers the various legal and factual issues associated with calculating the actual losses for property damage to the U.S. Capitol and other losses incurred by law enforcement personnel.   It also reasonably accounts for the fact that this Court found that the damage amount of $1,548 for the broken window panes alone was likely conservative.   *Id*.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 57 months, which is a sentence at the bottom of the Guidelines range as calculated by the government, restitution of $2,048, and the mandatory $205 special assessment for all counts of conviction.

Respectfully submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:     _s/ Cindy J. Cho_
CINDY J. CHO
Assistant United States Attorney
Detailee, Member of NY Bar
601 D Street, NW
Washington, DC 20530
(317) 246-0107
Cindy.Cho@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that October 19, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all parties listed on the Electronic Case Filing (ECF) System.

By: */s/ Cindy J. Cho*
CINDY J. CHO
Assistant United States Attorney