```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
     * * * * * * * * * * * * * * *    )
 3   UNITED STATES OF AMERICA,        )    Criminal Action
                                      )    No. 21-00057
 4                    Plaintiff,      )
                                      )
 5      vs.                           )
                                      )
 6   NICHOLAS RODEAN,                 )    Washington, D.C.
                                      )    October 26, 2022
 7                    Defendant.      )    10:19 a.m.
                                      )
 8   * * * * * * * * * * * * * * *    )

 9

10              TRANSCRIPT OF SENTENCING HEARING
           BEFORE THE HONORABLE TREVOR N. McFADDEN,
11                UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   FOR THE GOVERNMENT:       CINDY JANE CHO, ESQ.
                               UNITED STATES ATTORNEY'S OFFICE
15                               FOR THE SOUTHERN DISTRICT OF
                                 INDIANA
16                             10 West Market Street
                               Suite 2100
17                             Indianapolis, Indiana 46204

18   FOR THE DEFENDANT:        CHARLES BURNHAM, ESQ.
                               BURNHAM & GOROKHOV, PLLC
19                             1424 K Street, Northwest
                               Suite 500
20                             Washington, D.C. 20005

21   FOR U.S. PROBATION:       SHERRY BAKER

22   REPORTED BY:              LISA EDWARDS, RDR, CRR
                               Official Court Reporter
23                             United States District Court for the
                                 District of Columbia
24                             333 Constitution Avenue, Northwest
                               Room 6706
25                             Washington, D.C. 20001
                               (202) 354-3269
```

```
 1              THE COURTROOM DEPUTY:  Your Honor, this is

 2   Criminal Case 21-57, the United States of America versus

 3   Nicholas Rodean.

 4              From Probation, Officer Sherry Baker.

 5              Counsel, please come forward to identify yourself

 6   for the record, starting with the Government.

 7              MS. CHO:  Good morning, your Honor.  Cindy Cho for

 8   the United States.  With me at counsel table is Special

 9   Agent Eadie with the FBI.

10              THE COURT:  Good morning, Ms. Cho.

11              Good morning, Agent Eadie.

12              MR. BURNHAM:  Good morning, your Honor.  Charles

13   Burnham here at defense table with Nicholas Rodean.

14              THE COURT:  Good morning, Mr. Burnham.

15              Good morning, Mr. Rodean.

16              We're here for the sentencing of the Defendant,

17   Nicholas Rodean, who was found guilty by this Court on

18   Counts 1 through 7 of the second superseding indictment.

19   Those include destruction of government property, entering

20   and remaining in a restricted building or grounds,

21   disorderly and disruptive conduct in a restricted building

22   or grounds, engaging in physical violence in a restricted

23   building or grounds, disorderly conduct in a Capitol

24   building, acts of violence in a Capitol building and

25   parading, demonstrating or picketing in a Capitol building.
```

1     I've received and reviewed the presentence

2     investigation report and sentencing recommendation from the

3     probation office as well as sentencing memoranda from the

4     Government and defense.  I've also reviewed the numerous

5     letters and two doctors' reports attached to the Defendant's

6     memorandum and I've reviewed the additional letters filed by

7     the defense just yesterday.

8     Are there any other documents or materials that I

9     should have reviewed?  Ms. Cho?

10    MS. CHO:  None from the Government, your Honor.

11    THE COURT:  And Mr. Burnham?

12    MR. BURNHAM:  No, your Honor.

13    THE COURT:  Mr. Rodean, this sentencing hearing

14    will proceed in four steps, some of which may seem a bit

15    mechanical to you.  But I want you to keep in mind why we're

16    here today and the gravity of the situation:  You've

17    committed a federal crime.  Today's hearing is a serious

18    matter, as it is about the consequences that you will face

19    because of your decision to engage in criminal behavior in

20    violation of federal law.

21    Sir, the first step of today's hearing is for me

22    to determine whether you've reviewed the presentence report

23    and whether there are any outstanding objections to it and,

24    if so, to resolve those objections.

25    The second step is to calculate your recommended

1    sentence under the sentencing guidelines.

2          The third step is to hear from the Government,

3    from your counsel and you, sir, if you wish to be heard

4    about sentencing in this case.

5          And the last step requires me to fashion a just

6    and fair sentence in light of all the factors Congress set

7    forth in 18 USC 3553(a).

8          As part of this last step, the Court will actually

9    impose a sentence along with the other required consequences

10   of the offense.

11         So turning to that first step, the final

12   presentence investigation report was filed on October 14th,

13   2022.  The probation office filed its sentencing

14   recommendation on the same day.  The Government filed its

15   memorandum in aid of sentencing on October 19th, 2022, as

16   did Mr. Rodean.

17         Does the Government have any objection to any of

18   the factual determinations set forth in the presentence

19   report?  Ms. Cho?

20         MS. CHO:  No, your Honor.

21         THE COURT:  And, Mr. Burnham, have you and

22   Mr. Rodean read and discussed the presentence report?

23         MR. BURNHAM:  Yes, we have, your Honor.

24         THE COURT:  Does he have any objection to any of

25   the factual statements set forth in it?

```
1                    MR. BURNHAM:  No factual objection, your Honor.

2                    THE COURT:  Mr. Rodean, could you approach the

3         podium, sir.

4                    THE DEFENDANT:  (Complies.)

5                    THE COURT:  Sir, are you fully satisfied with the

6         services of your attorney in this case?

7                    THE DEFENDANT:  Yes.

8                    THE COURT:  Do you feel you've had enough time to

9         talk with him about the probation office's presentence

10        report and the papers the Government filed in connection

11        with sentencing?

12                   THE DEFENDANT:  Yes.

13                   THE COURT:  Thank you, sir.  You may have a seat.

14                   THE DEFENDANT:  (Complies.)

15                   THE COURT:  The Court will accept the facts as

16        stated in the presentence report.  The presentence report

17        will serve as my findings of fact for purposes of this

18        sentencing.

19                   And my thanks to Officer Baker for her hard work

20        on this case.

21                   The presentence report lays out the probation

22        office's calculation of the advisory guideline range that

23        applies in this case.  I'll attempt to summarize it as

24        follows:

25                   They first turn to Section 2B2.3 of the guidelines
```

1    manual, which provides that if the offense was committed

2    with the intent to commit a felony offense, the Court should

3    apply the guideline 2X1.1 with respect to that offense.

4    Probation submits that because the Court found that the

5    Defendant's conduct caused a disruption to the orderly

6    conduct of government business, the appropriate base offense

7    level is 14 because the Defendant impeded Congress's

8    certification of the election.

9          The probation office has grouped Counts 2 and 3 of

10   the guideline -- for guideline purposes because they involve

11   the same victim.  They also grouped together Counts 1 and 4

12   because they embody conduct that is treated as a specific

13   offense characteristic in or other adjustment to the

14   guideline applicable to another of the counts.

15         The guidelines do not apply to Counts 5 and 7

16   because they are Class B or C misdemeanors.

17         According to the probation office, the offenses

18   carry with them two enhancements:  First, Mr. Rodean used a

19   flagpole to break two large panes of glass in a window

20   adjacent to a door in the Senate wing of the U.S. Capitol.

21   Probation submits that 2J1.2(b)1(B) applies and imposes an

22   eight-level enhancement because the Defendant damaged

23   property in order to obstruct the administration of justice.

24         Second, Probation submits that the Defendant's

25   offenses resulted in substantial interference with the

1    administration of justice; specifically, the Electoral

2    College certification.  For that substantial interference,

3    2J1.2(b)(2) imposes a three-level enhancement.

4              All told, the total offense level is 25.

5              Mr. Rodean has no prior criminal history and zero

6    criminal history points, placing him in Criminal History

7    Category I.  So based upon a total offense level of 25 and a

8    criminal history category of I, the guideline range

9    applicable to Mr. Rodean would be 51 to 71 months on

10   Count 1, 12 months for Counts 2 and 3 and 4, and not

11   applicable to the remaining counts.

12             The guidelines fine range would be $20,000 to

13   $200,000.

14             I know both parties have various objections and

15   thoughts about both the total outcome and how the probation

16   office got there.

17             I'll tell you that my inclination is that the

18   obstruction of an official proceeding guideline would not

19   apply.  While I did say that the Defendant obstructed

20   government conduct on that day, I didn't say and I don't

21   think that he necessarily intended to, which of course is a

22   critical component of the obstruction charge, which the

23   Government ultimately did not proceed with and is not -- was

24   not a requirement for the destruction of property charge.

25             So my inclination is that I should be following

1    the probation office's alternative calculation on -- I think

2    it's Page 32.  I think it's Page 32 of the probation

3    office's presentence report, which has a total offense level

4    of 12.  So that's my instinct.  But I will certainly be

5    happy to hear from the parties on this.

6              Mr. Burnham, would you like to be heard?

7              MR. BURNHAM:  I agree with your Honor, your

8    Honor's analysis there.  We have no problem with your

9    Honor's analysis.  So perhaps I'll just reserve the right to

10   respond to the Government if there's any particular issues

11   that seem to require my input.

12             Thank you.

13             THE COURT:  So I thought you might have -- I know

14   there were various back-and-forths.  So I'm not saying

15   you're taking a different position.  But I want to make sure

16   you're comfortable with the probation office's alternative

17   analysis on Page 31 and 32 that ends up with a total offense

18   level of 12.

19             MR. BURNHAM:  That's right, your Honor.  That's

20   what I'm saying.

21             THE COURT:  Ms. Cho?

22             MR. BURNHAM:  Thank you, your Honor.

23             THE COURT:  Thank you.

24             MS. CHO:  Thank you, your Honor.

25             Understanding the direction that the Court has

1    communicated to the Government and defense regarding the

2    guidelines calculation, I did want to take a moment to

3    explain how the Government got here.

4         Of course, we have sought the application of that

5    cross-reference under the obstruction of justice guideline.

6    And while acknowledging, as the Court already has said, we

7    did not ultimately pursue that charge at trial, it is the

8    case that as we began preparing for trial and as we went

9    through trial that additional evidence had emerged regarding

10   that particular offense.  And that is why when it came to

11   sentencing, we did pursue that application of that

12   enhancement.  And just to briefly highlight some of those

13   facts:

14        At trial, we established that he had been part of

15   a crowd that pursued Officer Goodman into the building and

16   upstairs and right outside the Senate chamber.  To get

17   there, he had been at the front of the crowd that was on the

18   west side of the building.

19        Once he got inside, he remained inside, outside

20   the Senate chamber, for over 40 minutes.  And he told a

21   Capitol Police officer that he was there to stop the steal.

22   He told his supervisor a similar thing the next morning and

23   he had discussed that in advance of January 6th with his

24   supervisor.

25        So for all of those reasons, that is why we

1      pursued that particular cross-reference.

2              And understanding that the Court is not likely to

3      apply that cross-reference, we will be modifying our

4      recommendation for sentencing assuming that the Court's

5      guideline calculation is drastically different from the one

6      contained in the PSR, a Level 12.

7              THE COURT:  Thank you.

8              MS. CHO:  Sorry.  One other housekeeping matter:

9      I know that the defense had objected to the cross-reference

10     of 2B1.5 for Count 1.  That's the cultural heritage

11     resource.

12              I'm understanding right now that he is not

13     pursuing that objection any further.  But we did set forth

14     our rationale as to why that cross-reference applied here in

15     our briefing.

16              THE COURT:  Thank you.  That's my understanding,

17     too.  And for what it's worth, I agreed with you on -- I do

18     agree with you on that point, on the cultural heritage

19     point.

20              On the obstruction point, I think I hear you.  I

21     certainly don't think that's a crazy position to take.  I

22     think in many situations with many individuals the sum of

23     the various pieces of evidence that the Government put forth

24     at trial would certainly make out the guideline for

25     obstruction of administration of justice and arguably would

1    make out the crime of obstruction of an official proceeding,

2    although of course that was not before me and is not before

3    me.

4         But I also think, seeing the Defendant, knowing a

5    bit about him and particularly at this point where I do have

6    the benefit of all of the evidence that the defense has

7    submitted in his support for sentencing, I don't think I can

8    say that he intended to obstruct the electoral count.

9         And so I am going to adhere to my instinct, which

10   is to follow Probation's alternative guideline range made

11   out on Pages 31 and 32 of the PSR.  And that leaves us with

12   a total offense level of 12 and a guideline range of 10 to

13   16 months.

14        Moving to the applicable statutory penalties for

15   Count 1, destruction of government property, the maximum

16   prison term the Court may impose is ten years for Counts 2,

17   3 and 4, entering and remaining in a restricted building or

18   grounds, disorderly and disruptive conduct in a restricted

19   building or grounds and engaging in physical violence in a

20   restricted building or grounds, one year each.

21        For Counts 5, 6 and 7, which are disorderly

22   conduct in a Capitol building, acts of physical violence in

23   a Capitol grounds and parading, demonstrating or picketing

24   in a Capitol building, six months each.

25        Turning to the maximum fines:  For Count 1, the

1    maximum fine is $250,000.  For Counts 2 through 4, the

2    maximum fine is $100,000 per count.  And for the remaining

3    counts, there's a potential fine of $5,000 for each count.

4         There's also a mandatory special assessment of

5    $100 on Count 1, $25 on Counts 2 through 4 and $10 on

6    Counts 5 to 7 for each count.

7         Looking to supervised release:  For Count 1, the

8    Court may impose a term of supervised release of not more

9    than three years; for Counts 2 through 4, one year; and no

10   supervised release would apply for Counts 5 through 7.

11        For probation, the statute suggests not more than

12   one nor more than five years of probation for Count 1 and up

13   to five years of probation on the remaining counts.  Under

14   the guidelines, because this recalculated guideline range is

15   in Zone C, Mr. Rodean would be ineligible for probation

16   because Zone C would require incarceration.

17        Looking to restitution, restitution is mandatory

18   in this case under 18 USC 3663A.  And the Government argues

19   for $2,048 in restitution.

20        Have I stated accurately the statutory framework

21   under which we are operating in regard to this case,

22   Ms. Cho?

23             MS. CHO:  Yes, your Honor.

24             THE COURT:  And Mr. Burnham?

25             MR. BURNHAM:  Yes, your Honor.

1          THE COURT:  Before I discuss the other sentencing

2     factors that will bear on the Court's final decision, I will

3     at this point share with the parties the particular sentence

4     the probation office has recommended, taking into account

5     the advisory guidelines sentence, the available sentences

6     and all of the factors listed in Section 3553(a):  The

7     probation office has recommended a sentence of 48 months on

8     Count 1, 12 months on Counts 2 through 4 each and six months

9     on Counts 5 through 7 each, all terms of incarceration to

10    run concurrently.

11          Probation also recommends 36 months of supervised

12    release on Count 1, 12 months for Counts 2, 3 and 4, and all

13    terms of supervised release to run concurrently and a

14    special assessment of $205 and restitution in the amount of

15    $2,048.

16          The recommendation of the probation office is

17    based solely on the facts and circumstances contained in the

18    presentence report.

19          I must now consider the relevant factors that

20    Congress set out in 18 USC 3553(a) to ensure that the Court

21    imposes a sentence that is sufficient but not greater than

22    necessary to comply with the purposes of sentencing.

23          These purposes include the need for the sentence

24    imposed to reflect the seriousness of the offense, to

25    promote respect for the law and to provide just punishment

1     for the offense.

2            The sentence should also afford adequate

3     deterrence to criminal conduct, protect the public from

4     future crimes of the Defendant and promote rehabilitation.

5            In addition to the guidelines and policy

6     statements, I must consider the nature and circumstances of

7     the offense, the history and characteristics of the

8     Defendant, the need for the sentence imposed, the guideline

9     ranges, the need to avoid unwarranted sentence disparities

10    among defendants with similar records who have been found

11    guilty of similar conduct and the types of sentences

12    available.

13           Does the Government wish to be heard on the

14    application of the factors set forth in 3553(a), request a

15    variance or otherwise make a sentencing recommendation?

16           MS. CHO:  Yes, your Honor.

17           THE COURT:  Ms. Cho.

18           MS. CHO:  This Court is very familiar with the

19    facts of this case and with this Defendant.  We've been

20    through a bench trial together and we all have a good sense

21    of what the facts are.  So I will not rehash our facts and

22    much of what we set forth in our sentencing memorandum, and

23    I'll instead focus on the arguments made by the defense in

24    their sentencing memorandum.

25           There are portions of my argument that may

1  reference items that were filed under seal, your Honor.  And

2  when I get to those, I will let you know.  I don't know how

3  the Court would prefer to handle that portion.

4        THE COURT:  I take it the sealing was mostly

5  regarding the personal information of the people writing it.

6  Is that correct?

7        MR. BURNHAM:  Well, I'll address that, your Honor.

8        Really, what I was -- I've requested the documents

9  be preserved under seal mostly because I didn't want

10  personal health information on the internet or on Twitter.

11  But I do intend to discuss openly Mr. Rodean's autism

12  spectrum disorder, because I think -- for a lot of reasons,

13  but I think it's relevant to respect for the law, for

14  example, and general deterrence.  So I don't think the

15  Government or the Court needs to feel like they have to tap

16  dance around that.  I appreciate the Court receiving the

17  documents under seal.  That's much appreciated.  But I think

18  we can all speak freely here.

19        THE COURT:  Thank you.  I'd agree as well.

20        So I think you're probably fine to proceed,

21  Ms. Cho.

22        MS. CHO:  Thank you, your Honor.

23        As I mentioned before, the Government will be

24  modifying its sentencing recommendation here in light of the

25  Court's calculated guideline range.

1          The sentencing recommendation we'll be making is

2     21 months, your Honor.  And again, I want to emphasize that

3     that's based on the Court's calculation of the guideline

4     range which, you know, the Government acknowledges is very

5     far from where we have pegged the guidelines calculation.

6     And rather than robotically apply the sentencing guidelines

7     range that we have set forth and we stand by, we want to be

8     flexible enough to understand the Court's rulings here.

9          So 21 months, in case the Court is wondering,

10    draws from the 14- to 21-month range which is pegged toward

11    a Level 14.  The Level 14 is where the Defendant likely

12    would have been if the Court had applied the obstruction of

13    justice guideline without any of the plus-eight or

14    plus-three enhancements.  And it's not too far from where

15    the Court has landed, which is a Level 12.

16         So to begin, the defense makes several arguments

17    about sentencing disparities in this case.  And I'd like to

18    first talk about the case of *United States versus Hunter*

19    *Ehmke*.  This Court has reviewed our filing, the defense's

20    filing regarding that case; but in short, the defense talks

21    a lot about the 1512 arguments here.  Why didn't we charge

22    Mr. Ehmke with 1512?  Why didn't we pursue that adjustment?

23    That's less relevant now that we've hashed through that

24    particular question, so I'll go straight to the facts of the

25    case.

1       Mr. Ehmke didn't enter the Capitol Building on

2   January 6.  He didn't make any statements about stopping the

3   steal as far as we know.  He didn't engage in a standoff

4   with police once he got inside because he didn't get inside.

5   And he left after police told him to leave.

6       He also pleaded guilty.  He pleaded guilty back in

7   January of 2022.

8       So for all of those reasons, he stands in a

9   different place than Mr. Rodean for purposes of sentencing.

10  And any difference between that sentence and the sentence

11  we're requesting here is not unwarranted, although there may

12  be a difference.  There is a difference.

13      Second, the defense points to the D.C. Superior

14  Courts and essentially is arguing Mr. Rodean could have,

15  should have, some variation of that, been prosecuted in the

16  Superior Courts and then likely would have been eligible for

17  a mental health community court.

18      But in chasing down that argument, the Government

19  believes it is unlikely that -- well, first of all, the

20  handful of January 6th Defendants who were prosecuted in

21  Superior Court were all from arrests that were effectuated

22  the day of.  So they were arrested on January 6th and they

23  were prosecuted in Superior Court.

24      Again, and more importantly, factually

25  distinguishing the conduct, they did not enter the building

1    that day.

2            Second, diversion and the idea of some sort of

3    alternative sentence:  Mr. Rodean likely wouldn't have been

4    eligible for the mental health court; and the Court is

5    probably more aware than myself regarding what the

6    eligibility for those requirements is.  But my understanding

7    is that there needs to be an approval by both the U.S.

8    Attorney's Office and the Pretrial Services Specialized

9    Supervision Unit.  And the latter entity needs to see an SSU

10   diagnosis, which is essentially a serious and persistent

11   mental illness as defined by D.C. Code.  It is unlikely that

12   Mr. Rodean's diagnosis would fit under that particular

13   designation, and therefore that program would not likely

14   have been an option here.

15           And any idea that there's a disparity created by

16   the possibility of being eligible for that program is not

17   rooted in reality.

18           THE COURT:  Can you explain that to me a little

19   more?  Because I spent a little time in mental health court,

20   but I thought there were a number of people who ended up

21   there with various -- I didn't have a lot of visibility into

22   what Probation and Pretrial Services was doing.  But I guess

23   I would have agreed with Mr. Burnham's instinct that

24   somebody with Asperger's would be the type of candidate who

25   would be -- you'd be looking for.

1       MS. CHO:  In talking with the U.S. Attorney's

2  Office's -- AUSAs who work in this area, autism is not a

3  diagnosis that typically qualifies as an SSU diagnosis.  And

4  it's my understanding based on material submitted that

5  Asperger's syndrome is a type of autism.  And Mr. Rodean's

6  particular diagnosis as set forth in the papers is a

7  Level 1, which is the least -- I don't want to say serious,

8  but it's Level 1 to Level 3, according to the DSM-V.  And so

9  that's our understanding after talking with the area of the

10  office that does that work.

11       THE COURT:  And I appreciate you chasing that

12  down.  That's helpful.

13       MS. CHO:  The third area that the defense raises

14  as a potential unwarranted disparity are the Portland

15  prosecutions in 2020.  I'd like to of course first clear up

16  what an important -- I don't think Mr. Burnham makes an

17  accusation here, but he puts it out there -- the idea that

18  there's an improper bias at play in these prosecutions.  And

19  this Court has already disposed of that argument in the

20  David Judd case, and the Government echoes the Court.  Such

21  an allegation does not fit reality here.

22       But again, focusing on the question at the heart

23  of it:  Is there an unwarranted disparity at play between

24  people who were prosecuted in Portland by the U.S.

25  Attorney's Office and people who were prosecuted here in the

 1    January 6th cases?  And the answer is no.

 2              3663A directs this Court to consider unwarranted

 3    disparities among defendants with similar criminal histories

 4    or similar backgrounds or records who have been found guilty

 5    of similar conduct.  And it's not the same analysis that

 6    this Court engaged in in *Judd*, which involved selective

 7    prosecution, but it is certainly related.  The idea -- are

 8    these Defendants similarly situated enough to the Defendants

 9    in Portland?

10              And of course the Court has been through this

11    analysis.  The answer is no.

12              This Court, Judge Nichols in this Court, has also

13    observed that the Portland rioters' conduct was serious, but

14    it didn't target a proceeding -- that's written into the

15    Constitution -- that has to occur on January 6th, that has

16    to occur at the Capitol Building.

17              And those rioters did not for the most part make

18    it past the building's outer defenses.  Here, Mr. Rodean did

19    that.  His case is very different in both of those senses.

20              Further, Mr. -- the defense's argument is pretty

21    general here.  They cite one case regarding sort of more

22    lenient treatment.

23              And in looking that case up and checking the

24    docket, it is not the case that that Defendant was charged

25    with or convicted -- well, they were not convicted.  They

1    were not charged with a property damage offense, as

2    Mr. Rodean is here charged and convicted of, in addition to

3    the fact that the bulk of Mr. Rodean's crimes relate to a

4    specific place.  And that's not simply semantics of the

5    statute.  That goes towards the heart of why these cases are

6    different.  They're rooted in the Capitol.  Our offenses,

7    many of them, are tied to the Capitol Building and its

8    grounds.

9         THE COURT:  But I think his point is that the lead

10   charge he's facing is destruction of property, which is not

11   a Capitol-specific charge.  And as you say, the Defendant

12   in the *Judd* case is largely not cited as destruction of

13   property.  There it was physical violence, which I think

14   Mr. Burnham is suggesting is more serious than destruction

15   of property.

16        MS. CHO:  But that's where this nexus to the

17   official proceeding and to the Capitol Building is

18   important.  It does distinguish factually property damage in

19   other cases versus this one.

20        Mr. Rodean wasn't simply damaging property on a

21   lark.  There was at least as established at trial -- and

22   again, we can disagree about to what extent it was

23   established -- but there was a reasoning that we've

24   established goes towards some pretty important differences

25   between January 6th and Portland.

1          Finally, I want to talk a little bit about

2     specific deterrence.  The defense argues that this is not a

3     concern here because Mr. Rodean has no criminal history and

4     because the offense here only happened because of an

5     unlikely confluence of factors.

6          He also asserts that his certainly very supportive

7     and fulsome network will support him in avoiding a criminal

8     path in the future.

9          What we've heard emphasized regarding Mr. Rodean

10    are two characteristics that I believe are relevant in

11    thinking through the need for a significant sentence to

12    deter future criminal conduct.  And those two

13    characteristics are these:  rigidity of thought and

14    rule-following.  First, I want to talk about the rigidity of

15    thought.

16          Especially when it comes to these particular

17    crimes and the reason as established at trial as to why

18    Mr. Rodean was committing them, it seems to the Government

19    that being rigid in thinking points to the need for a more

20    significant -- points to a greater need for deterrence,

21    essentially, a bigger push to change the mind of a Defendant

22    like Mr. Rodean who has not accepted responsibility, at

23    least up until now.

24          The second characteristic is rule-following.  And

25    certainly that may be true, accepting many of the

1    representations by our letter-writers.  But there are also

2    standout instances where rule-following was not the default

3    for Mr. Rodean.  At least two of the family members

4    indicated that they told him not to go to Washington, D.C.,

5    on January 6th, but he went anyway.

6         They also indicate that Mr. Rodean follows rules

7    set forth by people who -- you know, I think to adopt their

8    viewpoint who lead him astray, whether that's someone

9    looking to take advantage of him at his apartment building,

10   whether that is a fellow rioter standing next to him at the

11   window, whether it's a former president.  But this line of

12   thinking certainly can't serve as an excuse for his conduct.

13   And I know that nobody is asserting it as an excuse.

14        But in terms of sentencing, it should give the

15   Court pause regarding again the strong need for deterrence

16   in Mr. Rodean's case.  And these two attributes, rigidity of

17   thinking and rule-following, but as the rules set forth by

18   who, it's unclear, they're an incredibly potent combination

19   when it comes to justifying wrongful actions.  And there's

20   no indication that these two attributes have abated or will

21   abate.

22        For all of those reasons, your Honor, the

23   Government believes that a sentence of 21 months is

24   necessary but not greater than.  It's sufficient but not

25   greater than necessary to achieve the aims of sentencing

1    here.  It takes into account the seriousness of the offense

2    as well as the Defendant's history and characteristics.

3            Thank you, your Honor.

4            THE COURT:  Ms. Cho, I have a question for you.

5            I don't think you've really addressed to what

6    extent you see Asperger's as being a mitigating circumstance

7    here.  The defense has put on significant evidence that this

8    was almost kind of a perfect storm of coming out of COVID,

9    hearing from President Trump and this fixation on President

10   Trump and what have you.  And I hear what you're saying

11   about rigidity and rule-following.  I think those are fair

12   points.

13           Doesn't the Asperger's, though, cut in his favor

14   as well?

15           MS. CHO:  So as an initial matter, the Court is of

16   course free and should consider the mental health as part of

17   its tools to consider in sentencing.

18           But we do agree with United States Probation that

19   a departure under the guidelines, 5K2.13, is not warranted

20   based on the information in front of us.

21           But your question is harder:  How does it play

22   into this recommendation?  Does it cut for more time or less

23   time or imprisonment versus non-imprisonment?

24           It's really hard, I think, in reviewing these

25   materials to know what to think.  But I do go toward -- I

1     look at the report submitted by the Defendant regarding the

2     diagnosis.

3               And I would note for the Court that the

4     psychiatrist found that there was no intellectual impairment

5     here.  And there were a lot of issues with connecting with

6     people and communicating and understanding relationships.

7     And for better or for worse, that's a malaise that inflicts

8     a lot of people now.  It doesn't mean that it rises to the

9     level of an illness for other people.  But these ideas of

10    fixating on a figure and committing crimes in the name of

11    following those rules, they come up in other January 6th

12    cases.

13              And unfortunately -- that's not something that we

14    highlight in a victorious manner.  It's not a good thing

15    that people have a lack of connection and it leads to this.

16    But this is a long way of saying that I don't think that the

17    documents -- again, many of the letters set forth compelling

18    reasons why Mr. Rodean is here today.  But that's what

19    sentencing letters are supposed to do.  They explain to the

20    Court -- if a Defendant has enough loving people who care

21    about him in his life, they explain to the Court why the

22    Defendant is here in front of the Court.  And Mr. Rodean has

23    the benefit of exactly that kind of network.

24              But that doesn't change that the Defendant did the

25    things he did.  And certainly wanting to be at the front,

1    having strong political views and acting on them in

2    destructive manners, it doesn't change that those things

3    happened for those reasons.

4           And I think all criminal defendants who come into

5    this courtroom have reasons, and some are better than

6    others, why they commit the crimes that they do.  But in

7    particular here, the idea that those reasons revolve around

8    strongly held views, rigidity and refusal to follow a rule

9    that conflicts with a preexisting rule, I think that those

10   really cut both ways.  They're characteristics of other

11   defendants in these cases as well.

12          So I've rambled, your Honor.  I don't think I've

13   given you much direction either way.  And I think it's a

14   difficult decision.  So I won't dance around that.

15          THE COURT:  I hear what you're saying.  I've been

16   on this case from the outset.  I think you may be the third

17   prosecutor.  I had concerns about competence for -- I

18   brought that up, I believe, repeatedly.  I haven't sentenced

19   many people in any context, including as an AUSA, where

20   somebody had a disability.  And that feels different than

21   somebody who self-medicates with heroin or something.  And

22   it's hard to know how to deal with this.

23          MS. CHO:  And I should have noted at the outset,

24   your Honor, you already know this, but it's still worth

25   saying that our adjustment in our sentencing recommendation

1    does not ignore that.  It does take into account all of the

2    same materials that the Court reviewed in coming in today.

3              So it is -- this is not to say that it means

4    nothing.

5              THE COURT:  Thank you, ma'am.

6              MS. CHO:  Yes.

7              THE COURT:  Mr. Burnham, do you wish to be heard

8    on the application of the factors set forth in 3553(a),

9    request a variance or otherwise make a sentencing

10   recommendation?

11             MR. BURNHAM:  Yes, your Honor.  Thank you.

12             Just one request perhaps I should have made

13   earlier:  One of Mr. Rodean's family members wants to very

14   briefly address the Court.  I can have her do that now or --

15   I'd prefer to do it around the time Mr. Rodean makes his --

16             THE COURT:  That's fine.  Why don't you speak and

17   then she can speak before your client speaks.

18             MR. BURNHAM:  So what I'll do here, your Honor, is

19   briefly address some of the points first that the Government

20   made with the exception of specific deterrence that I'll get

21   to sort of at the end and then go into what I had prepared

22   to say, if that makes sense.

23             With the *Ehmke* matter to begin with, that

24   Defendant received four months.  And it's true that he

25   didn't enter the building.  But from reading the papers, the

1    reason why he didn't enter the building is after breaking

2    the window -- that was how it started -- he was literally

3    tackled -- I think one of the sentencing memos uses that

4    very word -- by law enforcement.  So it's not like he didn't

5    enter the building because he had a change of heart or

6    something.  He was physically prevented from doing so.

7            So I think that brings -- that fact brings his

8    case much closer to Mr. Rodean's than the description that

9    didn't include that.

10           And his sentencing papers did -- there were

11   redacted portions as well.  So he may have had some personal

12   mitigating factors, too.  And I, of course, can't speak to

13   that.  I wasn't involved in that case.  But that's

14   Mr. Ehmke.

15           As to the significance of Superior Court:  Counsel

16   seemed to suggest that that argument was maybe faulting the

17   Government for bringing this case in federal court.  That's

18   not the case at all.  My argument is simply that the

19   disparities argument applies to disparities between Federal

20   Court defendants and Superior Court defendants the same way

21   it does between one federal court defendant and another.  It

22   creates disparities and encourages disrespect for the law if

23   people are being sentenced much more leniently for similar

24   conduct in one court system than another.

25           And I'll just quote -- I pulled it up quick

1    here -- the definition of mental illness that the guidelines

2    for mental health courts cite.  I'll just read it into the

3    record.  This is D.C. Code 21.501:  Mental illness --

4    Subsection 5 -- mental illness means a psychosis or other

5    disease which substantially impairs the mental health of a

6    person.  And I think Mr. Rodean clearly fits within that.

7    His mental health is absolutely substantially impaired.

8         And in my own personal experience -- counsel

9    proffered what her colleagues have said.  I was in Superior

10   Court a lot at one time.  Not so much anymore.  I never

11   encountered much pushback trying to get people into mental

12   health court.  That Court very much is -- wants to get

13   people into diversion.  You didn't get a lot of "Does it

14   really meet the definition?"  I don't see any reason why

15   someone with his -- with autism as profound as his wouldn't

16   be a good candidate for that.  So I think that should be

17   taken into account.

18        THE COURT:  I'm not sure that unwarranted

19   sentencing disparities look to state offenses.  I think

20   there's a long history of the Federal Government charging

21   people in federal court precisely because they're going to

22   get longer time there than they would in state court.  I'm

23   not sure that judges are supposed to look back at whatever

24   the least severe state court might be somewhere in the

25   country as a ceiling.

1          MR. BURNHAM:  I mean, just going on pure respect

2     for the law, I would say it's relevant.  I mean, the 2017

3     cases, there were dozens upon dozens of those.  They were in

4     Superior Court.  To the extent anyone had mental problems --

5     the inauguration case I'm referring to -- they could have

6     had the benefit of mental health court.  This case proceeded

7     differently, and that creates a perception.  I'm not

8     accusing anyone of anything.  But it creates a perception.

9     It's legitimate for your Honor to take account of that at

10    sentencing.

11          That sort of segues into the Portland matter.

12    Again, I'm not accusing any particular person of anything.

13    But you just look at the facts.

14          As the Court did in the *Judd* decision, I think

15    there's -- I think your Honor decided we're not going to be

16    throwing out indictments for that reason.  But there is some

17    language in the *Judd* decision that expresses some serious

18    and I think very justified concerns about the disparity in

19    treatment between the Portland Defendants and the

20    January 6th, especially because the argument is not that one

21    Portland Defendant got 30 months and here we have a

22    January 6th Defendant getting 41 months.  Not at all.

23    It's that the Portland Defendants aren't prosecuted at all

24    or got a DPA or a misdemeanor, and you've got people in this

25    Court going to jail for years.

1            You know, the disparities analysis quickly becomes

2    a rabbit hole where you're like, Well, this was at night,

3    but this was more dangerous, and this went on for three

4    months, but this was just one day.  And I think when you

5    take the whole picture, given the dramatic disparity in

6    treatment, it absolutely exerts a downward pressure on

7    sentences in this Court when the Portland experience is

8    taken into account for multiple 3553 reasons.

9            And with that, I'll circle back sort of to start

10   at the beginning with Mr. Rodean.

11           THE COURT:  Okay.

12           MR. BURNHAM:  Your Honor already summarized the

13   message I wanted to get across to the Court about

14   Mr. Rodean's personal situation quite well.  And I think

15   where I'd like to start is the period of time where in the

16   year or two leading up to 2020, Mr. Rodean, as your Honor

17   read, had in many ways a very unpleasant time as a schoolboy

18   with his classmates, didn't really even function very well,

19   living with his family, despite the loving bond that that

20   family shares.

21           He did better living alone in a place like

22   Fredrick, where he can walk, where there's people around,

23   where there's activities, where even his political interests

24   were channeled in a largely healthy way for a long time.

25           Mr. Rodean, as your Honor read, has a passion for

1    U.S. history.  He admires U.S. presidents.  The former

2    president very much spoke to that.  And his patriotic terms,

3    "Make America Great Again," "America First," that resonated

4    with someone with Mr. Rodean's interest in history.  And it

5    was channeled in a healthy way for a long time.

6         Going to the president's -- one of the former

7    president's rallies, going to the inauguration, all of that

8    went fine.  It could have been a perfectly healthy interest

9    and it could still be again.

10        Really, as your Honor already alluded to, things

11   started to unwind with the pandemic, where Mr. Rodean's

12   network that he had built was wiped out almost overnight.

13   No activities, no support.  He couldn't even walk to the

14   stores where he used to visit the shopkeepers that knew of

15   him and treated him kindly.  And he spent all of his time on

16   the internet, all day long.  And that's unhealthy even for a

17   neurotypical person.  For neuroatypical persons like him, it

18   was just disastrous.

19        And so his natural and healthy interest in public

20   affairs and politics began to channel itself with his

21   hyperfixation tendencies, conspiratorial and in a bit of an

22   excessive obsessive direction.

23        But even taking that into account, the problems

24   with Mr. Rodean and the internet and the pandemic, I still

25   suggest that the odds were overwhelming that he never would

1    have offended at all if January 6th hadn't unfolded in

2    exactly the way it did.  Here, I'll just -- I'd like to

3    connect a few dots between the evidence of January 6th and

4    what some of our letter-writers have said.

5           The way that day sort of happened is there was the

6    speech at the Ellipse.  And then some portion of that crowd,

7    arguably in response to comments by the president, began to

8    march down Pennsylvania Avenue to the Capitol.

9           And so why is that important?  Because several

10   letter-writers have said that one of Mr. Rodean's tendencies

11   is he always wants to be at the front of every group, even

12   in social settings, at restaurants.  He's been ostracized

13   his whole life.  He's been kind of put in a corner by his

14   friends, by his family.  He doesn't want to miss out.  He

15   doesn't want to be ostracized.

16          And so when the group started to move towards the

17   Capitol, he naturally is going to want to see what's going

18   on and gravitate towards whoever seems to be the leaders of

19   that current.  Obviously, the president's remarks probably

20   played into that as well.

21          And that pattern of him following the people that

22   seemed to be driving, you know, events absolutely played out

23   at the window itself.  Your Honor saw the video several

24   times.  An unhelpful person showed up at the exact wrong

25   time, literally handed Mr. Rodean the piece of metal that's

1    been described as an eggshell, half-eggshell, and encouraged

2    him to strike the window that other individuals had already

3    struck with other objects or with hands and feet.

4         I think the Court I hope could have no trouble

5    finding if he hadn't received that encouragement from

6    somebody he probably viewed as someone that he was sort of

7    following, taking his notes from them, he wouldn't have

8    offended in the way that he did.

9         And you can even see that at the final point.

10   Once he got into the building, that tendency sort of

11   continued.  Several letter-writers have commented that

12   Mr. Rodean, even more than most people, has a tendency to

13   gravitate towards assertive male figures, authority figures,

14   charismatic figures.  Obviously, Donald Trump is sort of the

15   epitome of that.

16        On January 6th, I think that person just turned

17   out to be Mr. Chansley.  He was getting all the attention;

18   he had the bullhorn; he was conspicuous; all the reporters

19   were bending down to take pictures of him.  And sure enough,

20   every photo after photo on the internet has Mr. Chansley

21   there with the horns and Mr. Rodean standing off to the

22   side, you know, at his elbow.  And I think probably he

23   gravitated towards that individual for that reason.

24        So really, if that -- I think your Honor said it

25   perfectly:  If that chain of events hadn't taken place in

1    exactly the way it did, if the pandemic hadn't happened or

2    perhaps if the president's remarks had been different than

3    they were or if Mr. Rodean hadn't been in a position where

4    he sort of fell in with the individuals who went to the

5    Capitol, Mr. Rodean wouldn't be here.  In all likelihood, he

6    would live out his life in a law-abiding manner.

7         So where does that leave us in terms of specific

8    deterrence?  I think there's many, many reasons to --

9    besides those which are already apparent from my argument so

10   far to conclude that specific deterrence has been achieved

11   here.  And that begins with the period immediately following

12   January 6th.

13        As the Government knows -- I don't know if it's in

14   the record of the Court yet -- Mr. Rodean surrendered almost

15   as quickly as he could.  He got in touch with me.  It wasn't

16   right away because I took the time to make some

17   arrangements.  It was a chaotic time for law enforcement.  I

18   kind of got transferred from FBI agent to FBI agent.  But

19   eventually, we got in touch with someone and made

20   arrangements for him to turn himself in.

21        And he did that right away.  And that was one of

22   the earliest cases, you know, among the earlier cases to be

23   prosecuted.  So for that whole time, he's been living under

24   the stress of a federal indictment.  And that's been very

25   traumatic for him and his family, and he's to a large extent

1    already learned the lessons that the Court I'm sure wants

2    him to take from that day.

3           And finally, his family.  He's worked very closely

4    with me, followed the court process very closely.  They're

5    enormously supportive of Mr. Rodean.  This caught everybody

6    by surprise, even knowing Mr. Rodean as they do.  I don't

7    think anyone expected this to happen, because it wasn't

8    probable.  Lots of things had to happen for Mr. Rodean to

9    get put in this position.  But his support network now knows

10   that this is something to be on the lookout for for him if

11   there's ever a period of public unrest the way there was in

12   2020.  And they're going to provide the support he needs not

13   to be in a position to get drawn into that.  Now they know

14   how to do it.  And I think that can give the Court a lot of

15   assurance.

16          So where that leaves us is, what factors would a

17   period of -- we're asking for no incarceration, which on

18   some levels I understand is a big ask.  I'll address it

19   directly.

20          The first thing I want to emphasize to the Court

21   is I think it's an accepted principle of sentencing that if

22   incarceration is going to be more punitive on a particular

23   defendant than, so to speak, the average defendant, it's a

24   valid reason for a downward variance.  We saw that during

25   COVID, I think, as one example where certain judges

1    explicitly sentenced defendants to a little less than they

2    would have because incarceration became more dangerous and

3    punitive than it was.  You saw that somewhat in

4    compassionate release motions, where people got out a little

5    early because it was tougher to be in prison during COVID

6    than it was before.  So that same logic applies to these

7    facts.

8           What would Mr. Rodean's experience be like in

9    prison even for a short time?  We know he's absolutely

10    absurdly trusting of anybody:  homeless people, people he

11    meets on the street.  He'll be taken advantage of, even in a

12    low-security facility in prison.

13           We know he has trouble getting overstimulated by

14    sounds, by smells, by activity.  And, oh my gosh, prison?  I

15    almost couldn't think of a situation more ripe to trigger

16    that autistic response that he's prone to even in less

17    unusual situations than prison.

18           Following directions:  Multiple individuals have

19    written to the Court to say he has to have direction spelled

20    out to him step by step, one at a time.  Anything other than

21    that, he can't complete it.  He won't do it.  He doesn't

22    have the capability.  And COs are not going to have that

23    kind of training to work with that.  And that could turn

24    quickly into a dangerous situation for him.

25           Finally, what I think most likely would happen --

 1    I don't know -- if Mr. Rodean were to go to prison, I think

 2    there's a good chance he'll be put in protective custody

 3    perhaps if the prison just throws up their hands with him.

 4    They can't keep him safe.  He can't follow directions.  He's

 5    getting in trouble.  And that means 23 hours a day in a cell

 6    by himself, which could have psychological consequences he

 7    may never recover from.

 8              So the bottom line, your Honor, is that

 9    imprisonment for him is not the same as it is for 99 percent

10    of the people who probably come before the Court.  That's

11    highly relevant.

12              So why is home incarceration a particularly good

13    option here?  Well, for several reasons:  One, Mr. Rodean

14    has his own house.  He has a support network that can bring

15    him the support he needs without him having to leave.

16              We know he's an absolutely maniacal rule-follower

17    99 percent of the time.  I think particularly poignant are

18    two of the examples from the letters submitted.  One is

19    where your Honor or the Court told him when he's on pretrial

20    release he can't break any laws.  So what that means for him

21    is, in a totally empty street in the middle of the day, he

22    will not jaywalk.  He won't cross the street unless he walks

23    to the end and walks across the crosswalk.  When his dad

24    takes him to my office, he reminds everyone:  You can't take

25    the GW Parkway.  It goes through Virginia.  I can't leave

1    Maryland.

2          Those are just two examples to reassure the Court

3    that whatever conditions your Honor sees fit to impose,

4    whether that's home incarceration or probation, he's going

5    to follow those conditions.  He's proven that.

6          And that includes possible restrictions on

7    internet access if your Honor sees that as appropriate.

8    That's something Dr. Bos suggested.  He's willing to abide

9    by that.  Probation can monitor his internet.  Some

10   January 6th pretrial detainees had that.  And that's an

11   option that the Court can invoke if that gives the Court

12   more comfort in possibly a bit of an alternative sentence.

13         So really I think where that leaves us is what 35

14   [sic] factors remain to justify locking up Mr. Rodean.  And

15   I think really arguably -- you know, I hope the Court

16   agrees -- that in terms of retribution or specific

17   deterrence, justice doesn't call for that, I don't think.

18   Perhaps general deterrence and disparities might be the only

19   two arguable ones.  But I don't think they need to carry

20   that great of weight in this situation in terms of general

21   deterrence.

22         There's been several hundred people sentenced for

23   this already and there will be more.  Many of them received

24   lengthy sentences as appropriate based on their history and

25   acts.

1        And I think it would increase respect for the law

2   looking at this incident as a whole in historical context if

3   the public sees that the courts in some cases showed

4   leniency in appropriate circumstances and in other cases

5   were harsh.  Mr. Rodean is one of the circumstances that we

6   hope the Court agrees calls for leniency.

7        And there's really not as much of a disparity

8   problem as perhaps the Government is suggesting.  There were

9   cases -- you know, the other one I mentioned is one -- where

10   the Courts have showed some measure of leniency.  And I

11   haven't seen one myself that had this amount of mitigation.

12   Perhaps it was sealed.  But I don't see this as creating any

13   disparities that are going to cause disrespect for the law

14   or create injustices with any other case that I've studied.

15        For all of those reasons, we think a sentence of

16   an appropriate period of home incarceration is appropriate

17   and leave the particular length and conditions in your

18   Honor's discretion.

19        That would not be letting Mr. Rodean off easy.

20   Having him be basically detained in his own home under those

21   conditions is going to have the absolute -- it's going to

22   have negative psychological effects on him because it'll put

23   him back in pandemic conditions.  It'll ruin his dog-walking

24   business that has been such a benefit to him and he spent so

25   much time building up.  It's not letting him off the hook

1    easy, I suggest.

2              And that's what we ask the Court to consider.

3              THE COURT:  Thank you, Mr. Burnham.

4              MR. BURNHAM:  Thank you, your Honor.

5              THE COURT:  You had a family member who wanted to

6    speak briefly?

7              MR. BURNHAM:  Yes.  Kimberly Rodean, his sister.

8    I told her she can speak from the bar.

9              THE COURT:  No.  She needs to come up here so we

10   can have the microphone.

11             MS. KIMBERLY RODEAN:  I'm Kimberly Rodean.

12             So a lot of what I already was going to say has

13   already been covered.

14             But I just want to reiterate that Nick has an

15   extremely strong support system with our family.  We love

16   him very much.  And I really think that putting him in

17   prison would be detrimental to the progress that he's made.

18             He's in a much better mental space than he was in

19   January of 2021.  He has social activities again.  He has a

20   booming dog business.  We go to see him multiple times a

21   week.  He's in a much better place.

22             One of the conditions in me speaking up here today

23   was he shook my hand and looked me in the eyes and solemnly

24   swore to me he would never do anything to get in trouble

25   with the law again.

1          For the rule-following, it wasn't a set rule that

2     we had said that he couldn't go to January 6th.  It was that

3     we suggested that he not go because we felt that it would be

4     physically dangerous to him.  We never imagined that

5     something like this could happen.

6          I know that he never went down there with the

7     intention of an insurrection or anything like that.  When he

8     said that he was down there to stop the steal, he meant the

9     literal name of the rally was the Stop the Steal Rally.

10          I think that there are other options that have

11     already been laid out that would be more -- not beneficial,

12     but would ensure that there's both deterrence, which we're

13     deeply invested in as well, making sure this never happens

14     again, or I'm afraid that prison would not have that outcome

15     for him.  Autistic people really don't fare well in prison.

16          We will be hypervigilant.  We know the warning

17     signs now and we know what to not let happen and how to

18     protect him and make sure that he's in a better space and

19     he's going to be making the right decisions and have

20     healthier hobbies and outlets and be engaged and involved

21     and busy.

22          And that's pretty much all I have to say, your

23     Honor.

24          THE COURT:  Thank you, ma'am.

25          MS. KIMBERLY RODEAN:  Thank you.

1          THE COURT:  Mr. Rodean, you have the right to make

2     a statement or present any information to mitigate the

3     sentence.  Would you like to say anything that you would

4     like me to consider before imposing sentence?

5          MR. BURNHAM:  Very brief remarks, your Honor.

6          THE DEFENDANT:  So before -- like during, like --

7     like 2020, like the terrorist organizations and antifa and

8     Black Lives Matter were, like, they were destroying a lot,

9     like, a lot of, like, like, stuff, like they literally took

10    over, like, sections of the city, like they burned down a

11    courthouse.  They, like -- they -- like they destroyed --

12    destroyed a whole bunch of stuff and then, like, the -- like

13    the prosecutors were refusing to even, like --

14         MR. BURNHAM:  (Confers with the Defendant

15    privately.)

16         THE DEFENDANT:  I mean, they were destroying,

17    like -- the prosecutors weren't even, like, like, like

18    prosecuting them.

19         Like I was the -- like in the -- on the -- I

20    normally, like, have, like, an aide, like, that will, like,

21    take me places and, like, help me, like, get groceries and

22    stuff.

23         But, like, when the whole, like, COVID thing,

24    like, happened, they wouldn't, like -- like they got rid of

25    the aide because they didn't have, like, enough, like --

1   they had, like, restrictions where, like, only one person

2   per -- they didn't -- so I didn't have, like, an aide.

3          And so, like, on, like, January 6th, I took an

4   Uber down, like, down, like, to there, because, like,

5   because there was the -- like, Trump was going to -- I mean,

6   Trump spoke.  And so I went to, like -- I went to

7   Washington, D.C., like, to see Trump's rally.

8          And on, like, when I saw -- like I watched -- I

9   listened -- like I went to -- I had my cell phone, like,

10  battery was, like, really low.  So, like, I turned off my

11  cell phone to preserve the, like, battery because, like, I

12  did charge it the night before but I guess it didn't

13  actually charge.  And, like, I had to have, like, off of --

14  like most of the time because I mean, it had some things

15  left.  So I turned -- I mean, I used it for the Uber --

16  actually, my sister paid for the Uber.

17         But there was some -- but so on, like -- so I

18  listened to Trump's whole, like, speech.  Like, some people

19  were leaving early.  I had no idea because, like, my cell

20  phone was off.  And, like, I just -- I listened to, like,

21  the whole speech.

22         And, like, so then, like, so then I went to the

23  Capitol because, like, I was, like, at the end of this,

24  like, speech, like, to go to the Capitol.  So I went to the,

25  like -- so I went to the Capitol and, like, at some point

1   during, like, when I was getting closer, like, somebody said

2   that, like, we breached, like, the Capitol, like -- but I,

3   like -- but I mean, like, I just kept following people to

4   the Capitol because, like, that's the -- like because that's

5   where everybody was going.

6           And, like, then, like, there was a whole bunch of

7   people, like, up on the thing, like.  There was, like, the

8   thing above the, like -- I guess, like, where the

9   inauguration would have -- like where inauguration, like,

10  happened, like that balcony, I think.  There was a whole

11  bunch of people, like, there.  And so people were, like,

12  were in the Capitol.  So I saw that's where people were

13  going.

14          And so I, like -- and so I didn't, like, actually

15  see the door, like there was so many, like, people, like I

16  didn't, like, realize there was, like, a door, like, really

17  close to, like, the window.  But like someone, like --

18          MR. BURNHAM:  Can I have a brief moment to confer,

19  your Honor?

20          THE COURT:  You may.

21          MR. BURNHAM:  (Confers with the Defendant

22  privately.)

23          THE DEFENDANT:  I mean, I'm just talking.

24          So, like, some, like -- like -- so, like, they,

25  like -- so in a certain sense everyone was, like, going.

1          Like, I was just, like -- so, like, someone, like,

2     handed me, like, the thing and, like, I, like -- I was only,

3     like, hitting the glass where it was physically, like,

4     already, like, broken, like, so I can get in, so I could,

5     like, be there because everyone else was going, like, in.

6          And I am sorry about, like -- I am sorry about,

7     like, breaking the window.  I realize now it was wrong, but

8     I was, like -- I was just following, like, everyone else.

9     And, like, that's where everyone else was going.

10         But I am really sorry about, like, breaking the

11    window.  And so I -- so, like, I am also sorry, like, really

12    sorry about, like, any -- like all the, like, other, like,

13    crimes that I did.  I didn't -- I was, like -- I am really

14    sorry about breaking the window.  I am really sorry about,

15    like -- I am really sorry about all the, like -- I am really

16    sorry about all the crimes that I did.

17         I wasn't, like, trying to commit a crime.  I was

18    just following everyone else into, like, the Capitol.

19         Like, and then, like, I followed everyone else and

20    then, like, I went to the, like, the front of the, like -- I

21    went to the front where people were, like -- I followed them

22    on.  And then I managed to get into the front because I

23    wanted to, like, to see what was, like, happening.

24         And, like, anytime I said "Stop the Steal," like,

25    everyone else was, like, chanting "Stop the Steal."  I was,

1    like -- I was saying all the different, like, chants that,

2    like, everyone else was, because everyone else was chanting.

3    So I was also, like, chanting like everyone else was

4    chanting, because that's what, like, everyone else was

5    chanting.

6          I am really sorry about any crimes.  I am sorry.

7          THE COURT:  Mr. Rodean, are you going to do

8    something like this again?

9          THE DEFENDANT:  No.

10          THE COURT:  You may sit down, sir.

11          I've assessed the particular facts of this case in

12    light of the relevant 3553(a) factors.  And I now want to

13    provide remarks for the record and for you, Mr. Rodean,

14    about my considerations in regard to the nature of the

15    offense and your history and characteristics.

16          Mr. Rodean, what happened on January 6th, 2021,

17    hurt our nation and it continues to hurt our nation.  The

18    U.S. Capitol Building was overtaken by a mob.  Hundreds of

19    officers were injured.  The peaceful transfer of

20    presidential authority was threatened.  And significant

21    physical damage was done to that historic and special

22    building.

23          You are in no way responsible for all of the bad

24    things that were done on that day, but you did break two

25    Capitol windows.  You proceeded to climb into the Capitol

1    Building without authority.  You took a hatchet into the

2    Capitol.  You participated in a mob of rioters that

3    confronted police officers in the building and you didn't

4    leave when officers told all of you to do so.

5              These are serious offenses.  And I do believe you

6    knew that you shouldn't be doing those things.

7              Having said that, I realize that your mental

8    health challenges made you particularly susceptible to

9    acting the way you did on that day.

10             The COVID pandemic had deprived you of the support

11   you typically have and greatly added to your instability.

12   Multiple family members and friends report that you have a

13   longstanding fascination with our presidents and that you

14   developed a special respect for President Trump.

15             Given all that you'd been reading about the 2020

16   election and then what you heard at the Stop the Steal

17   Rally, it was perhaps understandable that you were triggered

18   as you were, especially when you were surrounded by

19   thousands of other Trump supporters.

20             Several letters submitted on your behalf speak to

21   your susceptibility to direction from others.  And it

22   appears that you began breaking the windows after someone

23   else handed you a hard object who had been himself trying to

24   break into the windows.

25             I note Dr. Bos discussed your tendency to

1    hyperfixation and that you seem unable rather than unwilling

2    to shift your perspective on certain things, including

3    politics.

4            And I note that you have diagnosed issues with

5    loud noises and that by all accounts the atmosphere at the

6    Capitol on January 6th was extremely loud and volatile.  I

7    think this also was responsible for triggering you to act as

8    you did.

9            In short, I believe your Asperger's syndrome was a

10   major factor in your conduct on January 6th and

11   significantly mitigates the blameworthiness of your conduct.

12           I am buttressed in that view by my own

13   observations of you both in the number of hearings we've had

14   pretrial, during trial and now.  It's apparent to me that

15   you suffer significant difficulties that most people don't

16   suffer and that I think have to be taken into account when

17   determining your appropriate sentence here.

18           Your actions on January 6th were also a complete

19   aberration for you.  There are numerous letters submitted on

20   your behalf that describe you as a gentle, law-abiding

21   person.  They also explain how you've had to overcome many

22   challenges, including the teasing and ridicule of others,

23   because of your autism.

24           I've also taken into account your pretrial

25   compliance.  As your attorney has noted, you've had

1    excellent compliance while on pretrial release.

2              And I do appreciate your statements of remorse

3    now.  I credit your apology, and I think your sentence would

4    be more severe if you did not show the remorse that you show

5    now.  And I think there's a real recognition of the harm

6    that you've helped cause.

7              Ultimately, I believe the unique factors of this

8    case and in particular your Asperger's diagnosis justify a

9    noncustodial sentence here.

10             For all these reasons, I'm varying downward to

11   Zone B of the sentencing guidelines for an eight- to

12   14-month guideline range that is probation eligible.

13             I will note for the record I think Mr. Burnham had

14   suggested that a guidelines departure would be appropriate.

15   I disagree with him on that, but I do think a downward

16   variance is appropriate.

17             I've considered the unwarranted sentencing

18   disparities of both parties and frankly the concern of

19   creating unwarranted sentence disparity.  Ultimately, I

20   think this case stands apart.  We have very few similar

21   destruction-of-property cases.  The parties have only

22   pointed to one.  It seems like there was perhaps some unique

23   circumstances going on in that case.  Regardless, I think

24   the *Ehmke* case there is very different in probably both

25   directions from this one.  But I think Mr. Rodean's

1    Asperger's makes this case different from any other case

2    that I have certainly faced and certainly the mine run of

3    cases that we'd have to consider.

4           Rather than locking you up, sir, I intend to put

5    you on home detention.  While you're on home detention, I am

6    going to be limiting your internet use to no more than 30

7    minutes each day.  I'm also going to be imposing limitations

8    on your internet use during your period of probation.  I'm

9    doing that based in part on the recommendation of Dr. Bos

10   and frankly the suggestion of your attorney and in light of

11   the significant evidence that your actions on January 6th

12   were triggered by your fixation on politics.

13          I think it's healthy for all American citizens to

14   be informed about politics and what's going on in the world

15   around them.  The letters submitted on your behalf state

16   that you've memorized the presidents and vice-presidents and

17   notable features about each of them.  I think that's

18   wonderful.  It's also important for those around you and for

19   you that you have a better balance in your life than it

20   seems you had certainly in the months leading up to

21   January 6th.

22          Sir, I'm giving you a real break here.  I don't do

23   this often.  I'm doing that primarily because of the impact

24   Asperger's has had on your actions on January 6th and

25   because the evidence your attorney has submitted would

1    suggest that prison would be uniquely different for someone

2    in your situation.

3          I'm also giving you a chance because you have no

4    criminal history and what you did on January 6th was

5    completely out of character for you.

6          Please understand that this is your only chance,

7    though.  You need to rely on your friends and family to help

8    you follow the law in the future.  If you get in trouble

9    again, you should assume that I will lock you up.  I don't

10   want to do that.  But you need to make sure that you never

11   do anything like this again.

12         I will now impose the sentence.  It is the

13   judgment of the Court that you, Nicholas Rodean, are hereby

14   sentenced to serve a term of five years' probation on each

15   count, all counts to run concurrently.

16         You must also pay a $205 special assessment.

17         And while on probation, you must abide by the

18   following mandatory conditions:  You must not commit another

19   federal, state or local offense; you must not possess or use

20   any controlled substance.  I'm waiving any requirement for

21   drug testing.

22         You must cooperate in the collection of DNA.  You

23   must abide by the standard -- the recommended standard

24   conditions of release found in guideline 5D1.3(c).

25         You shall also comply with the following special

1    conditions:

2              First, you will be monitored by the form of

3    location monitoring technology indicated herein for a period

4    of 240 days, and you must follow the rules and regulations

5    of the location monitoring program.  The cost of the program

6    is waived.  Location monitoring technology at the discretion

7    of the probation officer may include radiofrequency

8    monitoring, GPS monitoring, including hybrid GPS, SMARTlink

9    or voice recognition.

10             This form of location monitoring will be used to

11   monitor the following restrictions on your movement in the

12   community:

13             You're restricted to your residence at all times

14   during those 240 days except for employment, education,

15   religious services, medical, substance abuse or mental

16   health treatment, attorneys' visits, court appearances,

17   court-ordered obligations or other activities as

18   pre-approved by the probation officer.  In short, I am

19   putting you on home detention for 240 days.

20             While you are on home detection, you will be

21   limited to 30 minutes of internet use per day; and after

22   home detention, you will be limited to one hour of internet

23   use per day while you're on probation.

24             To ensure compliance with this condition, you must

25   allow the probation officer to conduct initial and periodic

1    unannounced searches of any computers as defined in 18 USC

2    1030(e)(1), which are subject to computer monitoring.

3              You must allow the probation officer to install

4    computer-monitoring software on any computer.  This includes

5    desktops, laptops, mobile devices, smart watches, gaming

6    devices, private servers or any other high-speed

7    data-processing device performing logical, arithmetic or

8    storage functions.

9              These searches shall be conducted to determine

10   whether the computer contains any prohibited data prior to

11   installation of the monitoring software, whether the

12   monitoring software is functioning effectively after its

13   installation and whether there have been attempts to

14   circumvent the monitoring software after its installation.

15             You must warn any other people who use these

16   computers that the computers may be subject to searches

17   pursuant to this condition.

18             A probation officer may conduct a search pursuant

19   to this condition only when reasonable suspicion exists that

20   there's a violation of a condition of supervision and that

21   the computer or device contains evidence of this violation.

22   Any search will be conducted at a reasonable time and in a

23   reasonable manner.

24             You must participate in a mental health treatment

25   program and follow the rules and regulations of that

1    program.  The probation officer in consultation with the

2    treatment provider will supervise your participation in the

3    program.

4         You must pay the financial penalty in accordance

5    with the schedule-of-payment sheet of the judgment.  You

6    must also notify the Court of any changes in economic

7    circumstances that might affect the ability -- your ability

8    to pay this financial penalty.

9         Having assessed your ability to pay, a payment of

10   total criminal monetary penalties is due as follows:

11   payment in monthly installments of no less than $40 a month

12   over the course of your probation.  You must provide the

13   probation officer access to any requested financial

14   information and authorize the release of any financial

15   information.  The probation office may share financial

16   information with the United States Attorney's Office.

17        You must not incur new credit charges or open

18   additional lines of credit without the approval of the

19   probation officer.

20        The Court finds that you do not have the ability

21   to pay a fine, and therefore waives imposition of a fine in

22   this case.

23        You are ordered to make restitution to the

24   Architect of the Capitol in the amount of $2,048.

25   Restitution payments shall be made to the Clerk of the Court

1    for the U.S. District Court for the District of Columbia for

2    disbursement to the Architect of the Capitol, Office of the

3    Chief Financial Officer.

4           The $205 special assessment is immediately payable

5    to the Clerk of the Court for the U.S. District Court for

6    the District of Columbia.

7           Within 30 days of any change of address, you shall

8    notify the Clerk of the Court of the change until such time

9    as the financial obligation is paid in full.

10          The probation office shall release the presentence

11   investigation report to all appropriate agencies, which

12   includes the United States Probation Office in the approved

13   district of residence, in order to execute the sentence of

14   the Court.

15          Treatment agencies shall return the presentence

16   report to the probation office upon the Defendant's

17   completion or termination from treatment.

18          Pursuant to 18 USC 3742, you have the right to

19   appeal the sentence imposed by this Court if the period of

20   imprisonment is longer than the statutory maximum.  If you

21   choose to appeal, you must file any appeal within 14 days

22   after the Court enters judgment.

23          As defined in 28 USC 2255, you also have the right

24   to challenge the conviction entered or sentence imposed if

25   new and currently unavailable information becomes available

1    to you or on a claim that you received ineffective

2    assistance of counsel in your trial or in connection with

3    sentencing.

4            If you are unable to afford the cost of an appeal,

5    you may request permission from the Court to file an appeal

6    without cost to you.

7            Pursuant to *United States versus Hunter*, 809 F.3d

8    677 from the D.C. Circuit in 2016, are there any objections

9    to the sentence imposed that are not already noted on the

10   record?  Ms. Cho?

11           MS. CHO:  No.  Thank you, your Honor.

12           THE COURT:  And Mr. Burnham?

13           MR. BURNHAM:  No, your Honor.

14           Can I ask one clarifying question?

15           THE COURT:  Yes.

16           MR. BURNHAM:  We greatly appreciate the condition

17   that he can leave his house for employment.  He's a dog

18   walker.  Perhaps to avoid any problems, would your Honor be

19   willing to give him a radius of something around his house

20   that he can go to walk dogs?

21           THE COURT:  I want you to talk about that with the

22   probation office and talk with them on the first instance.

23   If you all can't figure something out, you can come back to

24   me.

25           I would like to schedule a progress hearing in

1    about two months.

2              How about 10:00 a.m. on December 22nd?  Ms. Cho,

3    you're not based here.  Right?

4              MS. CHO:  That's correct.  But that day works for

5    me.

6              THE COURT:  Mr. Burnham, does that day work for

7    the defense?

8              MR. BURNHAM:  It works for me.  I'm looking to the

9    gallery.  It's okay with them.

10              THE COURT:  We'll set this for a progress hearing

11   on December 22nd here in Courtroom 2 at 10:00 a.m.

12              Ms. Cho, anything further from the Government?

13              MS. CHO:  No, your Honor.

14              THE COURT:  Mr. Burnham?

15              MR. BURNHAM:  No, your Honor.

16              THE COURT:  Thanks, folks.

17              (Proceedings concluded.)

18

19

20

21

22

23

24

25

1                              **CERTIFICATE**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4        certify that the foregoing constitutes a true and accurate

5        transcript of my stenographic notes, and is a full, true,

6        and complete transcript of the proceedings produced to the

7        best of my ability.

8

9

10                   Dated this 5th day of December, 2022.

11

12              /s/ Lisa Edwards, RDR, CRR
                Official Court Reporter
13              United States District Court for the
                  District of Columbia
14              333 Constitution Avenue, Northwest
                Washington, D.C. 20001
15              (202) 354-3269

16

17

18

19

20

21

22

23

24

25